UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------------- X
DERRICK HARRIS,

*Plaintiff*,

-against-

THE CITY OF NEW YORK; P.O. SERGEANT ELIEZER PABON (Shield
No. 14623); P.O. DANIELLE HANKERSON (Shield No. 23415); P.O.
SUTHOM UNGCHAROEN (Shield No. 26224); NEW YORK COUNTY
DISTRICT ATTORNEY'S OFFICE; NEW YORK COUNTY DISTRICT
ATTORNEY CYRUS VANCE, JR).; NEW YORK COUNTY ADA
CAROLINA HOLDERNESS; ADA "JOHN/JANE DOES" 1-5; P.O.
and/or CAPTAIN and/or SERGEANT "JOHN DOES" 1-10; C.O.
"JOHN DOES" 1 -10; and, PSYCHIATRIST "JANE DOE"; (the name
"John Doe" and/or "Jane Doe" being fictitious as the true names are presently
unknown, individually and in their official capacity as New York City
Assistant District Attorneys, New York City Police Officers, New York City
Correction Officers and New York City Mental Health Professionals);

*Defendants*.
------------------------------------------------------------------------------------------- X

**VERIFIED
COMPLAINT**

**JURY TRIAL
DEMANDED**

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiff **DERRICK HARRIS** represented by

**NAPOLI SHKOLNIK, PLLC** and **BEN CRUMP LAW** seeks relief for Defendants'

violation of his rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 42

U.S.C. § 1988, and of rights secured by the relevant Amendments to the United States

Constitution (specifically, but not limited to: First, Fourth and Fourteenth), Due Process

Clause and of rights secured under the laws and Constitution of the State of New York.

2.     The level of care provided to Mr. Harris at all stages of the judicial process both within

and outside of prison walls, was grossly deficient.

3.     Plaintiff seeks damages, compensatory and punitive, affirmative and equitable relief, an

award of costs, interest and attorney's fees, and such other and further relief as this Court

1

deems equitable and just.

4.      Plaintiff was unjustly and falsely arrested and maliciously and falsely charged with criminal offenses and otherwise subjected to an excessive and unreasonable custodial detention and all association therewith.

5.      Throughout the near decade of torment, the defendants were presented with opportunity after opportunity to change course and "right this wrong".  Time and time again, when faced with the choice to do the right thing, the defendants relentlessly chose to continue down the wrong path.

6.      This case seeks justice for Mr. Harris for the unnecessary suffering he endured due to Defendants' acts and omissions.[1]

## JURISDICTION AND VENUE

7.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 and § 1331, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

8.      Jurisdiction is also invoked herein pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

9.      Plaintiff respectfully requests that this Court exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any state court causes of action that arise from a common nucleus of operative facts that give rise to the federally based causes of action pleaded herein, and as against all parties that are so related to claims in this action within the original jurisdiction of this court that are formed as part of the same case or controversy.

10.     Venue herein is proper for the United States District Court for the Southern District of

---

[1] Omissions are actionable as false statements and there is no reason to distinguish omissions of material fact from affirmative misstatements because both threaten the integrity of the judicial process by injecting it with falsity provided by the officers of the state whose official status gives the misinformation of a special aura of reliability.

New York pursuant to 28 U.S.C. § 1391 (a), (b) and (c).

## JURY DEMAND

11. Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed.

    R. Civ. P. 38(b).

12. Upon information and belief and within the time prescribed by law, a sworn Notice of

    Claim stating, among other things, the time when and the place where the injuries and

    damages were sustained, together with Plaintiff's demands for adjustment thereof was

    duly served on Plaintiff's behalf on the Comptroller of Defendant **THE CITY OF NEW**

    **YORK** and that, thereafter, said Comptroller for Defendant refused or neglected for more

    than thirty (30) days, and up to the commencement of this action, to make any adjustment

    or payment thereof, and that, thereafter, and within the time provided by law, this action

    was commenced.

13. Upon information and belief, pursuant to General Municipal Law §50(h), a hearing was

    held at the office of a designated agent on or about November 20, 2020.

## PARTIES

14. Plaintiff **DERRICK HARRIS** (hereinafter "Plaintiff" or "Mr. Harris") was in the

    custody of the New York City Department of Corrections and ("DOC") from September

    of 2011 through November of 2015.  He was primarily confined in Riker's Correctional

    Facility and Mid-South Hudson.

15. Mr. Harris is a United States Citizen and, at all times relevant to this Complaint, a

    resident of New York State.

16. Mr. Harris was arrested and prosecuted in New York County, State of New York.

17. Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein, a

municipal corporation duly incorporated and existing under and by virtue of the laws of the State of New York.

18.     Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein, a municipal entity created and authorized under the laws of the State of New York. It is authorized to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant **THE CITY OF NEW YORK** assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by New York City Police Department.

19.     Defendant **P.O. SERGEANT ELIEZER PABON (Shield No. 14623) ("P.O. PABON")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint.   Defendant **P.O. PABON** is sued in his individual and official capacities.

20.     Defendant **P.O. DANIELLE HANKERSON (Shield No. 23415) ("P.O. HANKERSON"** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint.   Defendant **P.O. HANKERSON** is sued in her individual and official capacities.

21.     Defendant **P.O. SUTHOM UNGCHAROEN (Shield No. 26224) ("P.O. UNGCHAROEN")** was, and still is, at all times relevant herein, duly appointed and

acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint.  Defendant **P.O. UNGCHAROEN** is sued in his individual and official capacities.

22.    Defendant **NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** (hereinafter "Cyrus Vance Jr." or the "New York County District Attorney") is authorized to maintain a District Attorney's Office in New York County, which acts as its agent in the area of prosecution and for which it is ultimately responsible. Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** assumes the risks incidental to the maintenance of a prosecutorial office and the employment of Assistant District Attorneys as said risk attaches to the public consumers of the services provided by New York County District Attorney's Office.

23.    Defendant **NEW YORK COUNTY ADA CAROLINA HOLDERNESS ("ADA HOLDERNESS")** was, and still is, at all times relevant herein, acting under color of state law in the course and scope of her duties and functions as officers, agents, servants, and employees of Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE,** was acting for, and on behalf of, and with the power and authority vested in her by Defendants **THE CITY OF NEW YORK AND NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** and was otherwise performing and engaging in conduct incidental to the performance of her lawful functions in the course of her duties, including but not limited to, the investigative phases.  Defendant **ADA HOLDERNESS** is sued in her individual and official capacities.

5

24.     Defendants **ADA "DOES"** were, and still are at all times relevant herein, acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant **THE CITY OF NEW YORK AND NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE,** were acting for, and on behalf of, and with the power and authority vested in them by Defendants **THE CITY OF NEW YORK AND NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties, including but not limited to in the investigative phases. [2]

25.     Defendants **P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** were, and still are, at all times relevant herein, acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant **THE CITY OF NEW YORK,** were acting for, and on behalf of, and with the power and authority vested in them by Defendants **THE CITY OF NEW YORK** and New York City Police Department and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  This includes but is not limited to, the Captain of the N.Y. Supreme Court Officers, who falsely swore to the replacement complaint. [3]

---

2 Upon information and belief, ADA CAROLINE SERINO and ADA JUNG PARK may have participated in the investigation and preparation of the manufacturing of this case against Mr. Harris.  However, this information is in the sole possession of Defendants and will be substituted, if it is determined that it is necessary to include these ADAs with the ADA "DOES" or other ADAs to be named during discovery.

3 The Officers that may or may not have directly participated in the civil rights violations and/or held pertinent supervisory roles in this case could include, but would not be limited to a "P.O. INGRAM" (P.O. Pabon's partner at the time); "P.O. LUPERON" and/or other officers, whose names, shield numbers and tax IDs are in the exclusive possession of Defendants to be substituted during discovery.

26.     Defendants **THE CITY OF NEW YORK** and New York City Department of Correction (DOC) owned, operated, managed and provided security to the premises, appurtenances and fixtures at Riker's Island and Mid-South Hudson facilities.

27.     Defendants **C.O. "JOHN DOES"** were, and still are, at all times relevant herein, acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant **THE CITY OF NEW YORK** and New York City Department of Correction (DOC)**,** were acting for, and on behalf of, and with the power and authority vested in them by Defendants **THE CITY OF NEW YORK** and New York City Department of Correction (DOC) and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

28.     Defendant **PSYCHIATRIST "JANE DOE"** was, and still is, at all times relevant herein, acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant **THE CITY OF NEW YORK,** were acting for, and on behalf of, and with the power and authority vested in them by Defendants **THE CITY OF NEW YORK** and New York City Department of Correction (DOC) and was otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

29.     At all times relevant, Defendants were "personally involved" for purposes of liability under § 1983 where they set the wheels of the constitutional depravation in motion, regardless of whether they are "directly" involved. *See,* Celestin v. City of New York, 581 F.Supp.2d 420, 429 (E.D.N.Y. 2008) ("Personal involvement may be established by a showing of direct participation, meaning 'personal participation by one

who has knowledge of the facts that rendered the conduct illegal or *indirect participation* such as *ordering* or *helping others* to do the unlawful acts.") (*emphasis added*).  This may also include instances of supervisory liability.

30.     All individual defendants, including all Defendants **"DOES"** are sued in their individual and official capacities. [4]

## STATEMENT OF FACTS

### THE UNDERLYING INCIDENTS AND THE IMMEASURABLE AMOUNT OF POLICE FAILURES

31.     Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

32.     The events which gave rise to this litigation began in the year of 2011, carried through the events which, took place in August and specifically, on September 12, 2011 and did not conclude until 2020.

33.     Mr. Harris was subjected to a continuous pattern of harassment by the Defendants, which began well before September of 2011 and specifically took place on September 12, 2011.

34.     On September 12, 2011, Mr. Harris was beaten and arrested by Defendants, the officers employed by the New York City Police Department.

35.     This targeting by Defendants continued through Mr. Harris' arrest, his prosecution, the egregious unconstitutional conditions of confinement, through the partial disposition of his criminal case more than four (4) years later when he was acquitted of some charges,

---

4 The true names and identifying information are in the sole possession of Defendants and should be provided by Defendant **CITY OF NEW YORK** at the earliest possible moment of litigation.  The 2nd Circuit has held that parties who are ignorant in whole or in part, of the name or identity of a person who may properly be made a party may proceed against him as an unknown party and "later make John Doe substitutions *nunc pro tunc*".  *See,* Hogan v. Fischer, 738 F.3d 509, 518 (2d Cir. 2013).

and concluded ultimately eight (8) years later when the District Attorney's office opted not to retry the case when it was finally dismissed on or about January 21, 2020.

36.    At all times relevant to this complaint, Mr. Harris owned and resided in a beautiful Brownstone, located on 12 West 120th Street in the Harlem neighborhood of New York.

37.    Upon information and belief, Mr. Harris was a successful self-employed music producer (with famous musicians as clients, including but not limited to Wu-Tang Clan, Alicia Keys and Busta Rhymes, etc) with no prior convictions or time in prison until this timeframe.

38.    Mr. Harris was unlawfully and improperly arrested on several occasions beginning in the year 2011 including but not limited to, on or about August 3, 2011 and September 12, 2011. [5]

39.    On September 12, 2011, at approximately 2:30pm, Mr. Harris was enjoying a glass of wine on the steps outside of his home when a woman approached.

40.    Mr. Harris recognized this woman as Ms. Aisha Mitchell.  They were friendly and spoke from time to time since meeting approximately 5-6 years prior.  They had their respective cell phone numbers and knew each other by name.

