UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------------- X

DERRICK HARRIS,

*Plaintiff*,

-against-

THE CITY OF NEW YORK; SERGEANT ELIEZER PABON (Shield No. 14623); P.O. DANIELLE HANKERSON (Shield No. 23415); P.O. SUTHOM UNGCHAROEN (Shield No. 26224); P.O. CRAIG BULLARD, (Shield 28485), NEW YORK COUNTY ADA CAROLINA HOLDERNESS; ADA, P.O. and/or CAPTAIN and/or SERGEANT and/or C.O. "JOHN/JANE DOES" 1-10 (the name "John Doe" and/or "Jane Doe" being fictitious as the true names are presently unknown, individually and in their official capacity as New York City Assistant District Attorneys, New York City Police Officers, Sergeants, Captions and/or, New York City Correction Officers);

*Defendants*.

--------------------------------------------------------------------------------------- X

**1ˢᵗ AMENDED VERIFIED COMPLAINT**

JURY TRIAL DEMANDED

22-cv-1763 (ER)

**PRELIMINARY STATEMENT**

1.  This is a civil rights action in which Plaintiff **DERRICK HARRIS** represented by **SHULMAN & HILL, PLLC** seeks relief for Defendants' violation of his rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and of rights secured by the relevant Amendments to the United States Constitution (specifically, but not limited to: First, Fourth and Fourteenth), Due Process Clause and of rights secured under the laws and Constitution of the State of New York.

2.  Plaintiff seeks damages, compensatory and punitive, affirmative and equitable relief, an award of costs, interest and attorney's fees, and such other and further relief as this Court

1

deems equitable and just.

3.   Plaintiff was unjustly and falsely arrested and maliciously and falsely charged with criminal offenses and otherwise subjected to an excessive and unreasonable custodial detention and all association therewith.

4.   This case seeks justice for Mr. Harris for the unnecessary suffering he endured due to Defendants' acts and omissions (including false statements and affirmative misstatements).

## JURISDICTION AND VENUE

5.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 and § 1331, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

6.   Jurisdiction is also invoked herein pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983; 42 U.S.C. § 1988.

7.   Plaintiff respectfully requests that this Court exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any state court causes of action that arise from a common nucleus of operative facts that give rise to the federally based causes of action pleaded herein, and as against all parties that are so related to claims in this action within the original jurisdiction of this court that are formed as part of the same case or controversy.

8.   Venue herein is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (a), (b) and (c).

## JURY DEMAND

9.   Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

10. Upon information and belief and within the time prescribed by law, a sworn Notice of Claim stating, among other things, the time when and the place where the injuries and damages were sustained, together with Plaintiff's demands for adjustment thereof was duly served on Plaintiff's behalf on the Comptroller of Defendant **THE CITY OF NEW YORK** and that, thereafter, said Comptroller for Defendant refused or neglected for more than thirty (30) days, and up to the commencement of this action, to make any adjustment or payment thereof, and that, thereafter, and within the time provided by law, this action was commenced.

11. Upon information and belief, pursuant to General Municipal Law §50(h), a hearing was held at the office of a designated agent on or about November 20, 2020.

## **PARTIES**

12. Plaintiff **DERRICK HARRIS** ("Plaintiff" or "Mr. Harris"), a United States Citizen and at all times relevant to this Complaint, a resident of New York State who was held in the custody of the New York City Department of Corrections and ("DOC") from September of 2011 through November of 2015 and was primarily confined in Riker's Correctional Facility and Mid-South Hudson.

13. Mr. Harris was arrested and prosecuted in New York County, State of New York.

14. Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein, municipal corporation duly incorporated and existing under and by virtue of the laws of the State of New York.

15. Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein, a municipal entity created and authorized under the laws of the State of New York. It is authorized to maintain a police department, which acts as its agent in the area of law

enforcement and for which it is ultimately responsible. Defendant **THE CITY OF NEW YORK** assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by New York City Police Department.

16.    Defendant **SERGEANT ELIEZER PABON (Shield No. 14623) ("P.O. PABON")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct  for incidents relevant to this Complaint.   Defendant **P.O. PABON** is sued in his individual and official capacities.

17.    Defendant  **P.O.  DANIELLE  HANKERSON  (Shield  No.  23415)  ("P.O. HANKERSON")** was, and still is, at all times relevant herein, duly appointed and acting officers,  agents,  servants,  and  employees  of  New  York  City  Police  Department  a municipal agency of Defendant **THE CITY OF NEW** YORK and of the 28th Precinct for incidents relevant to this Complaint.  **Defendant P.O. HANKERSON** is sued in her individual and official capacities.

18.    Defendant  **P.O.  SUTHOM  UNGCHAROEN  (Shield  No.  26224) ("P.O. UNGCHAROEN")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint. Defendant **P.O. UNGCHAROEN** is sued in his individual and official capacities.

19.    Defendant **P.O. CRAIG BULLARD (Shield No.  28485) ("P.O. BULLARD")** was,

and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint. Defendant **P.O. BULLARD** is sued in his individual and official capacities.

20.    Defendant **NEW YORK COUNTY ADA CAROLINA HOLDERNESS ("ADA HOLDERNESS")** was, and still is, at all times relevant herein, acting under color of state law in the course and scope of her duties and functions as officers, agents, servants, and employees of **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE,** was acting for, and on behalf of, and with the power and authority vested in her by **THE CITY OF NEW YORK AND NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** and was otherwise performing and engaging in conduct incidental to the performance of her lawful functions in the course of her duties, including but not limited to, the investigative phases. Defendant **ADA HOLDERNESS** is sued in her individual and official capacities.

21.    Defendants **A.D.A., and/or P.O. and/or CAPTAIN and/or SERGEANT "JOHN DOES" and/or C.O. JOHN/JANE DOES ("DOES")** were, and still are, at all times relevant herein, acting under color of state law in the course and scope of their duties and functions as Officers, Agents, Assistant District Attorneys, Captains, Sergeants, Servants, and Employees of Defendant **THE CITY OF NEW YORK,** were acting for, and on behalf of, and with the power and authority vested in them by Defendants **THE CITY OF NEW YORK** and New York City Police Department, New York County District Attorney's Office, and New York City Department of Correction (DOC) and

were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  Defendant DOES are sued in their individual and official capacities.[1]

22.     Defendants **THE CITY OF NEW YORK** and New York City Department of Correction (DOC) owned, operated, managed and provided security to the premises, appurtenances and fixtures at Riker's Island and Mid-South Hudson facilities.

23.     At all times relevant, Defendants were "personally involved" for purposes of liability under § 1983 where they set the wheels of the constitutional depravation in motion, regardless of whether they are "directly" involved.  *See,* Celestin v. City of New York, 581 F.Supp.2d 420, 429 (E.D.N.Y. 2008) ("Personal involvement may  be established by a showing of direct participation, meaning 'personal participation by one who has knowledge of the facts that rendered the conduct illegal or *indirect participation* such as *ordering* or *helping others* to do the unlawful acts.") (*emphasis added*).  This may also include instances of supervisory liability.