41.    After Ms. Mitchell and Mr. Harris exchanged greetings, Ms. Mitchell asked Mr. Harris for a glass of wine.  Mr. Harris invited her in and poured her a glass and they smoked a bit of marijuana together.

42.    After a little over an hour, Ms. Mitchell went to the bathroom, removed her clothing, walked out onto Mr. Harris' balcony and began to yell to the people outside in the neighborhood.

---

[5] On August 3, 2011, Mr. Harris was arrested for an alleged misdemeanor incident, which was unlawfully kept open for over 8 years even though, it should have been automatically dismissed years ago.  At the end, it was dismissed in its entirety.

43.     Shocked and appalled, Mr. Harris insisted Ms. Mitchell leave his home immediately.

44.     Mr. Harris assumed that this charade by Ms. Mitchell was perhaps done as an attempt to
        begin an extortion against him and so, he called to report this incident and his suspicions
        to his cousins, who are both NYPD officers employed by Defendants.   His cousins
        advised him to lock his door and remain in his home.   He reasonably relied on this
        advice.

45.     Later that afternoon at approximately 4:00pm, the arresting officer, Defendant **P.O.
        PABON** and several other police officers, including **P.O. "DOES"** broke down the door
        to Mr. Harris' brownstone, entered Mr. Harris' home and proceeded to beat, assault, and
        batter Mr. Harris thereby effectuating an unnecessarily violent arrest. [6]

46.     Upon information and belief, the arrest was warrantless and devoid of any exigent
        circumstances.

47.     At the time the arrest was made, there was no ongoing emergency upon arrival.

48.     Mr. Harris was punched, pushed and slammed to the ground.   His arms were wrenched
        behind his back and handcuffed without any explanation or de-escalation.

49.     Upon information and belief, at no point in time did Mr. Harris resist arrest.

50.     While bleeding and in pain, in his own home handcuffed, helpless and defenseless,
        Defendants then, strangely asked Plaintiff for his name as they rambunctiously stomped
        throughout all five (5) floors of his home in an unlawful, unorganized and unprofessional
        manner.

51.     Upon information and belief and during this warrantless arrest, Defendant **P.O.
        HANKERSON** arrived and mentioned that there was an assault of a woman reported

---

6 Upon information and belief and notably at trial, P.O. PABON testified that the door was ajar when they arrived
despite the Plaintiff and other witnesses for the People testifying that in fact, the hinges were broken by the police
officers.

earlier that day at the park across the street from Mr. Harris' residence.  The "woman from the park" then used an all-too-commonly used description (a description, which has been manipulated over time to demonize men of color in the community and has consistently haunted and criminalized black men throughout history) by reporting to **P.O. HANKERSON** that though she was not able to provide any identifying characteristics of her assailant, she could confirm (albeit, stereotypically), that it was a "tall black man."

52.     Defendant **P.O. PABON** seized on this information to manipulate this sound bite as a way to falsely and deceptively trump up the sexual assault charges against Mr. Harris.

53.     As such, the charges against Mr. Harris were then altered to include the totally unrelated assault incident, which allegedly occurred in the park.

54.     Upon information and belief, rather than using the "woman from the park's" foggy description, **P.O. PABON** falsely reported that the "woman from the park" had positively identified Mr. Harris when of course, this was not even remotely true.

55.     This choice by **P.O. PABON** to falsely swear that the "woman from the park" positively identified Mr. Harris, was made maliciously and intentionally.

56.     Upon information and belief, Mr. Harris' home was searched without any valid reason or provocation.

57.     On or about September 12, 2011, Defendant **P.O. PABON** signed a warrant application to employ a further search of Mr. Harris' home for evidence in the alleged sexual assault case.

58.     Upon information and belief, this search warrant falsely swears that the reasonable cause to search Mr. Harris' home was based, in part, on a lie, that **P.O. PABON** had a conversation with Mr. Harris in his home, however there were no conversations by and

11

between **P.O. PABON** and the Plaintiff.  Thus, Plaintiff's right to be free from self-incrimination was violated on many levels. [7]

59.   This search warrant falsely swears to the existence of "blood, semen" found in the home, and upon information and belief, not one scintilla of this alleged evidence was ever observed, found, located or retrieved from Mr. Harris' home.  This alleged evidence did not exist.

60.   Upon information and belief, Mr. Harris was taken directly to the 28th Precinct (and not directly to the hospital in violation of police practices and procedures pursuant to the NYPD Patrol Guide wherein the officer is required to remove an injured prisoner to the hospital directly from a place of arrest) where he was placed in a holding cell, bruised and in obvious physical and emotional distress.

61.   Upon information and belief, rather than transporting Mr. Harris to the Emergency Room to care for his physical injuries sustained during the arrest, Mr. Harris was transported to Bellevue Hospital to have a psychiatric evaluation because he was "refusing to speak to the police."

62.   Upon information and belief, at some point, **P.O. HANKERSON** falsely represented that she was the officer who escorted Mr. Harris to Bellevue Hospital that day.  Defendant **HANKERSON** swore that Mr. Harris made crude comments while in transport.

63.   Upon information and belief, **P.O. HANKERSON** was not the escort.  There were no such comments made by Mr. Harris.

---

7 Upon information and belief, later in the pretrial hearing, P.O. PABON testified that he had no idea that his warrant contained false statements and blamed it on his assistants.

64.    Mr. Harris was never read his Miranda rights, nor was he afforded the right to remain silent.  Not only was he deprived of his right to remain silent; he was retaliated against and brought to the psychiatric hospital as punishment for his silence.

65.    Upon information and belief and for the record, the psychiatrist correctly and obviously diagnosed him with "no psychosis."

66.    Upon information and belief, Mr. Harris was not transported to Central Booking until approximately 3:00am where he was fingerprinted, processed, photographed and taken to see the Judge the following day.

67.    It was not until the arraignment when he learned of his formal charges of sexual assault and related charges, and Mr. Harris' right to testify in the Grand Jury proceedings was denied.

68.    Upon information and belief, following bail being set, Mr. Harris was directed to remain in the courtroom while his family was attempting to secure his bail and private counsel.

69.    After Mr. Harris was informed by the officers in the courtroom that his family posted bail, **CAPTAIN "DOE"** was directed to escort him out of the building.

70.    Defendant **CAPTAIN "DOE"** escorted Mr. Harris through multiple locked gates and doors, which were unlocked by other officers. The officers exchanged pleasantries while navigating their way through the courthouse with Mr. Harris.

71.    Upon information and belief, Mr. Harris was escorted out through the back door, which was the same door he entered.  Defendant **CAPTAIN "DOE"** and other officers were present when he exited, which was depicted on the surveillance video later produced to the Court during his criminal trial.

72.   Upon information and belief, when Mr. Harris arrived home at approximately 2:00am, he said hello to the officers, who were assigned post outside of his home (because the arresting officers had broken down his door). [8]

73.   At approximately 5:00-6:00am, Plaintiff heard **P.O. UNGCHAROEN** outside of his home, yelling and knocking on his broken front door.

74.   Upon information and belief, Mr. Harris went to the front door where **P.O. UNGCHAROEN** advised him that he was being rearrested on the charge of escaping. There were several other officers present.

75.   Mr. Harris was transported to the 28th Precinct, processed and placed in a holding cell.

76.   Mr. Harris was then transported to Central Booking until arraignment.

77.   Upon information and belief, at arraignment in the lower court, Mr. Harris was charged with escape, which was based on a falsely sworn arrest complaint and additional false allegations that Plaintiff "spit" on an officer…however, that "spitting" charge was immediately dismissed. [9]

78.   Due to this additional felony complaint, Mr. Harris was denied bail and remanded into custody.  He was transported to Riker's Island.

79.   Upon information and belief, but for the false arrest of the false claim of escape, Mr. Harris would not have been incarcerated while awaiting trial.

---

8 See, footnote # 6 *supra*.

9 Upon information and belief, **P.O. UNGCHAROEN's** *original* felony arrest complaint stated in substantive part that he was assigned to guard Mr. Harris' Brownstone as a crime scene., and that while on guard he observed Mr. Harris walk right past his patrol car and go into the front door on the ground floor of his Brownstone.  The complaint also stated that after some time, **P.O. UNGCHAROEN** got a call from his Supervising Officer and was told to be on the "look out" for Mr. Harris because he had escaped custody.  **P.O. UNGCHAROEN** then informed his Supervisor that Mr. Harris was presently inside of his Brownstone, and that is when **P.O. UNGCHAROEN** was ordered to effect an arrest of Mr. Harris.

80.    Upon information and belief, it was not until Mr. Harris arrived at Riker's Island when he learned that he was indicted on the sexual assault charges and not given the opportunity to testify at the Grand Jury proceedings.

81.    Subsequently while on Riker's Island, Mr. Harris had the opportunity to review the felony arrest complaint.  Mr. Harris recognized that **P.O. UNGCHAROEN's** *original* felony arrest complaint was superseded by a subsequent complaint drafted by the Captain of the N.Y. Supreme Court Officers (upon information and belief, Captain "Farrell", shield number, unknown). [10]

82.    Upon information and belief, the *original* complaint omitted that Mr. Harris was first observed walking past the police and entering the front door of his brownstone where he remained until he was arrested by **P.O. UNGCHAROEN**. [11]

83.    The *subsequent replacement* complaint that was allegedly presented to the grand jury, falsely stated that Mr. Harris was first observed and apprehended climbing his backyard fence as an attempt to secretly gain entry through the back of his house.

84.    Moreover, and upon information and belief, the District Attorney's Office chose to consolidate two separately filed felony arrest complaints and thus, presented only one Grand Jury, despite knowing that the lower court does not have that type of discretion.

85.    Upon information and belief, **ADA HOLDERNESS** and **ADA "DOES"** consolidated two separate felony arrest cases during each of their separate CPL 180 "proceedings upon

10 Subsequently at trial, **P.O. UNGCHAROEN** testified that he was not aware that his original arrest complaint was replaced with another one.  He falsely swore that he had never seen the replacement Complaint and that he had no idea who Captain Thomas Farrell, a commanding officer of the N.Y. Court Officers was.  He also testified that Mr. Harris did not appear that he was trying to escape.

11 It is alleged that there was a concerted effort by the Defendants to ensure that Mr. Harris had no chance at being granted liberty.

a felony complaint" and represented to the Courts that each separately opened case had their own separate indictment, when that was a lie.

86.   After the indictment, and at the Supreme Court arraignment, the Honorable Judge Bartley was so appalled when made aware of what the prosecutors had done, that he referred to the indictment as an 'exception' to the jurisdiction of the Supreme Court and lifted the remand off of Mr. Harris, granting him bail.

87.   Upon information and belief, before Mr. Harris had the opportunity to bail himself out, **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; CYRUS VANCE, JR.; ADA HOLDERNESS; and ADA "DOES"** made the choice to aggressively argue to revoke the bail order connected to the unrelated August 3, 2011 arrest.  As a result, Mr. Harris was unable to bail out of prison for this case or any other pending matter.

### THE QUINTESSENTIAL RIKER'S ISLAND EXPERIENCE AS AN INNOCENT PRE-TRIAL DETAINEE, WHICH LIVED UP TO ITS HORRIFYING REPUTATION

88.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

89.   As a result of the revocation of the bail order and upon information and belief, Plaintiff was initially transported to the West Facility on Riker's Island because of his status in the music industry.

90.   He remained at Riker's Island (and transferred within the units and buildings) for more than four (4) years pre-trial.