## STATEMENT OF FACTS

### THE UNDERLYING INCIDENTS AND THE IMMEASURABLE AMOUNT OF POLICE MISCONDUCT

24.     Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with

---

[1] Despite Plaintiff's due diligence, Plaintiff at this time is not in possession of all relevant names and identifying information of all Defendants personally involved or with personal knowledge during this decade of prosecution. This includes but is not limited to, the Captain of the N.Y. Supreme Court Officers, who falsely swore to the replacement complaint. The Officers that may or may not have directly participated in the civil rights violations and/or held pertinent supervisory roles in this case could include, but would not be limited to a "P.O. INGRAM" (P.O. Pabon's partner at the time); "P.O. LUPERON" and/or other officers, whose names, shield numbers and tax IDs are in the exclusive possession of Defendants to be substituted during discovery.  Upon information and belief, ADA CAROLINE SERINO and ADA JUNG PARK may have participated in the investigation and preparation of the manufacturing of this case against Mr. Harris. However, this information is in the sole possession of Defendants and will be substituted, if it is determined that it is necessary to include these P.O.s, ADAs or other Does to be substituted with named defendants during discovery

the same force and effect as though fully stated herein.

25.    The events which gave rise to this litigation began on or about September 12, 2011 and did not conclude until January 21, 2020.

26.    On September 12, 2011, Mr. Harris was arrested by Defendants, the officers employed by the New York City Police Department.

27.    At all times relevant to this complaint, Mr. Harris owned and resided in a Brownstone, located on 12 West 120th Street in the Harlem neighborhood of New York.

28.    Mr. Harris was a successful self-employed music producer (with famous musicians as clients, including but not limited to Wu-Tang Clan, Alicia Keys and Busta Rhymes, etc) with no time in prison until this timeframe.

29.    On September 12, 2011, at approximately 3:00 P.M., Ms. Aisha Mitchell, an old acquaintance of Mr. Harris, came over to his Brownstone home.

30.    Ms. Mitchell proceeded to make false allegations against Mr. Harris, which was an obvious extortion scheme.

31.    Mr. Harris threw Ms. Mitchell out of his house and called to report this incident and his suspicions to his cousins, who are both NYPD officers employed by Defendants.  His cousins advised him to lock his door and remain in his home.  He reasonably relied on this advice.

32.    At approximately 4:00pm on September 12, 2011, the arresting officer, Defendant **P.O. PABON** and several other police officers, including **P.O. "DOES"** broke down the door to Mr. Harris' brownstone, entered Mr. Harris' home and arrested Mr. Harris.

33.    Upon information and belief, the arrest was warrantless and devoid of any exigent circumstances.

34.    At the time the arrest was made, there was no ongoing emergency upon arrival that required the Officers to enter the home without a warrant.

35.    At no point in time did Mr. Harris resist arrest.

36.    Upon information and belief and during this warrantless arrest, Defendant **P.O. HANKERSON** arrived and mentioned that there was an assault of a woman reported earlier that day at the park across the street from Mr. Harris' residence.  The "woman from the park" then used an all-too-commonly used description (a description, which has been manipulated over time to demonize men of color in the community and has consistently haunted and criminalized black men throughout history) by reporting to **P.O. HANKERSON** that though she was not able to provide any identifying characteristics of her assailant, she could confirm (albeit, stereotypically), that it was a "tall black man."

37.    Defendant **P.O. PABON** seized on this information to manipulate this sound bite as a way to falsely and deceptively trump up the sexual assault charges against Mr. Harris.

38.    As such, the charges against Mr. Harris were then altered to include the totally unrelated assault incident, which allegedly occurred in the park.

39.    **P.O. PABON** falsely reported that the "woman from the park" had positively identified Mr. Harris when this was not true.

40.    This choice by **P.O. PABON** to falsely swear that the "woman from the park" positively identified Mr. Harris, was made maliciously and intentionally.

41.    Mr. Harris' home was searched without any valid reason or provocation, and no contraband or anything illegal was found.

42.    On or about September 12, 2011, Defendant **P.O. PABON** applied for a Search Warrant

for Mr. Harris's residence.

43.     Upon information and belief, this search warrant falsely swears that the reasonable cause to search Mr. Harris' home was based, in part, on a lie, that **P.O. PABON** had a conversation with Mr. Harris in his home, however there were no conversations by and between **P.O. PABON** and the Plaintiff.

44.     This search warrant falsely swears to the existence of "blood, semen" found in the home, and upon information and belief, not one scintilla of this alleged evidence was ever observed, found, located or retrieved from Mr. Harris' home.  This alleged evidence did not exist.

45.     Upon information and belief, Mr. Harris was taken directly to the 28th Precinct where he was placed in a holding cell.

46.     Mr. Harris was transported to Bellevue Hospital to have a psychiatric evaluation because he was "refusing to speak to the police."

47.     Upon information and belief, Mr. Harris was not transported to Central Booking until approximately 3:00am where he was fingerprinted, processed, photographed and taken to see the Judge the following day.

48.     A Judge set bail in the amount of $250,000 based on the Defendant Officers false allegations.

49.     Mr. Harris owned a multi-million dollar brownstone, and had adequate assets to make bail, which was made clear to the Court during the Prosecutions bail argument.

50.     Following bail being set, Mr. Harris was directed to remain in the courtroom by DOC staff defendants while his family was securing his bail payment.

51.     The Correction Officers, the Court Staff, the Defense Attorney, and Plaintiff, all were

under the impression bail was being posted and the Plaintiff was being released from custody.

52. Defendant **P.O. BULLARD** and Defendant **CAPTAIN "DOE"** escorted Mr. Harris outside, by going through multiple locked gates and doors, which were unlocked by other officers.

53. Upon information and belief, Mr. Harris was escorted out through the back door, which was the same door he entered.  Defendant **P.O. BULLARD** and Defendant **CAPTAIN "DOE"** and other officers were present when he exited, which was depicted on the surveillance video later produced to the Court during his criminal trial.

54. When Mr. Harris was released from Central Booking at approximately 2:00AM, he went back to his home, the place he was initially arrested.

55. At approximately 5:00-6:00am, Plaintiff heard **P.O. UNGCHAROEN** outside of his home, yelling and knocking on his front door.

56. Upon information and belief, Mr. Harris went to the front door where **P.O. UNGCHAROEN** advised him that he was being rearrested on the charge of escaping. There were several other officers present.

57. Mr. Harris was transported to the 28th Precinct, processed, and taken back to Central Bookings for arraignment.

58. Mr. Harris was charged with escape, which was based on a falsely sworn arrest complaint.[2]

59. Due to this additional false felony complaint by the Defendants, Mr. Harris was denied

---

[2] P.O. UNGCHAROEN's original felony arrest complaint was superseded by a subsequent complaint drafted by the Captain of the N.Y. Supreme Court Officers (upon information and belief, Captain "Farrell", shield number, unknown who may be substituted as a DOE defendant once Defendants provide all identifying information).

bail and remanded into custody.  He was transported to Riker's Island. No amount of money could get the Plaintiff out of jail at this point because he was on Remand.