91.   Plaintiff was incarcerated at Riker's Island for approximately four (4) years while awaiting his criminal trial, thus, Plaintiff maintained the status as a Pre-Trial Detainee for the totality of his incarceration.

92.     During Mr. Harris' time spent on Riker's Island, Plaintiff was subjected to multiple acts
        of violence by inmates, as well as subjected to extreme and severe psychological warfare,
        excessive force and many acts of verbal abuse and violence at the hands of Defendants-
        correction officers.

93.     Mr. Harris was battered, assaulted, and physically abused for the entirety of his
        incarceration.  The officers' subsequent failures to act and failures to intervene ultimately
        increased the severity of his injuries by their refusal to intervene, their refusal to get him
        necessary medical attention, their deliberate indifference to his medical needs and denial
        of medical treatment throughout his time incarcerated while awaiting trial.

94.     Mr. Harris was mentally and emotionally abused for the duration of his incarceration by
        the Correction Officers employed by the City of New York, specifically by **C.O.
        "DOES"**.

95.     This psychological abuse included many things such as refusing to allow him to get his
        haircuts, despite having the proper vouchers to do so; spreading false defamatory rumors
        to other inmates that Mr. Harris was a bad man; refusing his requests to go to the Law
        Library; depriving him of calls and visits from his loved ones; preventing him from his
        daily exercise; never giving him the correct meals that supported his vegan diet; and
        otherwise mentally torturing him for the entirety of his time in prison awaiting trial.

96.     Mr. Harris was subjected to an excessive and unreasonable custodial detention and all
        association therewith, including but not limited to excessive time in Solitary Confinement
        (the "SHU" or the "box").

97.     Mr. Harris was ticketed with retaliatory infractions, which led to severe and unfair
        punishments (including but not limited to excessive time in solitary confinement), mostly

stemming from false allegations only to be deprived of due process, refused his requests for what should have been mandatory hearings and otherwise deprived of many of the privileges afforded to inmates awaiting trial.

98.  Despite many of the retaliatory infractions ultimately being dismissed, the disciplinary dispositions and interim punishments had already caused immeasurable damage.

99.  For instance, upon information and belief, on or about October 14, 2011 (after serving punishments for other fabricated charges) while in West Facility, **C.O. "DOE"**, (who may go by "C.O. Harris", Shield No. Unknown), called Mr. Harris out of his cell "to talk".  Plaintiff followed the orders and was taken down a hall where there was an inmate waiting for him to strike him on the back of the head.  **C.O. "DOE"** ("C.O. Harris") did not intervene or intercede, even more so, he set it up and /or looked on while it happened. This type of behavior by Correction Officers and the inability to manage this has now recently been held by Courts to be "tantamount to deliberate indifference" as reasoned by Hon. Justice April Newbauer of New York County Supreme Court. [12]

100.  Following the Defendants' endorsed 'Fight Night' behavior, the officer proceeded to escort Mr. Harris back to his cell (denying Mr. Harris much needed medical attention), and to add insult to injury, wrote him a retaliatory infraction.

101.  Upon information and belief, on or about October 19, 2011 when Plaintiff reported for the disciplinary hearing, **C.O. DOE** ("C.O. Harris") was called on the phone by the Adjudication Captain who was overseeing the hearing.  When the Captain asked C.O. "Harris" to explain the claim made by Plaintiff that he was "set up", C.O. "Harris" inexplicably hung up on the Adjudication Captain.  Upon information and belief, the bogus infraction was soon dismissed.  However, the punishment for the infraction had

---

[12] https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html

already begun and Plaintiff was inexcusably suffering in solitary confinement from the date of the infraction through the date of the hearing.

102.   Upon information and belief, despite several refusals for a psychiatrist evaluation by both the Plaintiff himself and his attorneys, Defendant-**PSYCHIATRIST "DOE"** at Riker's, met with Plaintiff outside of the presence of his attorney, wherein Defendant alleged that though Plaintiff was speaking "incoherently", he nevertheless "confessed" to the underlying crime.

103.   As a result of this Defendant's choice to lie about a confession that never happened, Mr. Harris was transferred to the Mental Health Observation Unit where he was further assaulted, beaten and abused by the Correction Officers and by inmates without proper intervention.

104.   Upon information and belief, on or about February 9, 2012, Mr. Harris was the victim of another "set up" by the correction officers.

105.   Markedly, it was during one of these many assaults in the day room of Riker's Island where the officers **C.O. "DOES"** (without warning), indiscriminately and gratuitously sprayed Mr. Harris with a chemical agent, (potentially MK9) and handcuffed Plaintiff leaving him unattended to for over 5-6 hours.  The handcuffs were too tight, Mr. Harris pleaded and asked for the handcuffs to be loosened, and the officers ignored and/or denied all of Mr. Harris' requests and pleas.  As a result, Mr. Harris' thumb/wrist was broken necessitating him to be in a cast up to his elbow for over eight (8) months.   To date, he still has restricted range of motion in his thumb as well as intermittent pain.

106.   During the time he was in a cast for the broken thumb/wrist, Mr. Harris' family member visited.  The officer **C.O. "DOE"** inappropriately ordered Mr. Harris to remove his cast

so that his broken thumb/wrist could be handcuffed.  As a result, Mr. Harris was in excruciating pain.  In response to Mr. Harris explaining he was in pain, the officer punched Mr. Harris in the face after he was handcuffed.  Upon information and belief, the retaliatory infraction that stemmed from this incident was subsequently dismissed.

107.  Mr. Harris was later transferred to Mid-Hudson Psychiatric Hospital due to challenging and requesting a hearing to investigate the false confession that was concocted by **PSYCHIATRIST "DOE"**.  The request for the hearing was denied and Mr. Harris was transferred.

108.  Another example of abuse occurred while being housed in Mid-Hudson, Mr. Harris suffered a fractured skull from an inmate who was known to be a dangerous inmate and required to be escorted by guards at all times.  With knowledge that the dangerous inmate was in the bathroom, and that it was not only foreseeable, but probable that whomever went into the bathroom would be attacked, the **C.O. "DOES"**, (including a "C.O. Johnson"), ordered Mr. Harris to go into the bathroom.  As expected, the dangerous inmate lunged at Mr. Harris.  Mr. Harris was beaten, the blows which knocked out two (2) teeth in his mouth and resulted in a fractured skull and fractured orbital bone.

109.  Mr. Harris was eventually transported to Orange Regional Hospital where the doctors directed him to a trauma center and transferred him to Westchester Medical Center for emergency surgery.  The **C.O. "DOES"** escorts from Mid-Hudson refused to permit the necessary surgery.  With deliberate indifference, Mr. Harris was prevented from surgery and from follow-up visits to the doctor, which was contrary to the medical diagnoses and treatment plan.

110.    Additionally, while housed in Manhattan Correctional Center, Mr. Harris was in the law library when the officers specifically chose that moment to insist that Mr. Harris report to the clinic.  Mr. Harris did not want to go to the clinic as he was working fastidiously on his criminal case (and did not know when he would be given the opportunity to return to the law library considering the pattern of the officers refusing his requests in the past). Upon information and belief, Defendants proceeded to improperly and unlawfully issue him an infraction for refusing to seek medical treatment.

111.    Upon information and belief, Mr. Harris had previously and explicitly grieved/complained about **C.O. "DOE"** who may go by "C.O. Johnson" (full name and Shield No. Unknown), however none of those complaints were taken under advisement or acted upon by the other officers/supervisors.

112.    Upon information and belief, and as a result of this violent and gruesome attack detailed *supra*, compounded with the many other beatings and attacks while in custody, Mr. Harris suffered a traumatic brain injury, which is permanent in nature and has caused short term memory issues and basic comprehension and mapping issues with reading and writing as well as many other consequences.

### THE TRIAL OF 2015 AND THE REVELATION OF THE OVERWHELMING MOUNTAIN OF EXCULPATORY EVIDENCE

113.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

114.    Upon information and belief, Defendants engaged in the destruction and falsification of evidence throughout the entirety of Mr. Harris' arrest, investigation, preparation for trial and throughout the course of the trial proceedings and reinvestigation following the mistrial.

21

115.   The arrest, prosecution and all proceedings stemming from the arrest is believed to be motivated by retaliation and bad faith, with the attempt to do harm to Mr. Harris.

116.   The arrest of Mr. Harris was for a purpose other than the intent to prosecute Mr. Harris.

117.   The defendants intentionally withheld from disclosing materials and crucial elements of the offense that Mr. Harris was alleged to have committed.

118.   For example, this withholding of materials caused the prosecution team to represent to the court that the accusatory instruments were sufficient.

119.   The police officers swore to an accusatory instrument that contained false information and withheld material facts from the trial attorneys.

120.   The sexual assault complaint falsely stated and was sworn to by **P.O. PABON** that **P.O. PABON** was informed by **P.O. HANKERSON** that Mr. Harris was observed assaulting a second woman in front of his house ("the woman from the park").

121.   After failing to intercede and/or intervene throughout the entire investigatory phase of this arrest, whereby permitting false reporting and deceptive practices by her fellow officers, **P.O. HANKERSON** testified under oath at both the pre-trial hearings and trial that she never told **P.O. PABON** that "the woman from the park" positively identified Mr. Harris or any perpetrator, for that matter.

122.   The Grand Jury proceedings were defective and mishandled in bad faith in that there was no lawful authorization to place an unrelated alleged misdemeanor offense within an unrelated felony complaint when it is not part of any felony transaction.

123.   Upon information and belief, the **DISTRICT ATTORNEY'S OFFICE, ADA HOLDERNESS and ADA "DOES"** rushed to an indictment to satisfy CPL § 180.80, and by rushing, they violated CPL § 190.55.

124. Mr. Harris was prevented by Defendants from preparing a full and complete defense, for example, at no point did Defendants correct the misleading and false details and at no point was any superseding information provided that was sufficient.

125. Defendants' withholding of material facts deviated from standard protocol and any standard of fairness or due process.

126. The failure of Defendants to deliver all of the Rosario material constituted actual prejudice.

127. The decision of Defendants to deliver some/much of the discovery, albeit late (in some cases the week of trial) constituted actual prejudice.

128. During the course of delivering Rosario material, Plaintiff learned that a wine glass was taken from his home in order to be tested for fingerprints.

129. Upon information and belief, Defendants represented that (for some unknown reason), this wine glass was never tested.  Upon information and belief, this material misstatement of fact constituted actual prejudice and, as a result of this lie (omitting exculpatory evidence), Plaintiff was forced to test the glass himself (for approximately $400-$500) only to learn that it had in fact already been tested and that none of the fingerprints were his.

130. Upon information and belief, the Defendants falsely stated on the record in open court that the wine glass was not tested.

131. The Defendants put forth many witnesses, relying solely on information provided to them with no further inquiry, when a reasonable person in their position would have done so. For example, the alleged victim (Ms. Mitchell) from the sexual assault case testified under oath at trial that she did not know Mr. Harris prior to that day.  That was an

obvious lie, which prior to trial, Mr. Harris told Defendants on multiple occasions throughout the investigation and while preparing for trial. There were multiple opportunities for both the police and the prosecution throughout many years, to make a further inquiry. However, at no point did any of the Defendants choose to do so. [13]

132. Upon information and belief and sometime in July of 2015, immediately before trial, the Defendants from the **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** exchanged the New York City Medical Examiner's Report.

133. Dr. Kamnik, for the City of New York (the Department of Health and Mental Hygiene), was called as a witness as part of the People's case in chief and testified under oath that out of all of the DNA profiles which were obtained in the case, Derrick Harris was excluded as a source.