60.    But for the false arrest of the false claim of escape, Mr. Harris would not have been incarcerated while awaiting trial.

61.    At a subsequent Court Proceeding, the Honorable Judge Bartley lifted the remand off Mr. Harris, granting him bail.

62.    On the next Court date, While Mr. Harris was in the process of securing this new bail amount with his family, **ADA HOLDERNESS and/or ADA DOES** asked the Judge to revoke the bail order based on an unrelated August 3, 2011 arrest.  As a result, the Judge remanded Mr. Harris again, and he was unable to post any bail, and was forced to remain in jail during the pendency of these false charges.

### THE QUINTESSENTIAL RIKER'S ISLAND EXPERIENCE AS AN INNOCENT PRE- TRIAL DETAINEE, WHICH LIVED UP TO ITS HORRIFYING REPUTATION

63.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

64.    Plaintiff was incarcerated at Riker's Island for approximately four (4) years while awaiting his criminal trial, thus, Plaintiff maintained the status as a Pre-Trial Detainee for the totality of his incarceration.

65.    During Mr. Harris' time spent on Riker's Island, Plaintiff was subjected to multiple acts of violence by inmates, as well as subjected to extreme and severe psychological warfare, excessive force and many acts of verbal abuse and violence at the hands of Defendants- correction officers.

66.    Mr. Harris was battered, assaulted, and physically abused for the entirety of his

incarceration. The officers' subsequent failures to act and failures to intervene ultimately increased the severity of his injuries by their refusal to intervene, their refusal to get him necessary medical attention, their deliberate indifference to his medical needs and denial of medical treatment throughout his time incarcerated while awaiting trial.

67. Mr. Harris was mentally and emotionally abused for the duration of his incarceration by the Defendants in this case, Police Officers, Correction Officers and Assistant District Attorneys employed by the City of New York.

68. This psychological abuse continued throughout the investigation and prosecution but, also included many things within the walls of the prison such as refusing to allow him to get his haircuts, despite having the proper vouchers to do so; spreading false defamatory rumors to other inmates that Mr. Harris was a bad man; refusing his requests to go to the Law Library; depriving him of calls and visits from his loved ones; preventing him from his daily exercise; never giving him the correct meals that supported his vegan diet; and otherwise mentally torturing him for the entirety of his time in prison awaiting trial.

69. Mr. Harris was subjected to an excessive and unreasonable custodial detention and all association therewith, including but not limited to excessive time in Solitary Confinement (the "SHU" or the "box").

70. Mr. Harris was ticketed with retaliatory infractions, which led to severe and unfair punishments (including but not limited to excessive time in solitary confinement), mostly stemming from false allegations only to be deprived of due process, refused his requests for what should have been mandatory hearings and otherwise deprived of many of the privileges afforded to inmates awaiting trial.

71.    Despite many of the retaliatory infractions ultimately being dismissed, the disciplinary dispositions and interim punishments had already caused immeasurable damage.

72.    For instance, upon information and belief, on or about October 14, 2011 (after serving punishments for other fabricated charges) while in West Facility, **C.O. "DOE"**, (who may go by "C.O. Harris", Shield No. Unknown), called Mr. Harris out of his cell "to talk".  Plaintiff followed the orders and was taken down a hall where there was an inmate waiting for him to strike him on the back of the head.  **C.O. "DOE"** ("C.O. Harris") did not intervene or intercede, even more so, he set it up and /or looked on while it happened. This type of behavior by Correction Officers and the inability to manage this has now recently been held by Courts to be "tantamount to deliberate indifference" as reasoned by Hon. Justice April Newbauer of New York County Supreme Court.

73.    Following the Defendants' endorsed 'Fight Night' behavior, the officer proceeded to escort Mr. Harris back to his cell (denying Mr. Harris much needed medical attention), and to add insult to injury, wrote him a retaliatory infraction. Upon information and belief, on or about October 19, 2011, when Plaintiff reported for  the disciplinary hearing, **C.O. DOE** ("C.O. Harris") was called on the phone by the Adjudication Captain who was overseeing the hearing.  When the Captain asked C.O. "Harris" to explain the claim made by Plaintiff that he was "set up", C.O. "Harris" inexplicably hung up on the Adjudication Captain.   Upon information and belief, the bogus infraction was soon dismissed.   However, the punishment for the infraction had already begun and Plaintiff was inexcusably suffering in solitary confinement from the date of the infraction through the date of the hearing.

74.    Upon information and belief, on or about February 9, 2012, Mr. Harris was the victim

of another "set up" by the correction officers.

75.    Markedly, it was during one of these many assaults in the day room of Riker's Island where the officers **C.O. "DOES"** (without warning), indiscriminately and gratuitously sprayed Mr. Harris with a chemical agent, (potentially MK9) and handcuffed Plaintiff leaving him unattended to for over 5-6 hours.  The handcuffs were too tight, Mr. Harris pleaded and asked for the handcuffs to be loosened, and the officers ignored and/or denied all of Mr. Harris' requests and pleas.  As a result, Mr. Harris' thumb/wrist was broken necessitating him to be in a cast up to his elbow for over eight (8) months.   To date, he still has restricted range of motion in his thumb as well as intermittent pain.

76.    During the time he was in a cast for the broken thumb/wrist, Mr. Harris' family member visited.  The officer **C.O. "DOE"** inappropriately ordered Mr. Harris to remove his cast so that his broken thumb/wrist could be handcuffed.  As a result, Mr. Harris was in excruciating pain.  In response to Mr. Harris explaining he was in pain, the officer punched Mr. Harris in the face after he was handcuffed.  Upon information and belief, the retaliatory infraction that stemmed from this incident was subsequently dismissed.

77.    Another example of abuse occurred while being housed in Mid-Hudson Forensic Psychiatric Center, Mr. Harris suffered a fractured skull from an inmate who was known to be a dangerous inmate and required to be escorted by guards at all times.  With knowledge that the dangerous inmate was in the bathroom, and that it was not only foreseeable, but probable that whomever went into the bathroom would be attacked, the **C.O. "DOES"**, (including a "C.O. Johnson"), ordered Mr. Harris to go into the bathroom. As expected, the dangerous inmate lunged at Mr. Harris.  Mr. Harris was beaten, the blows which knocked out two

(2) teeth in his mouth and resulted in a fractured skull and fractured orbital bone.

78.     Mr. Harris was eventually transported to Orange Regional Hospital where the doctors directed him to a trauma center and transferred him to Westchester Medical Center for emergency surgery.  The **C.O. "DOES"** escorts from Mid-Hudson refused to permit the necessary surgery.  With deliberate indifference, Mr. Harris was prevented from surgery and from follow-up visits to the doctor, which was contrary to the medical diagnoses and treatment plan.