134. Pursuant to Ms. Mitchell's claims, which led to Mr. Harris' top charge in the indictment, the following "sexual offense evidence" was collected as part of Ms. Mitchell's Rape Kit.

135. The Rape Kit contained the following: oral swabs and smear, a buccal specimen (which is a swab of the inside of Ms. Mitchell's mouth/cheek), dried secretions from her neck, inner thighs, perianal, and smear, vulva swabs and smear and vaginal swabs and smear.

136. Contrary to Ms. Mitchell's claims to the Defendants, Dr. Kamnik testified under oath that "no semen was found on the blue jeans, blue T-shirt or brown shirt and no blood was found on the blue jeans or the blue T-shirt."

137. Upon information and belief, Dr. Kamnik also testified that no DNA and no saliva was found on any of the alleged victim's tested clothes. All of this was known to the

[13] The Plaintiff was forced to call a witness, Tammy Ford, to the stand who testified that undoubtedly, Plaintiff and the alleged victim had a history of knowing each other.

Defendants in September of 2011, yet Mr. Harris continued to sit in jail awaiting a trial for a series of crimes that he did not commit and was excluded from committing.

138.    Egregiously, the Defendants were in possession of this Medical Examiner Report as early as September 26, 2011 yet, continued prosecution of Mr. Harris for years leading up to this trial of 2015 despite access to conclusive evidence of innocence (and a clear dissipation of any potential probable cause).

139.    Upon information and belief, Defendants argued at trial that further processing of the Rape Kit, to include testing for the lubricants, specifically KY Jelly and Johnson's Baby Oil *could not be done*.  This was a lie because subsequently, Mr. Harris was able to have it done by an outside company after the trial, which resulted in further proof of his innocence.

140.    Upon information and belief, even Dr. Kamnik's office had previously requested these lubricant tests on numerous occasions and even their office was denied.

141.    Upon information and belief, the Defendants opted *not* to test for the presence of lubricants because they already had conclusive evidence excluding Mr. Harris from the Rape Kit and any further testing would have only substantiated Mr. Harris' claim of innocence.

142.    In August of 2015, the Jury returned a partial verdict where Mr. Harris was found Not Guilty on the top charge of sexual assault and other top charges but deadlocked on the charge of escape and the lower charges. [14]

---

14 There was an issue with a Juror having to leave due to a vacation that she advised the Defendants about during jury selection.  The juror reminded the Judge and then the Judge gave Mr. Harris the choice to pick an alternate or he would declare a mistrial.

143.    While on Riker's Island awaiting trial, the Plaintiff was prohibited from viewing the video of this alleged "escape".  When Mr. Harris explained this to the Judge, His Honor allowed Mr. Harris to view the video while in Court with his advisory counsel.

144.    While viewing the video, it was evident that there were many minutes missing in several places throughout the tape and upon information and belief, the Judge stated on the record that he believed the video looked 'fishy' because there would be no way to get out of the Court building without it being captured on video, thus speculating that this video was doctored or edited.

145.    Upon information and belief, as a result of this partial not-guilty verdict (and despite indication that the escape charge was going to be *sua sponte* dismissed), Defendants fought against Plaintiff's conditional release and as such, Plaintiff was remanded to custody in Riker's Island.

146.    Upon information and belief, but for the Defendants' choice to double-down against Plaintiff's potential for conditional release, Plaintiff would not have been remanded back into custody and would have been granted liberty on that day.

147.    Upon information and belief, the escape charges were dismissed in their entirety and Plaintiff moved that his bail be reinstated.  Defendants opted again, to oppose this motion.  Though bail was fortunately reinstated, because it was over the People's objection, the amount was doubled to $500,000.00.

148.    Upon information and belief, Mr. Harris was not released from prison until early November of 2015.

## PLAINTIFF IS FORCED TO CONTINUE ZEALOUSLY "PROVING HIS INNOCENCE" FOR AN ADDITIONAL FOUR YEARS NOTWITHSTANDING BELIGERENT RESISTANCE FROM DEFENDANTS

149.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

150.    As of Plaintiff's long and overdue release in November of 2015, Plaintiff had been found Not Guilty by a jury of his peers on the charge of sexual assault of Ms. Mitchell; the Judge had dismissed the escape charges citing its opinion that the video had been doctored; and only a couple of misdemeanor charges remained.

151.    At this juncture, the alleged victim had been discredited; the officers had contradicted one another on the witness stand; evidence had been clearly manipulated; false sworn statements had been revealed; officers had lied; the top charges had already been dismissed; and the officer had already explicitly stated that the "woman from the park" never identified Mr. Harris as her assailant.

152.    In this moment, the decision to not retry Mr. Harris would have been the correct choice, however when Defendants again, were presented with a choice to do the right thing, they chose not to do so.

153.    Once again, Defendants made the choice to bullishly continue forward, in the wrong direction leaving Mr. Harris' liberty in the balance.

154.    For the next four (4) years, Mr. Harris was left with what felt like, the sole responsibility of investigating this case, which had been manufactured against him, in order to clear his name.

155.    At this point, despite having no probable or reasonable cause to continue, the defendants charged forward, nonetheless.

156.    The onus should not have been placed on Mr. Harris, however he rose to the challenge.

157.    Mr. Harris was essentially forced to prove his innocence over and over again until there was nothing more he could possibly do.  And even then, the Defendants maliciously deprived him of his right to liberty for fifteen (15) more months before finally deciding to end this once and for all on January 21, 2020.

158.    The Judge had ordered that Plaintiff was allowed to get the evidence processed and obviously, the Defendants forced the Plaintiff to pay.

159.    As such, or about March 30, 2016, Plaintiff paid for the rape kit to be tested.

160.    In February of 2017, the Plaintiff paid for the wine glass to be tested.

161.    The Plaintiff paid for the private lab testing and expert analysis when the Defendants either intentionally failed to test it themselves or even more deceptively, possibly tested it and then intentionally failed to provide the results.

162.    After thousands of dollars spent by Plaintiff, the tests revealed what anyone could have guessed: Mr. Harris was innocent, and the alleged victim was not credible.  These facts would have been uncovered by a reasonable person in the Defendants' position and could have, might have, and should have been discovered by these Defendants many years ago, prior to continuing the prosecution of Mr. Harris.

163.    Mr. Harris easily and swiftly was able to procure proof via phone records that Mr. Harris and Ms. Mitchell had known each other prior to the date of the incident, had each other's phone numbers and had a history of texting and phone calls. [15]

164.    To be clear, Ms. Mitchell stated multiple times that she had never met Mr. Harris prior to the date of the incident and there was not one attempt by any of the Defendants during

---

15 Upon information and belief, the phone records revealed over fifty (50) phone calls and text messages between Mr. Harris and Ms. Mitchell prior to this incident.

the investigation to validate or invalidate that claim despite Mr. Harris begging the Defendants to do so.

165.   Upon information and belief, the victim claimed that there was semen on her clothes…there was not.  The victim claimed that there was KY Jelly in her body…there was not.  The victim claimed Mr. Harris' DNA would be inside of her…it was not.  The victim claimed that there was the Plaintiff's saliva on her clothes…there was not.  The victim claimed that there would be the presence of Johnson's baby oil…there was not.

166.   The Defendants claimed that there was no way to test some this evidence…but, there certainly was a way to test the evidence, especially since it was officially requested to be tested by the medical examiner's office thus, being in direct violation of the C.P.L., among other violations

167.   Upon information and belief, the State had already tested the rape kit; but because the results did not conform to the Defendants' plan to manufacture proof to put an innocent man in jail, they omitted this material evidence during the investigation and intentionally blocked it from coming in at the trial.

168.   Upon information and belief, the fact that Plaintiff had to work so rigorously to prove his innocence (while uncovering the deep-seeded investigative and prosecutorial misconduct) is in direct contradiction to the pillars of the justice system.

169.   Upon information and belief, in September of 2018, the District Attorney's Office made the decision that they were not going to re-try Mr. Harris.

170.   For some reason, it was not until December of 2018 that this partial dismissal was entered into the record.

171.   Upon information and belief, on or about December 6, 2018, Mr. Samuel David, Esq. of the New York County District Attorney's Office dismissed all remaining counts of the indictment but, chose to keep one solitary count: the unrelated charge.  They cited a "lengthy reinvestigation", which included obtaining "new evidence" (such as phone records), obtained by Mr. Harris himself, as the reason for dismissing the remaining counts.

172.   At that moment, once again the Defendants were presented with a choice.  Once again, they chose wrong.

173.   Upon information and belief, the sole remaining charge on the sexual assault indictment was an unrelated non-sexual assault charge in the 3rd degree from the "woman from the park", and a separate indictment from alleged misdemeanor charges, all of which were eventually dismissed in their entirety.

174.   Thus, it was not until December 19, 2019 (more than another full year later!) that the final charge on the indictment was dismissed on December 19, 2019.  The Judge dismissed it by Mr. Harris' motion.

175.   It was not until December 19, 2019 that Case No. 04541-2011 (date of arrest: 9/14/2011) was dismissed and sealed.

176.   It was not until January 21, 2020, that Case No. 04786-2011 (date of arrest: 8/3/2011) was dismissed and sealed.

177.   Said police misconduct; prosecutorial misconduct; and correctional misconduct violated the Civil Rights of Plaintiff Mr. Harris**.**

### ADDITIONAL DAMAGES AND DETAILS ENCOMPASSING
### THE PROMISING LIFE THAT WAS PAINSTAKINGLY STRIPPED FROM
### PLAINTIFF

178.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with
the same force and effect as though fully stated herein.

179.   There is no question that this ordeal has greatly caused, initiated and then continuously
aggravated and exacerbated his emotional damages, and has otherwise affected him
mentally, emotionally and psychologically.

180.   Additionally, and as a further result of this ordeal, which was instituted and maintained
by Defendants, Plaintiff Mr. Harris has suffered substantial actual damages, including
and not limited to, legal fees and court costs, expenses of defending the prosecution and
subsequent motions and court appearances, prolonged confinement, loss of use of his
property, including his Brownstone, and other property never returned to him, extreme
emotional distress, aggravation, humiliation, loss of enjoyment of life, loss of reputation,
trauma, further fear of arrest and other incidental and consequential damages, which were
reasonably foreseeable by Defendants.

181.   Specifically and upon information and belief, as a result of the constant and consistent
physical, mental, verbal abuse while incarcerated, Mr. Harris has suffered and will
continue to suffer from many conditions, injuries, ailments, etc., including but not limited
to: Major Depressive Disorder, Post-Traumatic Stress Disorder, Anxiety, Trouble
Sleeping/Sleeplessness/Insomnia, Flashbacks, Adjustment Disorder, Mixed Anxiety with
Depressed Mood, Headaches, Nightmares, a Traumatic Brain Injury (TBI), a Fractured
Skull, a Fractured Orbital Bone, a Dislocated Shoulder, Fractured Thumb/Wrist, Reduced
Range of Motion in Thumb, Tinnitus/Ringing in ear, Memory Loss and Memory Issues,

31

Problems with Writing, Blurred Vision, Fungus, Acne and Acne Scarring, Lower Back injuries, Neck injuries; and many other injuries for the rest of his life.

182. Upon information and belief, Plaintiff has paid approximately $150,000.00 in legal fees, court costs and expenses for testing of evidence and investigating his own case.

183. Upon information and belief, the Harlem Brownstone that Mr. Harris owned and restored in the historic district was sold while he was incarcerated.

184. Upon information and belief, as a result of this near decade of accusations, many of Mr. Harris' familial relationships and friendships were irreparably destroyed.