### THE TRIAL OF 2015 AND THE REVELATION OF THE OVERWHELMING MOUNTAIN OF EXCULPATORY EVIDENCE

79.     Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

80.     Upon information and belief, Defendants engaged in the destruction and falsification of evidence throughout the entirety of Mr. Harris' arrest, investigation, preparation for trial and throughout the course of the trial proceedings and reinvestigation following the acquittal and mistrial.

81.     The Defendant police officers swore to an accusatory instrument that contained false information and withheld material facts from the trial attorneys.

82.     The sexual assault complaint falsely stated and was sworn to by **P.O. PABON** that **P.O. PABON** was informed by **P.O. HANKERSON** that Mr. Harris was observed assaulting a second woman in front of his house ("the woman from the park").

83.     After failing to intercede and/or intervene throughout the entire investigatory phase of this arrest, whereby permitting false reporting and deceptive practices by her fellow officers, **P.O. HANKERSON** testified under oath at both the pre-trial hearings and trial that she never told **P.O. PABON** that "the woman from the park" positively identified

Mr. Harris or any perpetrator, for that matter.

84. The Grand Jury proceedings were defective and mishandled in bad faith in that there was no lawful authorization to place an unrelated alleged misdemeanor offense within an unrelated felony complaint when it is not part of any felony transaction.

85. Upon information and belief, **ADA HOLDERNESS** rushed to an indictment to satisfy CPL § 180.80, and by rushing, they violated CPL § 190.55.

86. Defendants' withholding of material facts deviated from standard protocol and any standard of fairness or due process.

87. The Defendants put forth many witnesses, relying solely on information provided to them with no further inquiry, when a reasonable person in their position would have done so. For example, the alleged victim (Ms. Mitchell) from the sexual assault case testified under oath at trial that she did not know Mr. Harris prior to that day.

88. Upon information and belief and sometime in July of 2015, immediately before trial, the Defendant **ADA HOLDERNESS and/or ADA DOES** exchanged the New York City Medical Examiner's Report.

89. Dr. Kamnik, for the City of New York (the Department of Health and Mental Hygiene), was called as a witness as part of the People's case in chief and testified under oath that out of all of the DNA profiles which were obtained in the case, Derrick Harris was excluded as a source.

90. Pursuant to Ms. Mitchell's initial claims (which were debunked well before the dismissal in 2020), which led to Mr. Harris' top charge in the indictment, the "sexual offense evidence" was collected as part of Ms. Mitchell's Rape Kit.

91. The Rape Kit contained the following: oral swabs and smear, a buccal specimen (which

is a swab of the inside of Ms. Mitchell's mouth/cheek), dried secretions from her neck, inner thighs, perianal, and smear, vulva swabs and smear and vaginal swabs and smear.

92.   Contrary to Ms. Mitchell's claims, Dr. Kamnik testified under oath that "no semen was found on the blue jeans, blue T-shirt or brown shirt and no blood was found on the blue jeans or the blue T-shirt."

93.   Dr. Kamnik also testified at trial that no DNA and no saliva was found on any of the alleged victim's tested clothes.

94.   Egregiously, though the Defendants were in possession of this Medical Examiner Report as early as September 26, 2011, they nevertheless continued the investigation and prosecution of Mr. Harris for years leading up to this trial of 2015 despite access to conclusive evidence of innocence (and a clear dissipation of any potential probable cause).

95.   Upon information and belief, Defendants, including but not limited to **ADA HOLDERNESS** and **ADA DOES** argued at trial that further processing of the Rape Kit, to include testing for the lubricants, specifically KY Jelly and Johnson's Baby Oil *could not be done*.  This was a lie because subsequently, Mr. Harris was able to have it done by an outside company after the trial, which resulted in further proof of his innocence.

96.   Defendants, including but not limited to **ADA HOLDERNESS** and **ADA DOES** as part of their continued investigation, opted *not* to test for the presence of lubricants because they already had conclusive evidence excluding Mr. Harris from the Rape Kit and any further testing would have only substantiated Mr. Harris' claim of innocence.

97.   In August of 2015, the Jury returned a partial verdict where Mr. Harris was found Not

Guilty on the top charge of sexual assault and other top charges but deadlocked on the charge of escape and the lower charges.

98.    While on Riker's Island awaiting trial, the Plaintiff was prohibited from viewing the video of this alleged "escape". When Mr. Harris explained this to the Judge, His Honor allowed Mr. Harris to view the video while in Court with his advisory counsel present.

99.    While viewing the video, it was evident that there were many minutes missing in several places throughout the tape and upon information and belief, the Judge stated on the record that he believed the video looked 'fishy' because there would be no way to get out of the Court building without it being captured on video, thus speculating that this video was doctored or edited.

100.   Upon information and belief, as a result of this partial not-guilty verdict (and despite indication that the escape charge was going to be *sua sponte* dismissed), Defendants fought against Plaintiff's conditional release and as such, Plaintiff was remanded to custody in Riker's Island.

101.   After a few additional Court appearances, where the Prosecutor was allegedly re-evaluating the evidence against Plaintiff, a Judge finally lifted the remand status and set bail at $500,000.

102.   Over the People's objections, Mr. Harris made bail and was finally released from unlawful incarceration in November of 2015.

### PLAINTIFF IS FORCED TO CONTINUE ZEALOUSLY "PROVING HIS INNOCENCE" FOR AN ADDITIONAL FOUR YEARS NOTWITHSTANDING BELIGERENT RESISTANCE FROM DEFENDANTS

103.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

104.    As of Plaintiff's long and overdue release in November of 2015, Plaintiff had been found Not Guilty by a jury of his peers on the charge of sexual assault of Ms. Mitchell; the Judge had dismissed the escape charges citing its opinion that the video had been doctored; and only a couple of misdemeanor charges remained.

105.    At this juncture, Ms. Mitchell's claim had long been discredited; the officers had contradicted one another on the witness stand; evidence had been clearly manipulated; police documents had been fabricated; false sworn statements had been revealed; officers had lied; the top charges had already been dismissed; and the officer had already explicitly stated that the "woman from the park" never identified Mr. Harris as her assailant.  Once the Defendants, specifically **ADA HOLDERNESS** and **DOES** learned that the "woman from the park" substantially changed her testimony, Defendants knew that she was prohibited from testifying – but, disregarded this and continued their tunnel-vision prosecution.

106.    In this moment, the decision to not retry Mr. Harris would have been the correct choice, however when Defendants again, were presented with a choice to do the right thing, they chose not to do so.

107.    Mr. Harris paid for lab testing and expert analysis due to the Defendants' failure to test and/or failure to not reveal the test results, which proved there was no presence of semen or saliva on Ms. Mitchell's clothes, no presence of KY Jelly in Ms. Mitchell's body, no evidence of Plaintiff's DNA.

108.    Mr. Harris obtained the phone records between Mr. Harris and Ms. Mitchell proving the prior friendship and easily discrediting Ms. Mitchell.