185. Upon information and belief, as a result of this near decade of humiliation, Mr. Harris suffered damage to his reputation, loss of earnings and loss of future opportunities.

186. Upon information and belief, as a result of this near decade of embarrassment, Mr. Harris was defamed and that defamation continues to the present day as many of the published articles have never been corrected or removed. [16]

187. Upon information and belief, as a result of this near decade of deprivation of liberty (physically and mentally), Mr. Harris has had people steal from him (his Brownstone, jewelry, his record producer plaques and money).

188. Upon information and belief, as a result of this near decade of torment, Mr. Harris now lives an isolated life.

189. Upon information and belief, the public remembers the false charges much more so than the truthful dismissal.

---

[16] Despite Mr. Harris only to have been "alleged" to have escaped (only for the charges to be dismissed in their entirety years later), there are still articles on the "World Wide Web (www)" that remain to this day. Here are but a few examples:
https://www.theguardian.com/music/2011/sep/16/wu-tang-clan-producer-arrrested
https://www.dnainfo.com/20110915/harlem/wutang-clan-producer-is-sex-assault-suspect-who-escaped-court/
https://www.nme.com/news/music/wu-tang-clan-58-1279135

190.    As a result of this wrongful, unlawful and unjustified imprisonment, Mr. Harris suffered serious and severe health conditions.

191.    Upon information and belief, Mr. Harris was placed in solitary confinement more than thirty (30) times.

192.    Upon information and belief, Plaintiff has suffered severe and significant personal injuries and was otherwise damaged.

193.    Plaintiff attended numerous court appearances during his time on Riker's Island and for many years subsequent to his release from incarceration.

194.    Plaintiff was wrongfully incarcerated for more than four (4) years, not including the additional four years of an imprisoned mind throughout the time after trial while awaiting his fate.

195.    Plaintiff was wrongfully incarcerated for well over one thousand five hundred days (1,500).

196.    Upon information and belief, Mr. Harris sustained and will continue to sustain physical, mental and emotional trauma, humiliation, economic and monetary loss as well as loss of enjoyment of life for the rest of his life.

## AS AND FOR A FIRST CAUSE OF ACTION

**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 BY THE CITY OF NEW YORK; POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"**

197.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

198.    At all times material to this complaint, Defendant **THE CITY OF NEW YORK** acting through its police department and through Defendants **POLICE OFFICERS PABON;**

HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

199.   At all times material to this complaint, Defendant **THE CITY OF NEW YORK** acting through its police department, and through Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** had in effect and/or *de facto* policies, practices, customs and usages of failing to properly train, screen, supervise and discipline employees and police officers, and of failing to inform the individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants.   The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

200.   Defendant **THE CITY OF NEW YORK** acting through its police department, and through Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** being aware that such lack of training, screening, supervision, and discipline leads to improper conduct, acted with deliberate indifference in failing to establish a program of effective training, screening, supervision and discipline. Defendant **THE CITY OF NEW YORK** being aware that the persistent and substantial risk of improper arrest, search, seizure, detention and prosecution of persons based upon insufficient or incorrect information, and effective training, screening, supervision and discipline would lessen the likelihood of such occurrences. There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens, more specifically Plaintiff and

34

which are officially tolerated by Defendant **THE CITY OF NEW YORK**. Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/damages alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

201.    The Defendants denied Plaintiff of his right to liberty by basing this denial of liberty on false evidence.

202.    The defendants denied Plaintiff of his right to liberty when they changed the initial accusatory instrument by adding the felony escape charge, which was later dismissed for insufficient evidence.

203.    The investigating officials in this case fabricated evidence, which was likely to influence a jury's decision, forwarded that information to prosecutors and as a result, Mr. Harris suffered a deprivation of liberty.

204.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SECOND CAUSE OF ACTION

**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 BY NEW YORK DISTRICT ATTORNEY'S OFFICE; NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.; BY ADA CAROLINA HOLDERNESS; AND ADA "DOES"**

205.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

206.    At all times material to this complaint, Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; NEW YORK COUNTY DISTRICT ATTORNEY**

**CYRUS VANCE, JR.,** acting through Defendants **ADA HOLDERNESS AND ADA "DOES"** had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

207.    At all times material to this complaint, Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** acting through Defendants **ADA HOLDERNESS AND ADA "DOES"** had in effect and/or *de facto* policies, practices, customs and usages of failing to properly train, screen, supervise and discipline employees and police officers, and of failing to inform the individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants.  The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

208.    By the District Attorney's conduct and actions in arresting, searching, imprisoning, failing to intercede on behalf of Plaintiff and in failing to protect him from the unjustified and unconstitutional treatment he received at the hands of Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** and by **ASSISTANT DISTRICT ATTORNEY HOLDERNESS AND ADA "DOES"** acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of his acts, caused injury and damage in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

209.    Qualified immunity does not apply to the prosecutors because in this case, there was fabrication of evidence during the investigative phase.  In this case, the prosecutors took it a step further in that material omissions were knowingly made, which constituted further falsification of evidence.

210.    By fabricating evidence in the "investigative role", it was reasonably foreseeable that the evidence would be used in the grand jury.

211.    Upon information and belief, there was a pattern of "Brady" violations in this case.

212.    Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE AND NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** acting through Defendants **ADA HOLDERNESS AND ADA "DOES"** being aware that such lack of training, screening, supervision, and discipline leads to improper conduct, acted with deliberate indifference in failing to establish a program of effective training, screening, supervision and discipline. Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE AND NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** being aware that the persistent and substantial risk of improper prosecution of persons based upon insufficient or incorrect information, and effective training, screening, supervision and discipline would lessen the likelihood of such occurrences. There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens, more specifically Plaintiff and which are officially tolerated by Defendant **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE AND NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.**

213.    Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/damages

alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

214.  As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A THIRD CAUSE OF ACTION

**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 BY CORRECTION OFFICER "DOES"; AND PSYCHIATRIST "JANE DOE"**

215.  Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

216.  By his conduct and actions in arresting, searching, imprisoning, failing to intercede on behalf of Plaintiff and in failing to protect him from the unjustified and unconstitutional treatment he received at the hands of Defendants **THE CITY OF NEW YORK,** THE DEPARTMENT OF CORRECTION (DOC)**,** and acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

217.  As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological, and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A FOURTH CAUSE OF ACTION

### DERELICTION OF DUTY. DELIBERATE INDIFFERENCE
### AND FAILURE TO INTERVENE/INTERCEDE

218.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

219.   Defendants were under a duty of safeguarding the public and ensuring the appropriate execution of their roles.

220.   Plaintiff duly relied on Defendants' **POLICE OFFICERS'** fulfillment of their policing duties.

221.   Plaintiff duly relied on Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE'S** fulfillment of their prosecutorial duties.

222.   Plaintiff duly relied on Defendants **CORRECTION OFFICERS'** fulfillment of their correctional duties.

223.   Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in their presence.

224.   At the time of the incident, Defendants were observing and aware of the wrongful acts against Plaintiff.

225.   At the time of the incident, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in depraved and deliberate indifference to Plaintiff's well-being.

226.   Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

227. Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence by knowingly falsifying evidence, observing others lie under oath, observing others making material misstatements of facts and/or omitting necessary facts, preventing exculpatory evidence from the trial, continuing to prosecute despite the dissipation of probable cause to arrest and continued prosecution of Plaintiff, failing to prevent Plaintiff from being assaulted, battered, beaten and otherwise attacked, permitting retaliatory infractions and otherwise violating Plaintiff's constitutional rights in Defendants' presence.

228. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

229. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

### <u>AS AND FOR A FIFTH CAUSE OF ACTION</u>

**BATTERY, ASSAULT & EXCESSIVE FORCE; UNCONSTITUTIONAL & DANGEROUSLY IMPROPER CONDITIONS OF CONFINEMENT**

230. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

231. Defendants **THE CITY OF NEW YORK,** and The New York City Police Department are vicariously liable to Plaintiff for the individual Defendants', **P.O. PABON; P.O. HANKERSON; P.O. UNGCHAROEN; P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** common tort of battery and assault via the principle of *respondeat*

*superior* and that New York CPLR § 1601 does not apply pursuant to the exception provided by CPLR § 1602(1)(b).

232.   Defendants **P.O. PABON; P.O. HANKERSON; P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** committed a battery on Plaintiff by him being handcuffed, pushed, assaulted, battered, shoved, fingerprinted and searched. The conditions while in custody, were harmful, un-consented, and unjustified and in so doing, Defendants violated the laws and Constitution of the State of New York and otherwise violated Plaintiff's rights under New York Law.

233.   That on the aforementioned date, time and place, Defendants **P.O. PABON; P.O. HANKERSON; P.O. UNGCHAROEN; P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** committed the tort of assault against Plaintiff by causing him to be in fear and/or apprehension of imminent and offensive harm at the time of the arrest and other scare tactics in the course of arrest and in so doing, Defendants violated the laws and Constitution of the State of New York and otherwise violated Plaintiff's rights under New York Law.

234.   That by reason of the battery, Plaintiff was harmed physically and emotionally, all while unlawfully and illegally detained, and that Plaintiff was otherwise harmed as a result of the Defendants' **P.O. PABON; P.O. HANKERSON; P.O. UNGCHAROEN; P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES" and C.O. "DOES"** actions.

235.   Throughout the period of his imprisonment and/or detention, Plaintiff was continuously subjected to excessive and unreasonable detention and to multiple excessive and unnecessary and unreasonable acts of physical force (while in detention), and to unnecessary and unreasonable and excessive terms and conditions of his imprisonment

41

(including being put in solitary confinement), and acts of retaliation (including baseless misbehavior reports; manipulation of ID status; infractions/tickets and other related and unrelated punishments) at the hands of Defendants **C.O. "DOES"** under the color of state law, in violation of his rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 USC § 1983.

236.    Defendants **C.O. "DOES"** were deliberately indifferent to Plaintiff's health and reasonably safety.  The defendants created unconstitutionally dangerous conditions of confinement – that they were deliberately indifferent to serious risks that Plaintiff would be harmed and did not take reasonable measures to protect Mr. Harris' safety…in fact, there were many times when they welcomed the risks of harm to Plaintiff.

237.    Plaintiff's claim for excessive force and unconstitutional conditions of confinement relates to the entire period in which he was incarcerated.

238.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SIXTH CAUSE OF ACTION

**MALICIOUS PROSECUTION UNDER THE UNITED STATES CONSTITUTION** and **42 U.S.C. § 1983 AND UNDER NEW YORK STATE CLAIMS**

239.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

240.    Post arraignment deprivation of liberty implicates malicious prosecution. *See,* Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995).

241. Throughout the course of this arrest, investigation, prosecution and continued "reinvestigation", Defendants in this case were deliberately deceptive thus triggering a malicious prosecution claim. [17]

242. Defendants failed to relay pertinent information to the prosecution (despite having knowledge of the pertinent information).

243. Defendants misled, coerced and/or failed to properly inform the prosecution.

244. Defendants failed to give the assigned district attorney the details of the results of their investigation leading the assigned district attorney to believe that plaintiff had assaulted two women.