109.    Upon information and belief, the State had already tested the rape kit; but because the

results did not conform to the Defendants' plan to manufacture proof to put an innocent man in jail, they omitted this material evidence during the investigation and intentionally blocked it from coming in at the trial.

110.    Upon information and belief, on or about December 6, 2018, Mr. Samuel David, Esq. of the New York County District Attorney's Office dismissed all remaining counts of the indictment but, chose to keep one solitary count: the unrelated charge.    This unrelated misdemeanor charge should have been dismissed retroactively, however Defendants bullishly charged forward.

111.    It was not until December 19, 2019 (more than another full year later!) that the final charge on the indictment was dismissed on December 19, 2019.

112.    The Defendants maliciously deprived him of his right to liberty and maliciously prosecuted him for four (4) more years before finally deciding to end this once and for all on January 21, 2020, when they moved to dismiss the case in its entirety.

### ADDITIONAL DAMAGES AND DETAILS ENCOMPASSING THE PROMISING LIFE THAT WAS PAINSTAKINGLY STRIPPED FROM PLAINTIFF

113.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

114.    There is no question that this ordeal has greatly caused, initiated and then continuously aggravated and exacerbated his emotional damages, and has otherwise affected him mentally, emotionally and psychologically.

115.    Additionally, and as a further result of this ordeal, which was instituted and maintained by Defendants, Plaintiff Mr. Harris has suffered substantial actual damages, including and not limited to, legal fees and court costs, expenses of defending the prosecution and

subsequent motions and court appearances, prolonged confinement, loss of use of his property, including his Brownstone, and other property never returned to him, extreme emotional distress, aggravation, humiliation, loss of enjoyment of life, loss of reputation, trauma, further fear of arrest and other incidental and consequential damages, which were reasonably foreseeable by Defendants.

116.   Specifically and upon information and belief, as a result of the constant and consistent physical, mental, verbal abuse while incarcerated, Mr. Harris has suffered and will continue to suffer from many conditions, injuries, ailments, etc., including but not limited to: Major Depressive Disorder, Post-Traumatic Stress Disorder, Anxiety, Trouble Sleeping/Sleeplessness/Insomnia, Flashbacks, Adjustment Disorder, Mixed Anxiety with Depressed Mood, Headaches, Nightmares, a Traumatic Brain Injury (TBI), a Fractured Skull, a Fractured Orbital Bone, a Dislocated Shoulder, Fractured Thumb/Wrist, Reduced Range of Motion in Thumb, Tinnitus/Ringing in ear, Memory Loss and Memory Issues,

Problems with Writing, Blurred Vision, Fungus, Acne and Acne Scarring, Lower Back injuries, Neck injuries; and many other injuries for the rest of his life.

117.   Upon information and belief, Plaintiff has paid approximately $150,000.00 in legal fees, court costs and expenses for testing of evidence and investigating his own case.

118.   Upon information and belief, the Harlem Brownstone that Mr. Harris owned and restored in the historic district was sold while he was incarcerated.

119.   Upon information and belief, as a result of this near decade of accusations, many of Mr. Harris' familial relationships and friendships were irreparably destroyed.

120.   Upon information and belief, as a result of this near decade of humiliation, Mr. Harris

suffered damage to his reputation, loss of earnings and loss of future opportunities.

121. Upon information and belief, as a result of this near decade of embarrassment, Mr. Harris was defamed and that defamation continues to the present day as many of the published articles have never been corrected or removed.

122. As a result of this wrongful, unlawful and unjustified imprisonment, Mr. Harris suffered serious and severe health conditions.

123. Upon information and belief, Mr. Harris was placed in solitary confinement more than thirty (30) times.

124. Upon information and belief, Plaintiff has suffered severe and significant personal injuries and was otherwise damaged.

125. Plaintiff attended numerous court appearances during his time on Riker's Island and for many years subsequent to his release from incarceration.

126. Plaintiff was wrongfully incarcerated for more than four (4) years, not including the additional four years of an imprisoned mind throughout the time after trial while awaiting his fate.

127. Upon information and belief, Mr. Harris sustained and will continue to sustain physical, mental and emotional trauma, humiliation, economic and monetary loss as well as loss of enjoyment of life for the rest of his life.

## AS AND FOR A FIRST CAUSE OF ACTION
### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 BY THE CITY OF NEW YORK; POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS; ADA, and/or P.O. and/or CAPTAIN and/or SERGEANT "JOHN/JANE DOES"

128. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

129.   At all times material to this complaint, Defendant **THE CITY OF NEW YORK** acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/SERGEANT and/or C.O. "DOES"** had in effect actual and/or _de facto_ policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

130.   At all times material to this complaint, Defendant **THE CITY OF NEW YORK** acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; B U L L A R D ; ADA HOLDERNESS, AND  A D A ,  P.O. /CAPTAIN/SERGEANT and/or C.O.  "DOES"** had in effect and/or _defacto_ policies, practices, customs and usages of failing to properly train, screen, supervise and discipline employees and police officers, and of failing to inform the individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants.  The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

131.   Defendant **THE CITY OF NEW YORK** acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS** and **ADA, P.O. and/or CAPTAIN and/or SERGEANT and/or C.O. "JOHN DOES"** being aware that such lack of training, screening, supervision, and discipline leads to improper conduct, acted with deliberate indifference

in failing to establish a program of effective training, screening, supervision and discipline. Defendant **THE CITY OF NEW YORK** being aware that the persistent and substantial risk of improper arrest, search, seizure, detention and prosecution of persons based upon insufficient or incorrect information, and effective training, screening, supervision and discipline would lessen the likelihood of such occurrences. There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens, more specifically Plaintiff and which are officially tolerated by Defendant **THE CITY OF NEW YORK**. Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/damages alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

132. By the **CITY OF NEW YORK** through the District Attorney's conduct and actions in arresting, searching, imprisoning, failing to intercede on behalf of Plaintiff and in failing to protect him from the unjustified and unconstitutional treatment he received at the hands of Defendants **ADA HOLDERNESS** and **ADA DOES** acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of his acts, caused injury and damage in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

133. In this case, there was fabrication of evidence during the investigative phase. **ADA HOLDERNESS** and **ADA DOES** took it a step further in that material omissions were

knowingly made, which constituted further falsification of evidence. By fabricating evidence in the "investigative role", it was reasonably foreseeable that the evidence would be used in the grand jury.

134.   Upon information and belief, there was a pattern of <u>Brady</u> violations in this case.

135.   Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/damages alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

136.   The Defendants denied Plaintiff of his right to liberty by basing this denial of liberty on false evidence.

137.   The defendants denied Plaintiff of his right to liberty when they changed the initial accusatory instrument by adding the felony escape charge, which was later dismissed for insufficient evidence.

138.   The investigating officials in this case fabricated evidence, which was likely to influence a jury's decision, forwarded that information to prosecutors and as a result, Mr. Harris suffered a deprivation of liberty.

139.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SECOND CAUSE OF ACTION
### FAILURE TO INTERVENE

140.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with

the same force and effect as though fully stated herein.