245. Defendants failed to investigate leads, which clearly would have proven plaintiff's innocence.

246. Defendants failed to turn over information, which would have proven plaintiff's innocence.

247. Defendants either failed to process, failed to timely process, or alternatively, processed and then concealed the results of the rape kit, which would have contributed to proving plaintiff's innocence. [18]

---

[17] *See,* Newton v. City of New York where in that case, twenty years after an arrestee was convicted of assault, rape, and robbery, a medical examiner determined, from evidence in a rape kit, that he was innocent of these offenses. Because the arrestee had presented an alibi and there was a lack of physical evidence linking him to the incident, the court ruled that his claim that police officers and prosecutors pressured eyewitnesses into making false identifications, failed to produce the rape kit and other exculpatory evidence, and failed to investigate a suspect named by the victim was sufficient to present a claim that they acted in bad faith. The plaintiff could proceed with his malicious prosecution claims, and any claims concerning the rape kit were not time-barred because of the defendants' alleged deliberate deception in falsely stating that they searched for, but did not find, the rape kit. No. 07 Civ. 6211, 2008 U.S. Dist. Lexis 54084 (S.D.N.Y.).

[18] There were allegedly 350 rape kits unprocessed, submitted since November 2017 and as of 2020, Police in New York failed to process nearly 90% of rape kits performed on alleged victims of sexual assault of over the last six months and were still processing kits from three years ago.

248.    Defendants failed to properly check the information that was provided to them from the alleged victim, despite having an opportunity to do so.  This failure to make a further inquiry, when a reasonable person would have, is evidence of lack of probable cause. Colon v. City of New York, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983), *see also* Boose v. City of Rochester, 71 A.D.2d 59, 421 N.Y.S.2d 740, 748–749 (4th Dep't 1979). [19]

249.    By the actions described above, Defendants caused Plaintiff to be maliciously prosecuted without any probable cause, without reasonable suspicion, without any proper claims, without any right or authority to do so, illegally and with malice.

250.    Defendants' actions with regards to the institution and maintenance of the criminal prosecution were committed wantonly and with a reckless disregard for whether a reasonable ground of suspicion existed, supported by the circumstances, which would lead a reasonably prudent person to believe that Plaintiff had committed a crime.

251.    By the actions described above, Defendants initiated a prosecution against Plaintiff.

252.    By the action described above, the deprivation of liberty was effected pursuant to legal process and in perversion of proper legal procedures.

253.    Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** arrested and issued legal process in order to obtain collateral objectives outside the legitimate ends of the legal process and intimidating Plaintiff for their personal interest and further to prevent Plaintiff from disclosing the aforementioned evidence of their misconduct.

---

19 Plaintiff concedes that a police officer need not conduct an exhaustive investigation, however in this situation when the officers are presented with information that could have easily indicated whether or not the person in fact committed a crime, and choose to conceal or otherwise ignore it entirely, that is not exercising good faith.

254. Defendants **P P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** provided false information to the prosecutors and also created false information which likely would influence a jury's decision and forwarded that false information to the prosecutors.

255. Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** "failed to make a full and complete statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith" which satisfies the initiation element of malicious prosecution.

256. Upon information and belief, Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"; NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE; ADA HOLDERNESS; and ADA "DOES"** procured a Grand Jury indictment by fraud, perjury and/or bad faith.  Thus, there is a question of fact at this stage in the litigation as to the propriety of the indictment.

257. Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE and ADA HOLDERNESS and ADA "DOES"** continued the prosecution knowing that the evidence was insufficient and by the actions described above, Defendants lacked probable cause to believe the proceeding could succeed.

258. Defendants acted with intent to do harm to Plaintiff without excuse or justification.

259. Defendants false accusations were done intentionally and maliciously to mislead the Criminal Court.

260. The prosecution was ultimately terminated in favor of Plaintiff.

261. Defendants, acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of his acts, caused injury and damage due to this malicious prosecution in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

262. A timely Notice of Claim was filed with the City of New York.

263. Even the requirement of attending court appearances in connection with prosecution either for the underlying sexual assault and escape felony charges or any subsequent fabricated infractions constitute deprivation of liberty under the 4th Amendment. *See* Murphy v. Lynn, 118 F.3d 938, 945 (2d Cir. 1997)("The question, therefore, is whether the requirement that he attend court appointments constituted a 'seizure' within the meaning of the Fourth Amendment. We conclude that they *did.*") (emphasis added).

264. The defendants created false information and forwarded that information to prosecutors.

265. Mr. Harris overcomes the presumption of probable cause arising from his indictment with evidence establishing that police witnesses did not make complete and full statements of facts either to grand jury or to district attorney, that they misrepresented or falsified evidence, and that they have withheld evidence or otherwise acted in bad faith. [20]

266. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

---

20 Additionally, a "reasonable trier of fact could find that the defendant's actions were objectively unreasonable", thus a defense of qualified immunity would not shield any government officials in this case. *See* Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995).

## AS AND FOR A SEVENTH CAUSE OF ACTION

### MALICIOUS ABUSE OF PROCESS

267. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

268. The individual defendants issued legal process to place plaintiff under arrest.

269. The individual defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** arrested Plaintiff in order to obtain collateral objectives outside legitimate end of legal process, to wit, to delete the incriminating evidence in Plaintiff's possession, which could lead to one or more of their terminations of employment.

270. The arrest of **DERRICK HARRIS,** even if considered proper use of legal process is still nonetheless based on an improper or malicious motive.  It was executed for a collateral objective outside the legitimate ends of the process.

271. That, the Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** acted with improper purpose when they fabricated the information to support their arrest of Mr. Harris.  There was a collateral objective behind the arrest, which is the crux of a malicious abuse of process claim.

272. Here, the collateral purpose in arresting and continuing to prosecute Mr. Harris was to conceal the Defendants' own misconduct.

273. The statements made by the defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** in their arrest complaint are wholly insufficient and provided false information.

274.    Thus, there was false information in the records and then they compounded that improper behavior by testifying falsely under oath and concealing information from the ADA in order to legitimize the arrest.

275.    The defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** here had an active role in the prosecution, which can be inferred when the officers had the plaintiff arraigned, actively sought warrants, filled out complaining or corroborating affidavits and signed the felony complaints.

276.    The defendants **ADA HOLDERNESS and ADA "DOES"** had an active role in the investigation of this matter and participated in this investigation with an unjustified intent to do harm to Mr. Harris without justification.

277.    **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** initiated the prosecution by filing the accusatory instruments and by creating material, false information and forwarding that false information to the prosecutor and also withholding information from prosecution.

278.    Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"** in some way participated in the arrest with an intent to do harm without justification.  Here, the defendants' intent was not justified.

279.    Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; and P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"; ADA HOLDERNESS and ADA "DOES"** acted with the intent to achieve a collateral objective that was outside the

legitimate ends of criminal process.  The collateral objective here was an advantage to themselves and simultaneously harm Mr. Harris.

280.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### DEPRIVATION OF CONSTITUTIONAL RIGHT TO A FAIR TRIAL

281.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

282.   The illegal and improper investigation created by Defendants established false information likely to influence a jury's decision and said information was forwarded to the prosecution.

283.   The Defendants engaged in an unlawful, unreasonable, and arbitrary investigation, which lead to Plaintiff's arrest.

284.   The defendants deviated from standard protocols.  Thus, Mr. Harris's Constitutional Right to a Fair Trial was violated and the harm occasioned by this violation is an action for damages under 42 USC § 1983.   Here, a reasonable jury could find, based on the evidence, that defendants, under the color of state law, violated the Plaintiff's clearly established constitutional rights by conspiring to fabricate the story, which was almost certain to influence a jury's verdict.

285.   That the plaintiff did not know and could not have known that the investigation was illegal and/or improper until the favorable termination of the initial proceedings.

286.    The fabrication of evidence by the named police officers and unnamed police officers and forwarding of such evidence to prosecutors in this case was inherently harmful, regardless of whether there existed additional and untainted evidence.

287.    The plaintiff was subjected to deprivation of Constitutional Right to a Fair Trial in violation of his rights as guaranteed under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 USC § 1983.

288.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A NINTH CAUSE OF ACTION

**VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS (INCLUDING DELIBERATE INDIFFERENCE TO CONDITIONS OF CONFINEMENT), FABRICATION OF EVIDENCE & CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**

289.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

290.    Defendants individually and collectively are liable pursuant to 42 U.S.C. § 1983 for abuses against Plaintiff that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

291.    Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of Article 1, § 5 of the New York State Constitution.

292.    Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of New York law, rules and regulations.

293.    Defendants are liable for depriving Mr. Harris of liberty without due process of law in violation of U.S. Constitution, amend. XIV, § 1, cl. 3.

294.    Defendants are liable for fabricating evidence, under the Sixth Amendment to the United States Constitution.[21]

295.    Defendants are liable for fabricating evidence, which is an independent harm redressable under § 1983 and brings this claim challenging his criminal pretrial detention as unsupported by probable cause, even after the start of legal process (i.e. after the Judge's probable cause determination).  Manuel v. City of Joliet, 137 S. Ct. 911, 914 (2017).  In this case, the Judge's probable cause determination was predicated on the police officer's false statements, and thus, Plaintiff's challenge is valid.

296.    Defendants subjected Plaintiff to criminal charges on the basis of false evidence that was deliberately fabricated by the defendants.

297.    Defendants did, with malice, compose and swear out a false criminal complaint against Plaintiff and institute the criminal case against Plaintiff and that there was intent to do harm without justification. The defendants deliberately fabricated evidence that was used to criminally charge and prosecute the plaintiff.

298.    Plaintiff was deprived of his property, namely his home, without probable cause.

299.    Defendants systematically engaged in fabrication of evidence, false swearing, mishandling of evidence while in custody, withholding exculpatory evidence from prosecutors, failure to disclose evidence inconsistent with the plaintiff's guilt, false reporting of facts in the arresting documents, falsely reported facts in the warrants, maliciously concealing material evidence and maliciously prosecuting this case even after any and all probable cause had dissipated.

---

21 The Second Circuit has held that regardless of the particular amendment that prevents government officers from fabricating evidence, that that right nonetheless exists.

300.    Evidence fabrication in this case served to both improperly charge and/or arrest him as well as unfairly try him and continue prosecution even past the partial not guilty verdict. It involves aspects of both due process violations.

301.    In this case, the police officers turned over fabricated evidence to the prosecutor, and in addition to a *Brady* violation, can be redressed as a deprivation of liberty on the basis of false and fabricated evidence.

302.    Officers swore out a false complaint, false warrant and withheld crucial information from the prosecutors and then the prosecutors in turn, once they learned or had reason to believe that the documents were not facially sufficient or that otherwise further inquiries needed to be made to continue the investigation, the prosecutors also violated Mr. Harris' due process rights.

303.    It should also be noted that because no reasonably competent officer could disagree that the officer(s) could not properly rely on evidence, he knows to be false, qualified immunity cannot attach.  Additionally, there is no immunity attached to those who falsify affidavits and fabricate evidence.  The inconsistencies in the arresting documents and the warrants are more than a "mere discrepancy".

304.    Defendants acted in concert to fabricate the charges.  Defendants acted in their own personal interest, and not in the interest of the New York City Police Department or in the interest of the New York County District Attorney's Office in fabricating the charges against the Plaintiff. *See* <u>Lewis v. Havernack,</u> No. 12 Civ. 0031, 2013 WL 1294606, at *13 (N.D.N.Y. March 28, 2013).

305.    All the defendants, acting with each other individually and on behalf of and under the auspices and control of the City, and under color of law, conspired to injure plaintiff in

52

his person and property and deprive plaintiff of his First, Fourth, Fifth and Fourteenth Amendment rights.

306.   The defendants jointly caused such deprivation of rights by acting in concert to disseminate false information concerning the plaintiff and by disseminating false information that lacked any reasonable basis or probable cause to support it that the plaintiff committed a crime, and/ or to charge him with a crime, and/ or to arrest him.

307.   This Court has long recognized that knowingly using false evidence to deprive a defendant of liberty is "inconsistent with the rudimentary demands of justice." <u>Mooney v. Holohan,</u> 294 U.S. 103, 112 (1935).