141. Defendants were under the duty of safeguarding the public and ensuring the appropriate execution of their roles.

142. Plaintiff duly relied on Defendants' **POLICE OFFICERS'** fulfillment of their policing duties.

143. Plaintiff duly relied on Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE'S** fulfillment of their prosecutorial duties.

144. Plaintiff duly relied on Defendants **CORRECTION OFFICERS'** fulfillment of their correctional duties.

145. Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in their presence.

146. At the time, Defendants were observing and aware of the wrongful acts against Plaintiff.

147. At the time, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in depraved and deliberate indifference to Plaintiff's well-being.

148. Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

149. Defendants had an affirmative duty to intervene when Plaintiff's constitutional rights were being violated in Defendants' presence by knowingly falsifying evidence, observing others lie under oath, observing others making material misstatements of facts and/or omitting necessary facts, preventing exculpatory evidence from the trial, continuing to prosecute despite the dissipation of probable cause to arrest and continued

prosecution of Plaintiff, failing to prevent Plaintiff from being assaulted, battered, beaten and otherwise attacked, permitting retaliatory infractions and otherwise violating Plaintiff's constitutional rights in Defendants' presence.

150.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

151.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

### AS AND FOR A THIRD CAUSE OF ACTION
**MALICIOUS PROSECUTION UNDER THE UNITED STATES CONSTITUTION and 42 U.S.C. § 1983 AND UNDER NEW YORK STATE CLAIMS**

152.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

153.    Post arraignment deprivation of liberty implicates malicious prosecution.  *See,* Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995).

154.    Throughout the course of this arrest, investigation, prosecution and continued "reinvestigation", Defendants in this case were deliberately deceptive thus triggering a malicious prosecution claim.

155.    Defendants failed to relay pertinent information to the prosecution (despite having knowledge of the pertinent information).

156.    Defendants misled, coerced and/or failed to properly inform the prosecution.

157.    Defendants failed to give the assigned district attorney the details of the results of their

investigation leading the assigned district attorney to believe that plaintiff had assaulted two women.

158.   Defendants failed to investigate leads and failed to turn over Giglio and/or Brady information which clearly would have proven plaintiff's innocence.

159.   Defendants either failed to process, failed to timely process, or alternatively, processed and then concealed the results of the rape kit, which would have contributed to proving plaintiff's innocence. [3]

160.   Defendants failed to properly check the information that was provided to them from the alleged victim, despite having an opportunity to do so. This failure to make a further inquiry, when a reasonable person would have, is evidence of lack of probable cause. Colon v. City of New York, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983), see also Boose v. City of Rochester, 71 A.D.2d 59, 421 N.Y.S.2d 740, 748–749 (4th Dep't 1979).

161.   By the actions described above, Defendants caused Plaintiff to be maliciously prosecuted without any probable cause, without reasonable suspicion, without any proper claims, without any right or authority to do so, illegally and with malice.

162.   Defendants' actions with regards to the institution and maintenance of the criminal prosecution were committed wantonly and with a reckless disregard for whether a reasonable ground of suspicion existed, supported by the circumstances, which would lead a reasonably prudent person to believe that Plaintiff had committed a crime.

163.   By the actions described above, Defendants initiated a prosecution against Plaintiff.

---

[3] There were allegedly 350 rape kits unprocessed, submitted since November 2017 and as of 2020, Police in New York failed to process nearly 90% of rape kits performed on alleged victims of sexual assault of over the last six months and were still processing kits from three years ago

164.    By the action described above, the deprivation of liberty was effected pursuant to legal process and in perversion of proper legal procedures.

165.    Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; BULLARD; and P.O. and/or CAPTAIN and/or SERGEANT "DOES"** arrested and issued legal process in order to obtain collateral objectives outside the legitimate ends of the legal process and intimidating Plaintiff for their personal interest and further to prevent Plaintiff from disclosing the aforementioned evidence of their misconduct.

166.    Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; BULLARD; and P.O. and/or CAPTAIN and/or SERGEANT "DOES"** provided false information to the prosecutors and also created false information which likely would influence a jury's decision and forwarded that false information to the prosecutors.

167.    Defendants **P.O. PABON, P.O. HANKERSON**, **P.O. UNGCHAROEN, and P.O. BULLARD**; and P.O. **and/or CAPTAIN and/or SERGEANT "DOES"** "failed to make a full and complete statement of facts to the District Attorneys, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith" which satisfies the initiation element of malicious prosecution.

168.    Upon information and belief, Defendants **P.O. PABON, P.O. HANKERSON P.O. UNGCHAROEN; P.O. BULLARD, ADA HOLDERNESS and ADA, P.O. and/or CAPTAIN and/or SERGEANT "DOES";** procured a Grand Jury indictment by fraud, perjury and/or bad faith.  Thus, there is a question of fact at this stage in the litigation as to the propriety of the indictment.

169.    Defendant **ADA HOLDERNESS** and **ADA DOES** continued the prosecution knowing

that the evidence was insufficient and by the actions described above, Defendants

lacked probable cause to believe the proceeding could succeed.

170.    Defendant **ADA HOLDERNESS** and **ADA DOES** acted in an investigative capacity

when she stopped the forensic testing of the rape kit and the swabs from the clothing

worn by Ms. Mitchell. This testing would have shown that there was no presence of

semen, saliva, or KY Jelly, contrary to Ms. Mitchell's contention. **ADA**

**HOLDERNESS** and **ADA DOES** did this with malice because they knew the testing

would result in an exoneration of the Plaintiff.

171.    Defendant **ADA HOLDERNESS** and **ADA DOES** also refused, deferred, or delayed

turning over the only forensic testing done on the rape kit, until moments before trial.

172.    Defendants acted with intent to do harm to Plaintiff without excuse or justification.

173.    Defendants false accusations were done intentionally and maliciously to mislead the

Criminal Court.

174.    The prosecution was ultimately terminated in favor of Plaintiff.

175.    Defendants, acting with animus, and under color of law and without lawful justification,

intentionally, maliciously, and with deliberate indifference to and/or a reckless

disregard for the natural and probable consequences of his acts, caused injury and

damage due to this malicious prosecution in violation of Plaintiff's due process clause

and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States

Constitution, including its Fourth and Fourteenth Amendments.

176.    A timely Notice of Claim was filed with the City of New York.

177.    Even the requirement of attending court appearances in connection with prosecution

either for the underlying sexual assault and escape felony charges or any subsequent

fabricated infractions constitute deprivation of liberty under the 4th Amendment. *See* Murphy v. Lynn, 118 F.3d 938, 945 (2d Cir. 1997)("The question, therefore, is whether the requirement that he attend court appointments constituted a 'seizure' within the meaning of the Fourth Amendment. We conclude that they did.")

178.  The defendants created false information and forwarded that information to prosecutors.

179.  Mr. Harris overcomes the presumption of probable cause arising from his indictment with evidence establishing that police witnesses did not make complete and full statements of facts either to grand jury or to district attorney, that they misrepresented or falsified evidence, and that they have withheld evidence or otherwise acted in bad faith.