308.   Even in the event that it is determined that the Fourth Amendment's low bar for bringing charges was met in this case, that does not authorize decisions to prosecute or continue detaining Mr. Harris based on lies or fake evidence, which are independently wrongful regardless of whether untainted evidence met the general probable-cause standard.  In this case, Mr. Harris would not have been criminally charged, prosecuted, or otherwise deprived of his liberty but for the fabricated evidence, and that corruption violated his due process rights.[22]

309.   Plaintiff's rights pursuant to the Due Process Clause were violated when the use of excessive force amounted to punishment while he was a pretrial detainee (*See,* separate cause of action for excessive force and unconstitutional conditions of confinement).

310.   The substantive right of due process includes the right to be free from excessive force. [23]

---

[22] Nor is there any basis for treating pretrial deprivations of liberty differently where a defendant is ultimately acquitted. The due process prohibition on "knowingly us[ing] false evidence" is "implicit in any concept of ordered liberty." <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).

[23] Excessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment. <u>Riley v. Dorton</u>, 115 F.3d 1159, 1166 (4th Cir. 1997).

311.   Mr. Harris was deprived of this right when he was brutally beaten, set up, and otherwise subjected to acts of violence and punishment while incarcerated.  The Defendants **C.O. "DOES" and PSYCHIATRIST "DOE"** inflicted unnecessary and wanton pain and suffering upon Mr. Harris and subjected Mr. Harris to conditions of detention that amount to punishment.

312.   The Defendants **C.O. "DOES" and PSYCHIATRIST "DOE"** acted intentionally to impose the conditions and recklessly failed to act with reasonable care to mitigate the risk that the conditions posed to Mr. Harris even though the Defendants-Correction Officers knew or should have known that the conditions complained of posed an excessive risk to Mr. Harris' health and/or safety.

313.   The defendants' deliberate manufacture of false evidence both in the courtroom and within the prison were in direct contravention to the Due Process Clause.

314.   The defendants had no reasonable cause or rational decision-making when they continued to prosecute Plaintiff after the evidence was processed and the results exonerated Plaintiff. [24]

315.   Mr. Harris was a person detained prior to conviction, thus a pre-trial detainee innocent by law, of the underlying charges for the entirety of his incarceration and throughout his prolonged prosecution.

---

24 *See,* <u>Dominguez v. Hendley</u>, where in that case, a man convicted of a sexual assault, was exonerated when DNA proved that the semen found on the victim's underwear was not his, presented evidence sufficient to support a jury's verdict in his favor against a police officer for allegedly violating his due process right by tampering with or manipulating testimonial evidence and identification, causing his trial to be unfair. His claim was not time barred because his right to sue for malicious prosecution only arose after his criminal conviction was set aside. The Plaintiff was awarded $9,063,000 against the officer, a judgment for which the city was required to indemnify him. No. 07-1004, 2008 U.S. App. Lexis 20577 (7th Cir.).

316.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A TENTH CAUSE OF ACTION

## NEGLIGENCE AND/OR GROSS NEGLIGENCE

317.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

318.    Defendants negligently caused injuries and otherwise damaged Plaintiff.  The acts and conduct of Defendants were the direct and proximate cause of injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

319.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A ELEVENTH CAUSE OF ACTION

## NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, TRAINING & INADEQUATE SUPERVISION UNDER NEW YORK STATE LAW AND PURSUANT TO § 1983

320.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

321.    At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT**

ATTORNEY CYRUS VANCE, JR.,) owed Plaintiff a duty to manage, control, and supervise the Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"; ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE".**

322.    Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** negligently hired, screened, retained, disciplined, supervised and trained Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"; ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE".**

323.    At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** owed Plaintiff a duty to hire qualified and sufficient personnel in connection with the operation, management control, teaching at and/or supervision of Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or**

**CAPTAIN and/or SERGEANT "JOHN DOES"; ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE".**

324.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** owed Plaintiff a duty to train their employees so as to enable them to properly maintain order and control.

325.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** owed Plaintiff a duty to promulgate proper and/or adequate rules and regulations governing the proper care, guidance and/or supervision to be provided and rendered by those agents, servants, officers and/or employees hired as New York City Police Officers and Assistant District Attorneys.

326.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** owed Plaintiff a duty to provide a safe and proper environment.

327.    At all times herein mentioned, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** owed Plaintiff a duty to prevent from being prosecuted without probable cause.

328.    At all times relevant hereto, Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** and/or said Defendants' agents, servants, employees and/or licensees were, jointly, severally and concurrently, negligent, careless and reckless in individually and collectively breaching each and every duty owed to Plaintiff.

329.    The aforesaid occurrence was caused wholly and solely by reason of the negligence of Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** and/or said Defendants' agents, servants, employees and/or licensees, without any fault or negligence on the part of Plaintiff contributing thereto.

330.    Defendant **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT**

**OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** and through Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"**; **ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE"** had *defacto* to policies, practices, customs and usage, which were a direct and proximate cause of the unconstitutional conduct alleged herein.

331. The facts presented by Plaintiff present allegations in support of this cause of action in that it is abundantly clear that the individual defendants' conduct during this experience was in part, due to negligence in training, supervision and indeed retention; and that the City of New York (NYPD and DOC) and New York County District Attorney's Office's hiring processes were utterly deficient.

332. Had the employers used reasonable care in the hiring and retention of the employees that affected this matter, Mr. Harris may have been spared the foreseeable harm that he incurred at all phases of this incident.

333. In this case, the employers placed their employees in positions to cause foreseeable harm to Mr. Harris.

334. The municipality's failure to properly train, hire, retain and/or supervise its police officers, correction officers, Assistant District Attorneys and employed psychiatrists "evidences a deliberate indifference to the rights of its inhabitants." *See,* Henry-Lee v. City of New York, 746 F.Supp.2d 546, 566 (SDNY 2010).

335.    Because there was a failure to train in this case, which amounted to deliberate indifference to the rights of Mr. Harris throughout all phases of this experience, Mr. Harris rights were violated in the context of § 1983 and maintains a claim for liability in said context.

336.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A TWELFTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL HARM

337.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

338.    Defendants **THE CITY OF NEW YORK and NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** and through the individual Defendants negligently caused emotional distress and damage to Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of emotional injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws, rules and regulations of the City of New York.

339.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION

**INTENTIONAL INFLICTION OF EMOTIONAL HARM via STATE LAW and § 1983.**

340. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

341. Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** and through Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"**; **ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE"** knowingly, unreasonably, and maliciously sought to disturb Plaintiff by their individual and collective outrageous conduct.

342. In this case, there has been extreme outrageous conduct by Defendants with the intent to cause (and/or a disregard of a substantial probability of causing severe emotional distress, a causal connection between this conduct and the emotional damage Mr. Harris has experienced and severe emotional distress, which has been documented by professionals.

343. A timely Notice of Claim was filed.

344. This conduct includes, without being limited to, unreasonably and forcefully arresting him, improperly detaining him; subjecting him to multiple intimidation tactics, swearing out a false complaint, fabricating evidence, withholding crucial information from the prosecution, failing to test or otherwise processing and concealing the DNA and rape kit

evidence, maintaining the prosecution despite all of the instances when the probable cause dissipated, threatening him, mishandling his property, and many other additional ways in which they violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws, rules and regulations of the City of New York to be expounded upon in the course of discovery.

345.  Defendants **THE CITY OF NEW YORK (THROUGH THE NEW YORK CITY POLICE DEPARTMENT (NYPD) AND THE NEW YORK CITY DEPARTMENT OF CORRECTION (DOC))** and **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE (THROUGH DISTRICT ATTORNEY CYRUS VANCE, JR.,)** and through Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; AND P.O. /CAPTAIN/SERGEANT "DOES" P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES"**; **ADA HOLDERNESS; ADA "DOES"; C.O. "DOES" AND PSYCHIATRIST "JANE DOE"** have caused Plaintiff major depressive disorder, post-traumatic stress disorder, severe distress, humiliation, anxiety, fear, sleeplessness and severe distress, among many other severe emotional and psychological damages.

346.  Courts have held that continuous and coercive harassment *can* establish an IIED cause of action. Alexander v. Unification Church of America, 634 F.2d 673, 678-679 (2d Cir.1980) (filing of harassing lawsuits, constant surveillance, patrolling of plaintiffs' homes); Green v. Fischbein Olivieri Rozenholc & Badillo, 119 A.D.2d 345, 507 N.Y.S.2d 148 (1st Dep't 1986) (baseless eviction proceedings against plaintiff-tenant by landlord,  disruption  in services, deterioration of living

conditions, interference with mails, verbal abuse of plaintiff and his guests). *But see*, Gay v. Carlson, 60 F.3d 83, 89 (2d Cir.1995) (finding plaintiff had not established an IIED claim where "[a]ll that plaintiff alleges that any of the defendants has done is lodge official complaints about plaintiff's conduct or discuss the basis of those complaints with others.").

347. Upon information and belief, Defendants committed multiple acts against Plaintiff, which invaded his interests and inflicted injuries upon his throughout all stages of investigation, the continuous detention, the hearings, trials and prolonged waiting period prior to deciding not to re-try; which cumulatively amounted to intentional infliction of emotional harm and/or distress for a near decade of Mr. Harris' life. [25]

348. The emotional harm and/or distress continues to the present day.

349. The conduct transcended the bounds of human decency. The conduct amounted to more than the emotional harm that is encompassed within the other claims.

350. While certain of plaintiffs' allegations would not, by themselves, necessarily rise to the level of extremity and outrageousness to support an IIED claim, the defendants' total alleged course of conduct does. "Collectively, these actions are sufficiently extreme and outrageous to state a claim for IIED under New York law." Mejia v City of New York, 119 F Supp 2d 232, 284-87 (EDNY 2000).

351. **THE CITY OF NEW YORK** is responsible based on the theory of *respondeat superior* and in the context of *Monell* liability.

---

[25] The Courts in this Circuit and State have held that in certain scenarios the cause of action for IIED constitutes a tort that is continuing in nature and only accrues after the completion of the last act. *See*, Colliton v. Cravath, Swaine & Moore, 2008 WL 4386764 (S.D.N.Y. 2008) ("[If] plaintiff is subject to a sustained pattern of abuse, the continuing tort doctrine applies, and the statute of limitations begins to run *after the last actionable abuse has occurred.*")(emphasis added).

352.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A CLAIM OF MUNICIPAL LIABILITY

### VIA *MONELL*

353.   The actions of Defendants heretofore described resulting from the arrest, detention, imprisonment assault, use of excessive force, and prosecution of the Plaintiff: constitute an unlawful arrest imprisonment, assault and malicious prosecution which deprived the Plaintiff of rights, privileges, and immunities as guaranteed under the United States Constitution, Amendments One, Four, Five, and Fourteen,  the New York state Constitution, The Civil Rights Acts, 42 U.S.C. 981, 1983, 1985, 1986, and 1988 and the complained of conduct was either the result of an official policy or unofficial custom, including but not limited to, policies and customs concerning  the hiring, training, supervision, retention and discipline of the **CITY OF NEW YORK's** agents, servants and/or employees,  and those involving the arrest, detention  and prosecution of individuals, including and especially, those persons such as the Plaintiff who are males of African American ethnic descent.

354.   In this case, there was: Police witnesses failing to make full and complete statements – witness tampering and/or intimidation; Officers and prosecutors withholding evidence and/or misrepresenting or falsifying evidence; Overall inadequate police work and inadequate prosecutorial work-up of the case; and unacceptable treatment while incarcerated.