180.  As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific psychological  and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

**AS AND FOR AN FOURTH CAUSE OF ACTION**
**DEPRIVATION OF CONSTITUTIONAL RIGHT TO A FAIR TRIAL**

181.  Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

182.  The illegal and improper investigation created by Defendants established false information likely to influence a jury's decision and said information was forwarded to the prosecution.

183.  The Defendants engaged in an unlawful, unreasonable, and arbitrary investigation, which lead to Plaintiff's arrest.

184.  The defendants deviated from standard protocols.  Thus, Mr. Harris's Constitutional Right to a Fair Trial was violated and the harm occasioned by this violation is an action

for damages under 42 USC § 1983.  Here, a reasonable jury could find, based on the evidence, that defendants, under the color of state law, violated the Plaintiff's clearly established constitutional rights by conspiring to fabricate the story, which was almost certain to influence a jury's verdict.

185.   Defendant **PO PABON** testified falsely in the Grand Jury and at Trial that "the witness in the park" positively described and identified Plaintiff as being the one that assaulted her, when that was in fact not true.

186.   The Defendant Police Officers also lied in the official police paperwork regarding witness descriptions, witness identifications, and the observations surrounding the arrest for bail jumping.

187.   That the plaintiff did not know and could not have known that the investigation was illegal and/or improper until the favorable termination of the initial proceedings.

188.   The fabrication of evidence by the named police officers and unnamed police officers and forwarding of such evidence to prosecutors in this case was inherently harmful, regardless of whether there existed additional and untainted evidence.

189.   The plaintiff was subjected to deprivation of Constitutional Right to a Fair Trial in violation of his rights as guaranteed under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 USC § 1983.

190.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS**
**(INCLUDING UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT &**
**DELIBERATE INDIFFERENCE TO CONDITIONS OF CONFINEMENT**

**FABRICATION OF EVIDENCE & CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS)**

191.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

192.    Defendants individually and collectively are liable pursuant to 42 U.S.C. § 1983 for abuses against Plaintiff that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

193.    Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of Article 1, § 5 of the New York State Constitution.

194.    Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of New York law, rules and regulations.

195.    Defendants are liable for depriving Mr. Harris of liberty without due process of law in violation of U.S. Constitution, amend. XIV, § 1, cl. 3.

196.    Defendants are liable for fabricating evidence, under the Sixth Amendment to the United States Constitution.

197.    Defendants are liable for fabricating evidence, which is an independent harm redressable under § 1983 and brings this claim challenging his criminal pretrial detention as unsupported by probable cause, even after the start of legal process (i.e. after the Judge's probable cause determination).  Manuel v. City of Joliet, 137 S. Ct. 911, 914 (2017).  In this case, the Judge's probable cause determination was predicated on the police officer's false statements, and thus, Plaintiff's challenge is valid.

198.    Defendants subjected Plaintiff to criminal charges on the basis of false evidence that was deliberately fabricated by the defendants.

199.    Defendants did, with malice, compose and swear out a false criminal complaint against

Plaintiff and institute the criminal case against Plaintiff and that there was intent to do harm without justification. The defendants deliberately fabricated evidence that was used to criminally charge and prosecute the plaintiff.

200. Plaintiff was deprived of his property, namely his home, without probable cause.

201. Defendants systematically engaged in fabrication of evidence, false swearing, mishandling of evidence while in custody, withholding exculpatory evidence from prosecutors, failure to disclose evidence inconsistent with the plaintiff's guilt, false reporting of facts in the arresting documents, falsely reported facts in the warrants, maliciously concealing material evidence and maliciously prosecuting this case even after any and all probable cause had dissipated.

202. Evidence fabrication in this case served to both improperly charge and/or arrest him as well as unfairly try him and continue prosecution even past the partial not guilty verdict. It involves aspects of both due process violations.

203. In this case, the police officers turned over fabricated evidence to the prosecutor, and in addition to a Brady violation, can be redressed as a deprivation of liberty on the basis of false and fabricated evidence.

204. Officers swore out a false complaint, false warrant and withheld crucial information from the prosecutors and then the prosecutors in turn, once they learned or had reason to believe that the documents were not facially sufficient or that otherwise further inquiries needed to be made to continue the investigation, the prosecutors also violated Mr. Harris' due process rights.

205. Because no reasonably competent officer could disagree that the officer(s) could not properly rely on evidence, he knows to be false, qualified immunity cannot attach.

Additionally, there is no immunity attached to those who falsify affidavits and fabricate evidence. The inconsistencies in the arresting documents and the warrants are more than a "mere discrepancy".

206. Defendants acted in concert to fabricate the charges. Defendants acted in their own personal interest, and not in the interest of the New York City Police Department or in the interest of the New York County District Attorney's Office in fabricating the charges against the Plaintiff. *See* Lewis v. Havernack, No. 12 Civ. 0031, 2013 WL 1294606, at *13 (N.D.N.Y. March 28, 2013).

207. All the defendants, acting with each other individually and on behalf of and under the auspices and control of the City, and under color of law, conspired to injure plaintiff in his person and property and deprive plaintiff of his First, Fourth, Fifth and Fourteenth Amendment rights.

208. The defendants jointly caused such deprivation of rights by acting in concert to disseminate false information concerning the plaintiff and by disseminating false information that lacked any reasonable basis or probable cause to support it that the plaintiff committed a crime, and/ or to charge him with a crime, and/ or to arrest him.

209. This Court has long recognized that knowingly using false evidence to deprive a defendant of liberty is "inconsistent with the rudimentary demands of justice." Mooney v.Holohan, 294 U.S. 103, 112 (1935).

210. Even in the event that it is determined that the Fourth Amendment's low bar for bringing charges was met in this case, that does not authorize decisions to prosecute or continue detaining Mr. Harris based on lies or fake evidence, which are independently wrongful regardless of whether untainted evidence met the general probable-cause

standard.  In this case, Mr. Harris would not have been criminally charged, prosecuted, or otherwise deprived of his liberty but for the fabricated evidence, and that corruption violated his  due process rights.

211.   Plaintiff's rights pursuant to the Due Process Clause were violated when the use of excessive force amounted to punishment while he was a pretrial detainee.  The substantive right of due process includes the right to be free from excessive force.  Mr. Harris was deprived of this right when he was brutally beaten, set up, and otherwise subjected to acts of violence and punishment while incarcerated.  The Defendants **C.O. "DOES"** inflicted unnecessary and wanton pain and suffering upon Mr. Harris and subjected Mr. Harris to conditions of detention that  amount to punishment.

212.   The Defendants **C.O. "DOES"** acted improperly to impose the conditions and recklessly failed to act with reasonable care to mitigate the risk that the conditions posed to Mr. Harris even though the Defendants-Correction Officers knew or should have known that the conditions complained of posed an excessive risk to Mr. Harris' health and/or safety.