355.   The acts complained of were carried out by the aforementioned defendants in their capacities as police officers, assistant district attorneys, correction officers, psychiatrists and officials pursuant to customs, policies, usages, practices, procedures and rules of the **THE CITY OF NEW YORK** and City of New York Police Department, New York County District Attorney's Office and The Department of Correction, all under the supervision of ranking officers.

356.   The aforementioned customs, practices, procedures and rules of the **CITY OF NEW YORK** and New York City Police Department and Department of Correction include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

357.   In this case, pursuant to these well-known policies, practices or customs, defendants in this case felt empowered to arrest Plaintiff, further detain and issue legal process without probable cause, fabricate and swear to a false story to cover up the blatant violations of Plaintiff's constitutional rights (namely, but not limited to: the trumped up charge of escape; the fabricated swearing of Complaints; the improper combining of complaints;

replacement of complaints; falsification of evidence; omission of exculpatory evidence; the brutal beatings, baseless misbehavior reports and retaliatory infractions and loss of privileges; extended periods of time in solitary confinement; delay of medical treatment; psychological abuse and the list goes on and on). Additionally, there is an obvious custom and practice regarding further detention and prosecution of innocent people (specifically, Mr. Harris) in order to meet "productivity goals."

358. At the time of the aforementioned constitutional violations, the **THE CITY OF NEW YORK** and City of New York Police Department, New York County District Attorney's Office and The Department of Correction were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of **THE CITY OF NEW YORK** and City of New York Police Department, New York County District Attorney's Office and The Department of Correction to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part infra, the need for more effective supervision and other remedial measures was patently obvious, but the **THE CITY OF NEW YORK** and City of New York Police Department, New York County District Attorney's Office and The Department of Correction made no meaningful attempt to prevent future constitutional violations.

359. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

a. <u>Colon v. City of New York</u>, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> 'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police  Department.
> Despite numerous inquiries by commissions and strong reported efforts by the present administration— through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

b. <u>McMillan v. City of New York</u>, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

c. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion).

360. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, are further evidenced, inter alia, by the following:

a. Morgan Cloud, The Dirty Little Secret, 43 EMORY L.J. 1311, 1311-12 (1994)

("Judges, prosecutors, defense lawyers, and repeat offenders all know that police

officers lie under oath."); Jerome H. Skolnick, Deception by Police, CRIM. JUST.

ETHICS, Summer/Fall 1982, at 40, 42 (concluding that police "systematic[ally]"

perjure themselves to achieve convictions); ALAN M. DERSHOWITZ, THE

ABUSE EXCUSE 233 (Hachette Book Group 1994) (suggesting that "recent

disclosures about rampant police perjury cannot possibly come as any surprise" to

those who have practiced criminal law in state or federal courts); ALAN M.

DERSHOWITZ, THE BEST DEFENSE xxi-xxii (Random House  1983)

("Almost all police lie about whether they violated the Constitution in order to

convict guilty defendants."); Deborah Young, Unnecessary Evil: Police Lying in

Interrogations, 28 CONN. L. REV. 425, 427 (1996) (asserting that "the reported

cases of police lying represent only a fraction of the actual cases in which police

lying occurred"); David Kocieniewski, Perjury Dividend-A Special Report, N.Y.

TIMES, Jan.5, 1997, at A1 (noting that according to one New York police officer,

"lying under oath was standard procedure"); Lie Detectors Could Curb Police

Perjury, USA TODAY, Aug. 1, 1996, (Magazine), at 13 ("[M]any experienced

trial lawyers have said they believe police officers frequently lie on the stand.");

Joseph D. McNamara, Has the Drug War created an Officer Liars' Club?, L.A.

TIMES, Feb. 11, 1996, at M1 (noting recent perjury scandals have surfaced in

police departments in Los Angeles, Boston, New Orleans, San Francisco, Denver,

New York, and other large cities; and stating "[H]undreds of thousands of law-

enforcement officers commit felony perjury every year testifying about drug arrests.").

b. <u>The Mollen Commission</u> concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors  knew or should have known about falsified versions of searches and arrests and never questioned them.1 {…} What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police  officers  often  view falsification as, to use his words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty." *See,*  Mollen  Commission Report pgs 36-41.

361. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging  their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact.

362. The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of **THE CITY OF NEW YORK** (New York City Police Department, New York County District Attorney's Office and the Department of Correction).

363.    The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of **THE CITY OF NEW YORK**, are implemented by members of the New York City Police Department, New York County District Attorney's Office and the Department of Correction, engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner.

364.    All of the foregoing acts by defendants deprived Plaintiff of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

365.    Defendant **THE CITY OF NEW YORK** knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the pertinent and relevant Amendments to the United States Constitution.

366.    Defendant **THE CITY OF NEW YORK** is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and New York City Police Department, New York County District Attorney's Office, and the Department of Correction, and to require compliance with the Constitution and laws of the United States.

367.    Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the New York City Police Department, New York County District Attorney's Office, and the Department of Correction and the **THE CITY OF NEW YORK** including the Commissioner, have not

taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

368. The aforementioned Defendant's **THE CITY OF NEW YORK'S** policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights.

369. Pursuant to the aforementioned **THE CITY OF NEW YORK** policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiff's rights.

370. Plaintiff's injuries were a direct and proximate result of the defendant **THE CITY OF NEW YORK'S** wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant **THE CITY OF NEW YORK** to properly supervise, train and discipline their police officers.

371. Specifically in this case, there is municipal liability based on a failure to supervise. "*Monell* does not provide a separate cause of action for the failure by the government to

train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (emphasis in original)); <u>Zahra,</u> 48 F.3d at 685 ("A municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior.*"); <u>Vippolis v. Vill. of Haverstraw,</u> 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who ... subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights, 42 U.S.C. § 1983.").

372. The **NEW YORK COUNTY DISTRICT ATTORNEY CYRUS VANCE, JR.,** acting on behalf of the County of New York, was obligated to supervise his employees at the District Attorney's Office, but failed to do so in that, for example, the indictments were procured through improper means and in violation of the constitutional rights of the Plaintiffs.

373. Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE, CYRUS VANCE, JR., ADA HOLDERNESS and ADA "DOES"** knew or had reason to know about the improprieties in the investigation and took no steps to terminate the prosecution at an immeasurable amount of moments throughout this near decade of prosecution.

374. Given the many allegations regarding the personal involvement of the District Attorney's Office, municipal liability in this case against the County can also be based upon District Attorney alleged role as the final policymaker. *See* <u>Gronowski v. Spencer,</u> 424 F.3d 285,

296 (2d Cir.2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights.").

375.    Importantly, it is nevertheless well-known that there is a clear culture of violence within the Department of Correction at Rikers Island. "The policy or custom need not be memorialized in a specific rule or regulation." <u>Kern v. City of Rochester</u>, 93 F.3d 38, 44 (2d Cir. 1996) (citing <u>Sorlucco v. N.Y. City Police Dep't,</u> 971 F.2d 864, 870 (2d Cir. 1992)).  Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." <u>Sorlucco v. N.Y. City Police Dep't</u>, 971 F.2d 864, 870–71 (2d Cir. 1992) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691, 98 S. Ct. 2018 (1978)) (internal quotation marks omitted).  According to one report, there is "an average of 11 incidents a day ranging from pepper sprayings to punches — amid heightened scrutiny from federal prosecutors to clean up what federal prosecutors have called a "deep-seated culture of violence.""  See, Gary Hunter: "<u>Deep Seated Culture of Violence</u>" and Abysmal Medical Care at Rikers Island, Prison Legal News, July 7, 2015.  In the year 2015, there was a documented 27 percent increase in reports of the use of force by staff members against inmates.  *See*, <u>William Neuman:</u> Jail Injury Claims Against New York City Surge, The New York Times, March 2, 2016. [26]

376.    Defendants **C.O. DOES** exhibited deliberate indifference to a risk of inmate on inmate assault.

---

26 In light of the prior revelations about widespread brutality at Rikers Island, it is very plausible that discovery will reveal that an unconstitutional custom and/or practice of officer-on-inmate violence, combined with a failure of training and supervision, indeed existed at that jail. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (post-Iqbal Rikers): <u>See</u> Michael Winerip and Michael Schwirtz: <u>Where Mental Illness Meets Brutality in Jail</u>, N.Y. Times, July 14, 2014.

377.   Even more so, this Southern District Court of New York organized a monitoring group to audit the Rikers facilities and study the use of force on Rikers.  There have been campaigns to close Rikers entirely due to the well-known violence, which included excessive use of force by officers on inmates.  Additionally, it is also well-known that former Mayor de Blasio disclosed a ten year plan to close Rikers Island for what has become widespread custom and usage. [27]

378.   Pursuant to City policies, practices and/or customs and repeated failure to train, supervise and discipline, Defendants **C.O. "DOES"** felt empowered to use excessive and unnecessary force on Plaintiff; the officers failed to intervene in or report Defendants' violations of Plaintiff's rights; the need for more or different training in these circumstances were so obvious that the inadequacy was so likely to result in the violation of constitutional rights in this case that they clearly were deliberately indifferent to the need to provide different or proper training; and that there is a pattern of encouraging and coordinating brutal attacks and then utilizing infractions in a retaliatory fashion and the policymakers were aware of and acquiesced in this pattern. [28]

379.   A pattern of conduct, including officer-permitted assaults by inmates and attacks by officers **C.O. DOES** took place daily until the last days of Mr. Harris' incarceration. [29]

380.   Plaintiff filed several grievances against many officers throughout his time incarcerated.

---

27 http://www1.nyc.gov/office-of-the-mayor/news/193-17/statement-mayor-bill-de-blasio-closure-rikers-island#/0

28 Moreover, because these acts occurred in public places including the confines of the Rikers dormitory or similar areas, it could be inferred, as in Michael, "that the officers involved did not fear supervisory personnel observing their conduct, intervening to stop them, or subjecting them to disciplinary action for their misdeeds."

29 There was a custom pervasive throughout Rikers at the time Mr. Harris was incarcerated; moreover, the fact that so many officers were involved in these incidents without any apparent concern that they would be punished is further evidence that such custom existed.  See See Castilla v. City of New York, 2012 WL 3871517, *4 (S.D.N.Y. 2012) ("concerted action" by several police officers over many hours and in different locations, a plausible inference was raised that a custom of failure to train and/or supervise existed); accord Goode v. Newton, 2013 WL 1087549, *7-8 (D. Conn. 2013) (two distinct violations "which share a common thread of manufactured criminality").

381.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Defendants:

      a.   Compensatory damages;

      b.   Punitive damages;

      c.   Declaratory relief;

      d.   Injunctive relief;

      e.   The convening and empaneling of a jury to consider the merits of the claims herein;

      f.   Costs and interest and attorneys' fees;

      g.   Such other further relief as this court may deem appropriate and equitable.

Dated: New York, New York
March 3, 2022

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**

**Craig Phemister, Esq.**
*Attorney for Plaintiff*
360 Lexington Avenue, Suite 1102
New York, New York 10017
(212) 397-1000
CPhemister@NapoliLaw.com

**Ellie Silverman, Esq**.
*Attorney for Plaintiff*
360 Lexington Avenue, Suite 1102
New York, New York 10017
(212) 397-1000
ESilverman@NapoliLaw.com

**BEN CRUMP LAW**

/s/ *Ben Crump*

**Ben Crump, Esq.**
*Anticipated Pro-Hac Vice Application*
360 Lexington Avenue, 11th Floor
New York, New York 10017