213.   The defendants' deliberate manufacture of false evidence both in the courtroom and within the prison were in direct contravention to the Due Process Clause.

214.   The defendants had  no  reasonable  cause  or  rational  decision-making  when  they continued  to  prosecute  Plaintiff  after  the  evidence  was  processed  and  the  results exonerated  Plaintiff.

215.   Mr. Harris was a person detained prior to conviction, thus a pre-trial detainee innocent by law, of the underlying charges for the entirety of his incarceration and throughout his prolonged prosecution.

216.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A SIXTH CAUSE OF ACTION
### NEGLIGENCE AND/OR GROSS NEGLIGENCE

217.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

218.    Defendants negligently caused injuries and otherwise damaged Plaintiff.  The acts and conduct of Defendants were the direct and proximate cause of injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

219.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, TRAINING & INADEQUATE SUPERVISION UNDER NEW YORK STATE LAW AND § 1983

220.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

221.    At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to manage, control, and supervise the Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS; AND ADA, P.O. /CAPTAIN/SERGEANT, C.O "DOES".**

222.   Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) negligently hired, screened, retained, disciplined, supervised and trained **Defendants POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS; AND ADA, P.O. /CAPTAIN/SERGEANT and/or CO "DOES".**

223.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to hire qualified and sufficient personnel in connection with the operation, management control, teaching at and/or supervision of Defendants**.**

224.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to train their employees so as to enable them to properly maintain order and control.

225.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to promulgate proper and/or adequate rules and regulations governing the proper care, guidance and/or supervision to be provided and rendered by those agents, servants, officers and/or employees hired as New York City Police Officers, Correction Officers and Assistant District Attorneys.

226.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to provide a safe and proper environment.

227.   At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to

prevent from being prosecuted without probable cause.

228. At all times relevant hereto, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and/or said Defendants' agents, servants, employees and/or licensees were, jointly, severally and concurrently, negligent, careless and reckless in individually and collectively breaching each and every duty owed to Plaintiff.

229. The aforesaid occurrence was caused wholly and solely by reason of the negligence of Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and/or said Defendants' agents, servants, employees and/or licensees, without any fault or negligence on the part of Plaintiff contributing thereto.

230. Defendant **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS,** and **ADA, P.O. /CAPTAIN/SERGEANT and/or CO "DOES"** had *defacto* to policies, practices, customs and usage, which were a direct and proximate cause of the unconstitutional conduct alleged herein.

231. The facts presented by Plaintiff present allegations in support of this cause of action in that it is abundantly clear that the individual defendants' conduct during this experience was in part, due to negligence in training, supervision and indeed retention; and that the City of New York (through the NYPD, DOC and NY County District Attorney's Office)'s hiring processes were utterly deficient.

232. Had the employers used reasonable care in the hiring and retention of the employees that affected this matter, Mr. Harris may have been spared the foreseeable harm that he

incurred at all phases of this incident.

233. In this case, the employers placed their employees in positions to cause foreseeable harm to Mr. Harris.

234. The municipality's failure to properly train, hire, retain and/or supervise its police officers, correction officers, Assistant District Attorneys and employed agents, servants and employees, which "evidences a deliberate indifference to the rights of its inhabitants." *See,* Henry-Lee v. City of New York, 746 F.Supp.2d 546, 566 (SDNY 2010).

235. Because there was a failure to train in this case, which amounted to deliberate indifference to the rights of Mr. Harris throughout all phases of this experience, Mr. Harris rights were violated in the context of § 1983 and maintains a claim for liability in said context.

236. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL HARM

237. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

238. Defendants **THE CITY OF NEW YORK** and through the individual Defendants negligently caused emotional distress and damage to Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of emotional injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws,

rules and regulations of the City of New York.

239.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

### AS AND FOR A NINTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL HARM via STATE LAW AND § 1983

240.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

241.    Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/SERGEANT and/or C.O. "DOES"** knowingly, unreasonably, and maliciously sought to disturb Plaintiff by their individual and  collective outrageous conduct.

242.    In this case, there has been extreme outrageous conduct by Defendants with the intent to cause (and/or a disregard of a substantial probability of causing severe emotional distress, a causal connection between this conduct and the emotional damage Mr. Harris has experienced and severe emotional distress, which has been documented by professionals.

243.    A timely Notice of Claim was filed.

244.    This conduct includes, without being limited to, unreasonably and forcefully arresting him, improperly detaining him; subjecting him to multiple intimidation tactics, swearing out a false complaint, fabricating evidence, withholding crucial information from the prosecution, failing to test or otherwise processing and concealing the DNA

and rape kit evidence, maintaining the prosecution despite all of the instances when the probable cause dissipated, threatening him, mishandling his property, and many other additional ways in which they violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws, rules and regulations of the City of New York to be expounded upon in the course of discovery.

245.   Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/SERGEANT and/or C.O. "DOES"** have caused Plaintiff major depressive disorder, post-traumatic stress disorder, severe distress, humiliation, anxiety, fear, sleeplessness and severe distress, among many other severe emotional and psychological damages.

246.   Courts have held that continuous and coercive harassment *can* establish an IIED cause of action.

247.   Upon information and belief, Defendants committed multiple acts against Plaintiff, which invaded his interests and inflicted injuries upon his throughout all stages of investigation, the continuous detention, the hearings, trials and prolonged waiting period prior to deciding not to re-try; which cumulatively amounted to intentional infliction of emotional harm and/or distress for a near decade of Mr. Harris' life.

248.   The emotional harm and/or distress continues to the present day.

249.   The conduct transcended the bounds of human decency. The conduct

amounted to more than the emotional harm that is encompassed within the other claims.

250. While certain of plaintiffs' allegations would not, by themselves, necessarily rise to the level of extremity and outrageousness to support an IIED claim, the defendants' total alleged course of conduct does. "Collectively, these actions are sufficiently extreme and outrageous to state a claim for IIED under New York law." <u>Mejia v City of New York</u>, 119 F Supp 2d 232, 284-87 (EDNY 2000).

251. **THE CITY OF NEW YORK** is responsible based on the theory of *respondeat superior.*

252. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all Defendants:

a. Compensatory damages;

b. Punitive damages;

c. Declaratory relief;

d. Injunctive relief;

e. The convening and empaneling of a jury to consider the merits of the claims herein;

f. Costs and interest and Attorneys' fees;

g. Such other further relief as this court may deem appropriate and equitable.

DATED:          New York, New York
                December 20, 2022

                                    Respectfully submitted,


                                    *Cary London*
                                    Cary London, Esq.
                                    Shulman-Hill, PLLC
                                    *Attorneys for Plaintiff*
                                    1 State Street Plaza
                                    15th Floor
                                    New York, New York 10004
                                    (212) 221-1000


                                    Ellie Silverman, Esq.
                                    Shulman & Hill, PLLC
                                    *Attorneys for Plaintiff*
                                    1 State Street Plaza
                                    15th Floor
                                    New York, New York 10004
                                    (212) 221-1000