UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------- X

DERRICK HARRIS,

|  | *Plaintiff,* | **2nd AMENDED** |
|---|---|---|

                                    *Plaintiff,*

                    -against-

THE CITY OF NEW YORK; SERGEANT ELIEZER PABON
(Shield No. 14623); P.O. DANIELLE HANKERSON (Shield No.
23415); P.O. SUTHOM UNGCHAROEN (Shield No. 26224); P.O.
CRAIG BULLARD, (Shield 28485), NEW YORK COUNTY ADA
CAROLINA HOLDERNESS; ADA PARK,ADA SERINO, ADA
JANE DOES P.O. and/or CAPTAIN THOMAS FARRELL, and/or
SERGEANT and/or C.O. "JOHN/JANE DOES" 1-10 (the name
"John Doe" and/or "Jane Doe" being fictitious as the true names are
presently unknown, individually and in their official capacity as New
York City Assistant District Attorneys, New York City Police
Officers, Sergeants, Captions and/or, New York City Correction
Officers);

-------------------------------------------------------------------------------- X
----------

**2nd AMENDED
VERIFIED
COMPLAINT**

JURY TRIAL
DEMANDED

22-cv-1763 (ER)

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiff **DERRICK HARRIS** represented by

        **SHULMAN & HILL, PLLC** seeks relief for Defendants' violation of his rights

        secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and

        of rights secured by the relevant Amendments to the United States Constitution

        (specifically, but not limited to: First, Fourth and Fourteenth), Due Process Clause and

        of rights secured under the laws and Constitution of the State of New York.

2.      Plaintiff seeks damages, compensatory and punitive, affirmative and equitable relief,

        an award of costs, interest and attorney's fees, and such other and further relief as this

        Court deems equitable and just.

1

3.     Plaintiff was unjustly and falsely arrested and maliciously and falsely charged with criminal offenses and otherwise subjected to an excessive and unreasonable custodial detention and all association therewith.

4.     This case seeks justice for Mr. Harris for the unnecessary suffering he endured due to Defendants' acts and omissions (including false statements and affirmative misstatements).

## JURISDICTION AND VENUE

5.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 and § 1331, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

6.     Jurisdiction is also invoked herein pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983; 42 U.S.C. § 1988.

7.     Plaintiff respectfully requests that this Court exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any state court causes of action that arise from a common nucleus of operative facts that give rise to the federally based causes of action pleaded herein, and as against all parties that are so related to claims in this action within the original jurisdiction of this court that are formed as part of the same case or controversy.

8.     Venue herein is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (a), (b) and (c).

## JURY DEMAND

9.    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed.

R. Civ. P. 38(b).

10.    Upon information and belief and within the time prescribed by law, a sworn Notice of Claim stating, among other things, the time when and the place where the injuries and damages were sustained, together with Plaintiff's demands for adjustment thereof was duly served on Plaintiff's behalf on the Comptroller of Defendant **THE CITY OF NEW YORK** and that, thereafter, said Comptroller for Defendant refused or neglected for more than thirty (30) days, and up to the commencement of this action, to make any adjustment or payment thereof, and that, thereafter, and within the time provided by law, this action was commenced.

11.    Upon information and belief, pursuant to General Municipal Law §50(h), a hearing was held at the office of a designated agent on or about November 20, 2020.

## PARTIES

12.    Plaintiff **DERRICK HARRIS** ("Plaintiff" or "Mr. Harris"), a United States Citizen and at all times relevant to this Complaint, a resident of New York State who was held in the  custody of the New York City Department of Corrections and ("DOC") from September of 2011 through November of 2015 and was primarily confined in Riker's Correctional Facility and Mid-Hudson Psychiatric Hospital.

13.    Mr. Harris was arrested and prosecuted in New York County, State of New York.

14.    Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein,

a municipal corporation duly incorporated and existing under and by virtue of the laws of the State of New York.

15.     Defendant **THE CITY OF NEW YORK** was, and still is, at all times relevant herein, a municipal entity created and authorized under the laws of the State of New York. It is authorized to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant **THE CITY OF NEW YORK** assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by New York City Police Department.

16.     Defendant **SERGEANT ELIEZER PABON (Shield No. 14623) ("P.O. PABON")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct  for incidents relevant to this Complaint.  Defendant **P.O. PABON** is sued in his individual and official capacities.

17.     Defendant   **P.O.   DANIELLE HANKERSON (Shield No. 23415) ("P.O. HANKERSON")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW** YORK and of the 28th Precinct for incidents relevant to this Complaint.  **Defendant P.O. HANKERSON** is sued in her individual and official capacities.

18.     Defendant   **P.O.   SUTHOM   UNGCHAROEN   (Shield   No.   26224)**

**("P.O. UNGCHAROEN")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint. Defendant **P.O. UNGCHAROEN** is sued in his individual and official capacities.

19.    Defendant **P.O. CRAIG BULLARD (Shield No. 28485) ("P.O. BULLARD")** was, and still is, at all times relevant herein, duly appointed and acting officers, agents, servants, and employees of New York City Police Department a municipal agency of Defendant **THE CITY OF NEW YORK** and of the 28th Precinct for incidents relevant to this Complaint.  Defendant **P.O. BULLARD** is sued in his individual and official capacities.

20.    Defendant **NEW YORK COUNTY ADA CAROLINA HOLDERNESS ("ADA HOLDERNESS")** was, and still is, at all times relevant herein, acting under color of state law in the course and scope of her duties and functions as officers, agents, servants, and employees of **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE,** was acting for, and on behalf of, and with the power and authority vested in her by **THE CITY OF NEW YORK AND NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE** and was otherwise performing and engaging in conduct incidental to the performance of her lawful functions in the course of her duties, including but not limited to, the investigative phases.  Defendant **ADA HOLDERNESS** is sued in her individual and official capacities.

21.    Defendants **A.D.A., and/or P.O. and/or CAPTAIN and/or SERGEANT "JOHN**

5

DOES" and/or C.O. JOHN/JANE DOES ("DOES")were, and still are, at all times

relevant herein, acting under color of state law in the course and scope of their duties

and functions as Officers, Agents, Assistant District Attorneys, Captains, Sergeants,

Servants, and Employees of Defendant **THE CITY OF NEW YORK,** were acting

for, and on behalf of, and with the power and authority vested in them by Defendants

**THE CITY OF NEW YORK** and New York City Police Department, New York

County District Attorney's Office, and New York City Department of Correction

(DOC) and were otherwise performing and engaging in conduct incidental to the

performance of their lawful functions in the course of their duties.  Defendant DOES

are sued in their individual and official capacities.[1]

22.    Defendants **THE CITY OF NEW YORK** and New York City Department of

Correction (DOC) owned, operated, managed and provided security to the premises,

appurtenances and fixtures at Riker's Island and Mid-South Hudson facilities.

23.    At all times relevant, Defendants were "personally involved" for purposes of liability

under § 1983 where they set the wheels of the constitutional depravation in motion,

regardless of whether they are "directly" involved.  *See,* Celestin v. City of

New York, 581 F.Supp.2d 420, 429 (E.D.N.Y. 2008) ("Personal involvement may

---

[1] Despite Plaintiff's due diligence, Plaintiff at this time is not in possession of all relevant names and identifying information of all Defendants personally involved or with personal knowledge during this decade of prosecution. This includes but is not limited to, the Captain of the N.Y. Supreme Court Officers, who falsely swore to the replacement complaint. The Officers that may or may not have directly participated in the civil rights violations and/ or held pertinent supervisory roles in this case could include, but would not be limited to a "P.O. INGRAM" (P.O. Pabon's partner at the time); "P.O. LUPERON" and/or other officers, whose names, shield numbers and tax IDs are in the exclusive possession of Defendants to be substituted during discovery.  Upon information and belief, ADA CAROLINE SERINO and ADA JUNG PARK may have participated in the investigation and preparation of the manufacturing of this case against Mr. Harris. However, this information is in the sole possession of Defendants and will be substituted, if it is determined that it is necessary to include these P.O.s, ADAs or other Does to be substituted with named defendants during discovery

be established by a showing of direct participation, meaning 'personal participation by one who has knowledge of the facts that rendered the conduct illegal or *indirect participation* such as *ordering* or *helping others* to do the unlawful acts.") (*emphasis added*). This may also include instances of supervisory liability.

## STATEMENT OF FACTS

### THE UNDERLYING INCIDENTS AND THE IMMEASURABLE AMOUNT OF POLICE MISCONDUCT

24.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

25.   The events which gave rise to this litigation began on or about September 12, 2011 and did not conclude until January 21, 2020.

26.   On September 12, 2011, Mr. Harris was arrested by Defendants, the officers employed by the New York City Police Department.

27.   At all times relevant to this complaint, Mr. Harris owned and resided in a Brownstone, located on 12 West 120th Street in the Harlem neighborhood of New York.

28.   Mr. Harris was a successful self-employed music producer (with famous musicians as clients, including but not limited to Wu-Tang Clan, Alicia Keys and Busta Rhymes, 50 Cent, etc) with no time in prison until this timeframe.

29.   On September 12, 2011, at approximately 3:00 P.M., Ms. Aisha Mitchell, an old acquaintance of Mr. Harris, came over to his Brownstone home.

30.   Ms. Mitchell proceeded to make false allegations against Mr. Harris, which was an obvious extortion scheme.

31.   Mr. Harris threw Ms. Mitchell out of his house and called to report this incident and his suspicions to his cousins, who are both NYPD officers employed by Defendants. His cousins advised him to lock his door and remain in his home.  He reasonably relied on this advice.

32.   At approximately 4:00pm on September 12, 2011, the arresting officer, Defendant **P.O. PABON** and several other police officers, including **P.O. "DOES"** broke down the door to Mr. Harris' brownstone, entered Mr. Harris' home and arrested Mr. Harris.

33.   Upon information and belief, the arrest was warrantless and devoid of any exigent circumstances.

34.   At the time the arrest was made, there was no ongoing emergency upon arrival that required the Officers to enter the home without a warrant.

35.   At no point in time did Mr. Harris resist arrest.

36.   Upon information and belief and during this warrantless arrest, Defendant **P.O. HANKERSON** arrived and mentioned that there was an assault of a woman reported earlier that day at the park across the street from Mr. Harris' residence.  The "woman from the park" then used an all-too-commonly used description (a description, which has been manipulated over time to demonize men of color in the community and has consistently haunted and criminalized black men throughout history) by reporting to **P.O. HANKERSON** that though she was not able to provide any identifying characteristics of her assailant, she could only confirm (albeit, stereotypically), that it was a "tall black man."

37.   Defendant **P.O. PABON** seized on this information to manipulate this sound bite as a

way to falsely and deceptively trump up the sexual assault charges against Mr. Harris.

38.     As such, the charges against Mr. Harris were then altered to include the totally unrelated assault incident, which allegedly occurred in the park.

39.     **P.O. PABON** falsely reported that the "woman from the park" had positively identified Mr. Harris when this was not true.

40.     This choice by **P.O. PABON** to falsely swear that the "woman from the park positively identified Mr. Harris, was made maliciously and intentionally resulting in Mr. Harris being arrested without probable cause and also constitutes a fabrication of evidence.

41.     Mr. Harris' home was searched without any valid reason or provocation, and valuable possession such as jewelry and money was stolen.

42.     On or about September 12, 2011, Defendant **P.O. PABON** applied for a Search Warrant for Mr. Harris's residence.

43.     Upon information and belief, this search warrant falsely swears that the reasonable cause to search Mr. Harris' home was based, in part, on a lie, that **P.O. PABON** had a conversation with Mr. Harris in his home, however there were no conversations by and between **P.O. PABON** and the Plaintiff.   **P.O. PABON** testified that Defendant **ADA HOLDERNESS** actually wrote his search warrant application for him and that she is responsible for this false material statement in it.   **P.O. PABON** also testified that had no idea his search warrant application contained this false material statement because he never read it since he trusted **ADA HOLDERNESS.**   Most importantly, defendant testified that he would never have signed his search warrant application if

9

he knew that it falsely stated the reasonable cause to search Mr. Harris this home was partly based on conversations he had with Mr. Harris.

44. This search warrant also falsely swears to the existence of "blood, semen" found in the home, and upon information and belief, not one scintilla of this alleged evidence was ever observed, found, located or retrieved from Mr. Harris' home. This alleged evidence did not exist.

45. Upon information and belief, Mr. Harris was taken directly to the 28th Precinct where he was placed in a holding cell.

46. Mr. Harris was transported to Bellevue Hospital to have a psychiatric evaluation because he was "refusing to speak to the police."

47. Upon information and belief, Mr. Harris was not transported to Central Booking until approximately 3:00am where he was fingerprinted, processed, photographed and taken to see the Judge the following day.

48. A Judge set bail in the amount of $250,000 based on the Defendant Officers false allegations.

49. Mr. Harris owned a multi-million dollar brownstone, and had adequate assets to make bail, which was made clear to the Court during the Prosecutions bail argument.

50. Following Mr. Harris' arraignment which was the last call on the calendar that night, Mr. Harris was directed to remain in the courtroom by **P.O. BULLARD** and other DOC and NY Court Officer staff defendants while his family was securing his bail payment.

51. The Correction Officers, the Court Staff, the Defense Attorney, and Plaintiff, all were

under the impression bail was being posted and the Plaintiff was being released from custody.

52. Defendant **P.O. BULLARD** and Defendant **CAPTAIN "DOE"** escorted Mr. Harris outside, by going through multiple locked gates and doors, which were unlocked by other officers.

53. Upon information and belief, Mr. Harris was escorted out through the back door, which was the same door he entered. Defendant **P.O. BULLARD** and Defendant **CAPTAIN "DOE"** and other officers were present when he exited. Surveillance video later produced to the Court during his criminal trial, was clearly doctored as indicated by the time code signature, to remove the fact that either a Captain of Corrections or Captain of NY Court Officers escorted Mr. Harris out of the Court building.

54. When Mr. Harris was released from Central Booking at approximately 2:00AM, he went back to his home, the place he was initially arrested. Mr. Harris walked into the front of his home while it was being guarded by officers who sat directly in the front of the building.

55. At approximately 5:00-6:00am, **P.O. UNGCHAROEN** was informed by his Superior to be on the lookout for the plaintiff because he had allegedly escaped, at which time **P.O. UNGCHAROEN** informed his Superior that the plaintiff was inside his home. It was at this point that **P.O. UNGCHAROEN** was instructed to affect and arrest of the Plaintiff.

56. Plaintiff heard **P.O. UNGCHAROEN** outside of his home, yelling and knocking on

his front door.  Upon information and belief, Mr. Harris went to the front door where **P.O. UNGCHAROEN** advised him that he was being rearrested on the charge of escaping. There were several other officers present.

57.  On or about Sept. 15, 2011, Mr. Harris was arraigned in criminal court on a felony complaint subscribed by **P.O. UNGCHAROEN**. Mr. Harris' and his arraignment attorney asserted on the record that he had not escaped but was rather told he was bailed out, and then escorted out of the building by a Captain in white shirt. Mr. Harris' arraignment attorney gave notice of his absolute right to testify before the grand jury, and stated on the record that if video footage could prove that he was escorted out of the building by an officer, then he could not be found guilty of escape. All of the foregoing statements in this count would later be removed from the record,

58.  Since **P.O. UNGCHAROEN.** arrest complaint cast doubt that Mr. Harris had ever escaped by stating that he was first observed walking right past the police who were sitting right in front of his home, and then used a key to enter his home on the ground lever and lock the door, where he remained until **P.O. UNGCHAROEN** was informed by his superior to be on the lookout for Mr. Harris, this complaint was illegally replaced with one written by Captain FARRELL OF THE NY Court Officers which only stated Mr. Harris was arrested climbing his backyard fence trying to gain access to his home.

59.  Due to this additional false felony complaint by the Defendant **CAPTAIN FARRELL** of the NY Court Officers, Defendant **ADA HOLDERNESS** was able to deny Mr. Harris his right to testify for both the sexual assault and escape and use the illegal

12

replacement escape complaint to present a more believable narrative to the grand jury. Since the new illegal replacement complaint now only stated that Mr. Harris was caught trying to gain access to his house by climbing the backyard fence. It would be entirely impossible for Defendant Captain Ferrell to do all of this on his own without conspiring with **ADA HOLDERNESS.**

60. Since Mr. Harris was never permitted to see or cross examine Captain Ferrell about his about his illegal replacement arrest complaint, Mr. Harris suspects that    Defendant **CAPTAIN FERRELL** is the same Captain who escorted him out of the Criminal Court Building and then had the video footage doctored to removed his actions in addition to writing his illegal replacement complaint.  Mr. Harris would never have been incarcerated while awaiting trial to prove his innocence if not for the false claim of escape,

61. At Mr. Harris's first arraignment in Supreme Court, the Honorable Judge Bartley lifted the remand off Mr. Harris, granting him bail. Judge Bartley referred to the indictment as "an exception" to the jurisdiction of the Supreme Court because Defendant Prosecutors had illegally consolidated 2 separately filed felony cases on her own discretion and without the exclusive consent and jurisdiction of the Supreme Court.

62. On the next Court date, While Mr. Harris was in the process of securing this new bail amount with his family, **ADA HOLDERNESS and/or ADA DOES** asked the Judge to revoke the bail order based on an unrelated August 3, 2011 arrest.  As a result, the Judge remanded Mr. Harris again, and he was unable to post any bail, and was forced to remain in jail during the pendency of these false charges.  The court minutes for this court date, Nov. 10, 2011, falsely state Plaintiffs own attorney requested his bail be

revoked.

### THE QUINTESSENTIAL RIKER'S ISLAND EXPERIENCE AS AN INNOCENT PRE- TRIAL DETAINEE, WHICH LIVED UP TO ITS HORRIFYING REPUTATION

63.  Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

64.  Plaintiff was incarcerated at Riker's Island for approximately four (4) years while awaiting his criminal trial, thus, Plaintiff maintained the status as a Pre-Trial Detainee for the totality of his incarceration.

65.  During Mr. Harris' time spent on Riker's Island, Plaintiff was subjected to multiple acts of violence by inmates, as well as subjected to extreme and severe psychological warfare, excessive force and many acts of verbal abuse and violence at the hands of Defendants- correction officers.

66.  Mr. Harris was battered, assaulted, and physically abused for the entirety of his incarceration. The officers' subsequent failures to act and failures to intervene ultimately increased the severity of his injuries by their refusal to intervene, their refusal to get him necessary medical attention, their deliberate indifference to his medical needs and denial of medical treatment throughout his time incarcerated while awaiting trial.

67.  Mr. Harris was mentally and emotionally abused for the duration of his incarceration by the Defendants in this case, Police Officers, Correction Officers and Assistant District Attorneys employed by the City of New York.

68.  This psychological abuse continued throughout the investigation and prosecution but,

also included many things within the walls of the prison such as refusing to allow him to get his haircuts, despite having the proper vouchers to do so; spreading false defamatory rumors to other inmates that Mr. Harris was a pedophile; refusing his requests to go to the Law Library; depriving him of calls and visits from his loved ones; preventing him from his daily exercise; never giving him the correct meals that supported his vegan diet; and otherwise mentally torturing him for the entirety of his time in prison awaiting trial.

69.    Mr. Harris was subjected to an excessive and unreasonable custodial detention and all association therewith, including but not limited to excessive time in Solitary Confinement (the "SHU" or the "box") based on falsely reported infractions.

70.    After Mr. Harris was able to successfully win some initial infraction hearings, corrupt correction officers began falsely claiming that Mr. Harris refused his hearings so that he could be found guilty in his absence without defending himself..

71.    Mr. Harris was ticketed with retaliatory infractions, which led to severe and unfair punishments (including but not limited to excessive time in solitary confinement), mostly stemming from false allegations only to be deprived of due process, refused his requests for what should have been mandatory hearings and otherwise deprived of many of the privileges afforded to inmates awaiting trial.

72.    Despite many of the retaliatory infractions ultimately being dismissed, the disciplinary dispositions and interim punishments had already caused immeasurable damage.

73.    For instance, upon information and belief, on or about October 14, 2011 (after serving punishments for other fabricated charges) while in West Facility, **C.O. "DOE"**, (who

may go by "C.O. Harris", Shield No. Unknown), called Mr. Harris out of his cell "to talk". Plaintiff followed the orders and was taken down a hall where there was an inmate waiting for him to strike him on the back of the head. **C.O. "DOE"** ("C.O. Harris") did not intervene or intercede, even more so, he set it up and /or looked on while it happened. This type of behavior by Correction Officers and the inability to manage this has now recently been held by Courts to be "tantamount to deliberate indifference" as reasoned by Hon. Justice April Newbauer of New York County Supreme Court.

74.  Following the Defendants' endorsed 'Fight Night' behavior, the officer proceeded to escort Mr. Harris back to his cell (denying Mr. Harris much needed medical attention), and to add insult to injury, wrote him a retaliatory infraction. Upon information and belief, on or about October 19, 2011, when Plaintiff reported for the disciplinary hearing, **C.O. DOE** ("C.O. Harris") was called on the phone by the Adjudication Captain who was overseeing the hearing. When the Captain asked C.O. "Harris" to explain the claim made by Plaintiff that he was "set up", C.O. "Harris" inexplicably hung up on the Adjudication Captain.  Upon information and belief, the bogus infraction was quickly dismissed.  However, the punishment for the infraction had already begun and Plaintiff was inexcusably suffering in solitary confinement from the date of the infraction through the date of the hearing.

75.  Upon information and belief, on or about February 9, 2012, Mr. Harris was the victim of another "set up" by the correction officers.

76.  Markedly, it was during one of these many assaults in the day room of Riker's Island

where the officers **C.O. "DOES"** (without warning), indiscriminately and gratuitously sprayed Mr. Harris with a chemical agent, (potentially MK9) and handcuffed Plaintiff leaving him unattended to for over 5-6 hours. The handcuffs were too tight, Mr. Harris pleaded and asked for the handcuffs to be loosened, and the officers ignored and/or denied all of Mr. Harris' requests and pleas. As a result, Mr. Harris' thumb/wrist was broken necessitating him to be in a cast up to his elbow for over eight (8) months. To date, he still has restricted range of motion in his thumb as well as intermittent pain.

77. During the time he was in a cast for the broken thumb/wrist, Mr. Harris' family member visited. The officer **C.O. "DOE"** inappropriately ordered Mr. Harris to remove his cast so that his broken thumb/wrist could be handcuffed. As a result, Mr. Harris was in excruciating pain. In response to Mr. Harris explaining he was in pain, the officer punched Mr. Harris in the face after he was handcuffed. Upon information and belief, the retaliatory infraction that stemmed from this incident was subsequently dismissed when Mr. Harris informed the Hearing Captain the video of incident would prove the officer **C.O. "DOE"** had falsely reported the incident.

78. Another example of abuse occurred while being housed in Mid-Hudson Forensic Psychiatric Center, Mr. Harris suffered a fractured skull from an inmate who was known to be a dangerous inmate and required to be escorted by guards at all times. With knowledge that the dangerous inmate was in the bathroom, and that it was not only foreseeable, but probable that whomever went into the bathroom would be attacked, the **C.O. "DOES"**, (including a "C.O. Johnson"), ordered Mr. Harris to go into the bathroom. As expected, the dangerous inmate lunged at Mr. Harris. Mr.

Harris was beaten, the blows which knocked out two(2) teeth in his mouth and resulted in a fractured skull and fractured orbital bone.

79.    Mr. Harris was eventually transported to Orange Regional Hospital where the doctors directed him to a trauma center and transferred him to Westchester Medical Center for emergency surgery.  The **C.O. "DOES"** escorts from Mid-Hudson refused to permit the necessary surgery.  With deliberate indifference, Mr. Harris was prevented from surgery and from follow-up visits to the doctor, which was contrary to the medical diagnoses and treatment plan.

**THE TRIAL OF 2015 AND THE REVELATION OF THE OVERWHELMING MOUNTAIN OF EXCULPATORY EVIDENCE**

80.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

81.    Upon information and belief, Defendants engaged in the destruction and falsification of evidence throughout the entirety of Mr. Harris' arrest, investigation, preparation for trial and throughout the course of the trial proceedings and reinvestigation following the acquittal and mistrial.

82.    The Defendant police officers swore to an accusatory instrument that contained false information and withheld material facts from the trial attorneys.

83.    The sexual assault complaint falsely stated and was sworn to by **P.O. PABON** that **P.O. PABON** was informed by **P.O. HANKERSON** that Mr. Harris was observed assaulting a second woman in front of his house ("the woman from the park").

84.    After failing to intercede and/or intervene throughout the entire investigatory phase of

this arrest, whereby permitting false reporting and deceptive practices by her fellow officers, **P.O. HANKERSON** testified under oath at both the pre-trial hearings and trial that she never told **P.O. PABON** that "the woman from the park" positively identified Mr. Harris or any perpetrator, for that matter.

85.     The Grand Jury proceedings were defective and mishandled in bad faith in that there was no lawful authorization to place an unrelated alleged misdemeanor offense within an unrelated felony complaint when it is not part of any felony transaction.

86.     Upon information and belief, **ADA HOLDERNESS** rushed to an indictment to satisfy CPL § 180.80, and by rushing, they violated CPL § 190.55.

87.     Defendants' withholding of material facts deviated from standard protocol and any standard of fairness or due process.

88.     The Defendants put forth many witnesses, relying solely on information provided to them with no further inquiry, when a reasonable person in their position would have done so. For example, the alleged victim (Ms. Mitchell) from the sexual assault case testified under oath at trial that she did not know Mr. Harris prior to that day.

89.     Upon information and belief and sometime in July of 2015, immediately before trial, the Defendant **ADA HOLDERNESS and/or ADAs PARK and SERINO** finally provide Mr. Harris with the New York City Medical Examiner's Reports.

90.     Dr. Kamnik, for the City of New York (the Department of Health and Mental Hygiene), was called as an expert witness as part of the People's case in chief and testified under oath that out of all of the DNA profiles which were obtained in the case, Derrick Harris was excluded as a source.

91.  Pursuant to Ms. Mitchell's initial claims (which were debunked well before the dismissal in 2020), which led to Mr. Harris' top charge in the indictment, the "sexual offense evidence" was collected as part of Ms. Mitchell's Rape Kit.

92.  The Rape Kit contained the following: oral swabs and smear, a buccal specimen (which is a swab of the inside of Ms. Mitchell's mouth/cheek), dried secretions from her neck, inner thighs, perianal, and smear, vulva swabs and smear and vaginal swabs and smear.

93.  Contrary to Ms. Mitchell's claims, Dr. Kamnik testified under oath that "no semen was found on the blue jeans, blue T-shirt or brown shirt and no blood was found on the blue jeans or the blue T-shirt."

94.  Dr. Kamnik also testified at trial that no DNA, and no saliva was found on any of the alleged victim's tested clothes, which shattered the alleged victim's claims of spitting semen and all over herself.

95.  Egregiously, though the Defendants were in possession of this Medical Examiner Report as early as September 26, 2011, they nevertheless continued the prosecution of Mr. Harris for years leading up to this trial of 2015 without finishing the forensic tests requested for by both the NYPD and the Medical Examiners Office and despite access to conclusive evidence of innocence (and a clear dissipation of any potential probable cause).

96.  Upon information and belief, Defendants, including but not limited to **ADA HOLDERNESS** and **ADA DOES** argued at trial that further processing of the Rape Kit, to include testing for the lubricants, specifically KY Jelly and Johnson's Baby Oil

*could not be done*.  This was a lie because their own expert witness Dr. Kamnick testified that it could be done and he had also requested for the tests to be performed in his report, just like the Police had requested for the same tests as part of their official investigation.   Therefore subsequently after the partial acquittal and mistrial, Mr. Harris was able to have them done by an outside laboratory after the trial, which resulted in further proof of his innocence.

97.   Defendants, including but not limited to **ADA HOLDERNESS** and **ADAs PARK and SERINO** as part of their continued investigation, opted *not* to test for the presence of lubricants because they already had conclusive evidence excluding Mr. Harris from the Rape Kit and any further testing would have only substantiated Mr. Harris' claim of innocence and made it impossible to continue his unnecessary  harassment.

98.   In August of 2015, the Jury returned a partial verdict where Mr. Harris was found Not Guilty on the top charge of sexual assault and other top charges but deadlocked on the charge of escape and the lower charges.

99.   While on Riker's Island awaiting trial, the Plaintiff was prohibited from viewing the video of this alleged "escape".  When Mr. Harris explained this to the Judge, His Honor allowed Mr. Harris to view the video while in Court with his advisory counsel present.

100.   While viewing the video, Mr. Harris' advisory counsel noticed that the video had been doctored to remove many minutes missing in several places throughout the tape and upon information and belief, the Judge stated on the  record that he believed the video looked 'fishy' because there would be no way to get out of the Court building without

21

it being captured on video, thus speculating that this video was doctored or edited.

101.   Upon information and belief, as a result of this partial not-guilty verdict (and despite
indication that the escape charge was going to be *sua sponte* dismissed), Defendants
fought against Plaintiff's conditional release and as such, Plaintiff was remanded to
custody in Riker's Island.

102.   After a few additional Court appearances, where the Prosecutor was allegedly re-
evaluating the evidence against Plaintiff, a Judge finally lifted the remand status and
set bail at $500,000.

103.   Over the People's objections, Mr. Harris made bail and was finally released from
unlawful incarceration in November of 2015.

**PLAINTIFF IS FORCED TO CONTINUE ZEALOUSLY "PROVING HIS
INNOCENCE" FOR AN ADDITIONAL FOUR YEARS NOTWITHSTANDING
BELIGERENT RESISTANCE FROM DEFENDANTS**

104.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs
with the same force and effect as though fully stated herein.

105.   As of Plaintiff's long and overdue release in November of 2015, Plaintiff had been
found Not Guilty by a jury of his peers on the charge of sexual assault of Ms.
Mitchell; the Judge had dismissed the escape charges citing its opinion that the video
had been doctored; and only a couple of misdemeanor charges remained.

106.   At this juncture, Ms. Mitchell's claim had long been discredited; the officers had
contradicted one another on the witness stand; evidence had been clearly manipulated;
police documents had been fabricated; false sworn statements had been revealed;
officers had lied; the top charges had already been dismissed; and the officer had

already explicitly stated that the "woman from the park" never identified Mr. Harris as her assailant.   Once the Defendants, specifically **ADA HOLDERNESS** and **DOES** learned that the "woman from the park" substantially changed her initial identification statement from not being able to positively identify her assailant to now stating it was Mr. Harris who she casually knew because he lived right next door to where she worked,  Defendants knew that she was prohibited from testifying about identification pursuant to CPL 60.25 Subd.2 – but, disregarded this and continued their tunnel-vision prosecution.

107.   In this moment, the decision to not retry Mr. Harris would have been the correct choice, however when Defendants again, were presented with a choice to do the right thing, they chose not to do so.

108.   Mr. Harris paid for lab testing and expert analysis due to the Defendants' failure to test and/or failure to not reveal the test results, which proved there was no presence of semen or saliva on Ms. Mitchell's clothes, no presence of KY Jelly in Ms. Mitchell's body, no evidence of Plaintiff's DNA.

109.   Mr. Harris obtained the phone records between Mr. Harris and Ms. Mitchell proving the prior friendship and easily discrediting Ms. Mitchell.

110.   Upon information and belief, the State had already tested the rape kit; but because the results did not conform to the Defendants' plan to manufacture proof to put an innocent man in jail, they omitted this material evidence during the investigation and intentionally blocked it from coming in at the trial.

111.   Upon information and belief, on or about December 6, 2018, Mr. Samuel David, Esq.

of the New York County District Attorney's Office dismissed all remaining counts of

the indictment but, chose to keep one solitary count: the unrelated charge.   This

unrelated misdemeanor charge should have been dismissed retroactively, however

Defendants bullishly charged forward.

112.   It was not until December 19, 2019 (more than another full year later!) that the final

charge on the indictment was dismissed on December 19, 2019.

113.   The Defendants maliciously deprived him of his right to liberty and maliciously

prosecuted him for four (4) more years before finally deciding to end this once and for

all on January 21, 2020, when they moved to dismiss the case in its entirety.

## ADDITIONAL DAMAGES AND DETAILS ENCOMPASSING THE PROMISING LIFE THAT WAS PAINSTAKINGLY STRIPPED FROM PLAINTIFF

114.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs

with the same force and effect as though fully stated herein.

115.   There is no question that this ordeal has greatly caused, initiated and then

continuously aggravated and exacerbated his emotional damages, and has otherwise

affected him mentally, emotionally and psychologically.

116.   Additionally, and as a further result of this ordeal, which was instituted and

maintained by Defendants, Plaintiff Mr. Harris has suffered substantial actual

damages, including and not limited to, legal fees and court costs, expenses of

defending the prosecution and subsequent motions and court appearances, prolonged

confinement, loss of use of his property, including his Brownstone, and other property

never returned to him, extreme emotional distress, aggravation, humiliation, loss of

enjoyment of life, loss of reputation, trauma, further fear of arrest and other incidental and consequential damages, which were reasonably foreseeable by Defendants.

117. Specifically and upon information and belief, as a result of the constant and consistent physical, mental, verbal abuse while incarcerated, Mr. Harris has suffered and will continue to suffer from many conditions, injuries, ailments, etc., including but not limited to: Major Depressive Disorder, Post-Traumatic Stress Disorder, Anxiety, Trouble Sleeping/Sleeplessness/Insomnia, Flashbacks, Adjustment Disorder, Mixed Anxiety with Depressed Mood, Headaches, Nightmares, a Traumatic Brain Injury (TBI), a Fractured Skull, a Fractured Orbital Bone, a Dislocated Shoulder, Fractured Thumb/Wrist, Reduced Range of Motion in Thumb, Tinnitus/Ringing in ear, Memory Loss and Memory Issues,

Problems with Writing, Blurred Vision, Fungus, Acne and Acne Scarring, Lower Back injuries, Neck injuries; and many other injuries for the rest of his life.

118. Upon information and belief, Plaintiff has paid approximately $150,000.00 in legal fees, court costs and expenses for testing of evidence and investigating his own case.

119. Upon information and belief, the Harlem Brownstone that Mr. Harris owned and restored in the historic district was sold while he was incarcerated.

120. Upon information and belief, as a result of this near decade of accusations, many of Mr. Harris' familial relationships and friendships were irreparably destroyed.

121. Upon information and belief, as a result of this near decade of humiliation, Mr. Harris suffered damage to his reputation, loss of earnings and loss of future opportunities.

122. Upon information and belief, as a result of this near decade of embarrassment, Mr.

Harris was defamed and that defamation continues to the present day as many of the published articles have never been corrected or removed.

123.    As a result of this wrongful, unlawful and unjustified imprisonment, Mr. Harris suffered serious and severe health conditions.

124.    Upon information and belief, Mr. Harris was placed in solitary confinement more than thirty (30) times.

125.    Upon information and belief, Plaintiff has suffered severe and significant personal injuries and was otherwise damaged.

126.    Plaintiff attended numerous court appearances during his time on Riker's Island and for many years subsequent to his release from incarceration.

127.    Plaintiff was wrongfully incarcerated for more than four (4) years, not including the additional four years of an imprisoned mind throughout the time after trial while awaiting his fate.

128.    Upon information and belief, Mr. Harris sustained and will continue to sustain physical, mental and emotional trauma, humiliation, economic and monetary loss as well as loss of enjoyment of life for the rest of his life.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION
AND 42 U.S.C. § 1983 BY THE CITY OF NEW YORK; POLICE OFFICERS
PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;
ADA, and/or P.O. and/or CAPTAIN and/or SERGEANT "JOHN/JANE DOES"**

129.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with  the same force and effect as though fully stated herein.

130.    At all times material to this complaint, Defendant **THE  CITY  OF  NEW  YORK**

acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/SERGEANT and/or C.O. "DOES"** had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

131.    At all times material to this complaint, Defendant **THE CITY OF NEW YORK** acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; B U L L A R D ; ADA HOLDERNESS, AND   A D A ,   P.O.  /CAPTAIN/SERGEANT and/or C.O.   "DOES"** had in effect and/or *defacto* policies, practices, customs and usages of failing to properly train, screen, supervise and discipline employees and police officers, and of failing to inform the individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants.  The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

132.    Defendant **THE CITY OF NEW YORK** acting through its police department, Department of Corrections and New York County District Attorney's Office and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS** and **ADA, P.O. and/or CAPTAIN and/or SERGEANT  and/or C.O. "JOHN DOES"** being aware that such lack of training, screening, supervision, and discipline leads to improper conduct, acted with deliberate

indifference in failing to establish a program of effective training, screening, supervision and discipline. Defendant **THE CITY OF NEW YORK** being aware that the persistent and substantial risk of improper arrest, search, seizure, detention and prosecution of persons based upon insufficient or incorrect information, and effective training, screening, supervision and discipline would lessen the likelihood of such occurrences. There are recurrent circumstances which involve such potential danger to the constitutional rights of citizens, more specifically Plaintiff and which are officially tolerated by Defendant **THE CITY OF NEW YORK**. Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/damages alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

133.   By the **CITY OF NEW YORK** through the District Attorney's conduct and actions in arresting, searching, imprisoning, failing to intercede on behalf of Plaintiff and in failing to protect him from the unjustified and unconstitutional treatment he received at the hands of Defendants **ADA HOLDERNESS** and **ADA DOES** acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of his acts, caused injury and damage in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

134.    In this case, there was fabrication of evidence during the investigative phase. **ADA HOLDERNESS** and **ADA DOES** took it a step further in that material omissions were knowingly made, which constituted further falsification of evidence.    By fabricating evidence in the "investigative role", it was reasonably foreseeable that the evidence would be used in the grand jury.

135.    Upon information and belief, there was a pattern of Brady violations in this case.

136.    Such policies, practices, customs or usages were a direct and proximate cause of the conduct alleged herein and otherwise a direct and proximate cause of the harm/ damages alleged herein, in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

137.    The Defendants denied Plaintiff of his right to liberty by basing this denial of liberty on false evidence.

138.    The defendants denied Plaintiff of his right to liberty when they changed the initial accusatory instrument by adding the felony escape charge, which was later dismissed for insufficient evidence.

139.    The investigating officials in this case fabricated evidence, which was likely to influence a jury's decision, forwarded that information to prosecutors and as a result, Mr. Harris suffered a deprivation of liberty.

140.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SECOND CAUSE OF ACTION
### FAILURE TO INTERVENE

141.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

142.   Defendants were under the duty of safeguarding the public and ensuring the appropriate execution of their roles.

143.   Plaintiff duly relied on Defendants' **POLICE OFFICERS'** fulfillment of their policing duties.

144.   Plaintiff duly relied on Defendants **NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE'S** fulfillment of their prosecutorial duties.

145.   Plaintiff duly relied on Defendants **CORRECTION OFFICERS'** fulfillment of their correctional duties.

146.   Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in their presence.

147.   At the time, Defendants were observing and aware of the wrongful acts against Plaintiff.

148.   At the time, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in depraved and deliberate indifference to Plaintiff's well-being.

149.   Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

150.   Defendants had an affirmative duty to intervene when Plaintiff's constitutional rights were being violated in Defendants' presence by knowingly falsifying evidence, observing others lie under oath, observing others making material misstatements of facts and/or omitting necessary facts, preventing exculpatory evidence from the trial, continuing to prosecute despite the dissipation of probable cause to arrest and continued prosecution of Plaintiff, failing to prevent Plaintiff from being assaulted, battered, beaten and otherwise attacked, permitting retaliatory infractions and otherwise violating Plaintiff's constitutional rights in Defendants' presence.

151.   Although Defendant P.O. HANKERSON helped save Mr. Harris from being wrongfully convicted during trial when she testified that P.O. PABON had lied in his arrest complaint to establish probable cause, it still took her 4 years to speak up.  This clearly constitutes as a failure to intervene.

152.   Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

153.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

**AS AND FOR A THIRD CAUSE OF ACTION**
**MALICIOUS PROSECUTION UNDER THE UNITED STATES
CONSTITUTION and 42 U.S.C. § 1983 AND UNDER NEW YORK STATE**

31

**CLAIMS**

154.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

155.    Post arraignment deprivation of liberty implicates malicious prosecution. *See,* Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995).

156.    Defendant **P.O. PABON** knowingly committed material perjury in his arrest complaint by falsely stating Defendant **P.O. HANKERSON** had informed him the Plaintiff was also positively identified for the separate and unrelated alleged Misdemeanor Assault crime.

157.    It would take 4 years before **P.O. HANKERSON** would finally testify that she never informed Defendant Pabon that the Plaintiff had assaulted another woman.  Defendant **P.O. HANKERSON** further testified that she told Defendant Pabon the victim who she spoke to could not positively identify her assailant, and therefore the assault victim could only give **P.O. HANKERSON** a general description of "A Tall Blackman".

158.    Defendant **P.O. PABON** falsely arrested Plaintiff for an alleged crime with no probable cause to believe that he had committed any such crime.    Defendant **P.O. PABON** knew the victim of this unrelated misdemeanor assault could not positively identify her perp, which is why he deliberately chose to use an impermissibly suggestive tactic to maliciously accuse the Plaintiff .

159.    The victim of this unrelated alleged misdemeanor assault worked literally right next-door to the Plaintiff's Brownstone, and prior to this alleged incident they would

casually speak to each other.  This is a fact that the victim tried desperately to avoid admitting during trial, because **P.O. HANKERSON**  testified that the victim could not positively identify her assailant, and also made no mention that he lives right next-door to where she works at.

160.  Defendants **P.O. PABON** and **ADA HOLDERNESS** are both responsible for the Blatant Material Perjury committed in **P.O. PABON's** Search Warrant Application. *"The Second Circuit has held that Prosecutors do not have absolute immunity from liability for making false statements when he provided a "Certification for Determination of Probable Cause" to secure a warrant."  Flagler v. Trainor, 663 F.3d 543 (2d Cir. 2011).*

161.  Defendant **P.O. PABON's** Search Warrant Application falsely states that it was "based in part" on conversations Defendant **P.O. PABON** had with the Plaintiff**,** yet no such conversations ever occurred.   This false  material statement deceptively suggested to the Warrant Court that the Plaintiff had somehow incriminated himself to Defendant **P.O. PABON,** and therefore violated the Plaintiff's Constitutional Right against self incrimination with a lie.

162.  This false sworn material statement is not protected by a prosecutors quasi judicial immunity or duty to advocate. Defendant **ADA HOLDERNESS** created **P.O. PABON's** search warrant application after interviewing Defendant **P.O. PABON** and deliberately avoiding going over the application with him when she is required to do so.

163.  While it is not unusual for a prosecutor to write a warrant application for a police

officer, it is unusual for a prosecutor to add a false material statement, and then deliberately avoid going over the application with the officer so that they never realize the search warrant application contains material perjury. *"Absolute immunity is also not available "for the act of giving legal advice to the police in the investigative phase of a criminal case, or for assisting in a search and seizure or arrest." See. Simon v. City of N.Y. 27 F.3d 167 (2d Cir. 2013)*

164. When Defendant **P.O. PABON** was confronted about this material perjury, he appeared to be genuinely shocked and unaware that it was in his Search Warrant Application. Defendant **P.O. PABON's** first response was, "My search warrant application does not say it was "based" on conversations I had with the Plaintiff," because the Plaintiff never spoke to me or any of my colleagues."

165. After Defendant **P.O. PABON** was shown a signed copy of his Warrant Application, he read it and emphatically declared the prosecutor **ADA HOLDERNESS** had written it, not him.  He stated the ADA had interviewed him and then written his search warrant application for him, and that he had not actually read it before signing it because he had trusted the Prosecutor **(ADA HOLDERNESS).**  When **P.O. PABON** was asked would he have signed his application had he known it contained a false material statement, he responded, "No", he would not have signed it had he known it falsely stated it that was partly based on conversations he had with the Plaintiff.

166. Defendant Prosecutors worked desperately to keep the Plaintiff imprisoned on Rikers Island for over 4 years, even though within a few months after Plaintiff's arrest they had test results from the Medical Examiner's Office which indicated the alleged victim had

lied about the entire alleged incident.   Post arraignment deprivation of liberty implicates malicious prosecution.  *See,* Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir. 1995).

167.   Defendant Prosecutors **ADA HOLDERNESS, ADA JUNG PARK,** and **ADA SERINO** all worked together to Fabricate Evidence which they used against the Plaintiff at his trial, and in order to carry out their scheme they also had to violate very important "administrative duties" which they were required to do.   A scheme to fabricate evidence falls outside of the prosecutorial functions protected by absolute immunity.  *(See. Zahrey v. Coffey 221 F.3d 342 (2d Cir. 2000)*   Prosecutors are only granted qualified immunity for administrative duties.  (*See. Simon v. City of N.Y. 727 F.3d 167 (2d Cir. 2013)*

168.   Defendant Prosecutors pretended they had never performed an important fingerprint test which was requested for in writing by the NYPD, so that they could fraudulently use evidence against the Plaintiff during trial which they already knew tended to prove his innocence.   This deceptive scheme also prevented the Plaintiff from being fully acquitted at trial and contributed to a mistrial with only a partial acquittal.

169.   What makes this fabrication of evidence even worse, is that all Prosecutors know the **CPL 240.20 Discovery; upon demand of defendant,** prohibits them from commencing a trial without performing and providing to the Defense all of the Forensic tests which were requested for in writing by the NYPD and Medical Examiners Office since they intended to call forensic biologist Dr. Kamnik as an expert witness.

170.   In January or February 2011, Dr. Kamnik sent 2 forensic reports to **ADA**

**HOLDERNESS** who was supervising the police investigation because the SVD is understaffed and no Special Victims Detective was assigned to oversee the testing for Mr. Harris case.

171.    1 of the 2 tests sent by Dr. Kamnik to **ADA HOLDERNESS** indicated that the alleged victim had lied about the alleged forced oral sodomy.  The other report related to alleged sexual abuse and an alleged attempted rape accusation, since Mr. Harris was alleged to have put a lubricant on his hand and forcibly insert it into the alleged victim's vagina. This second report indicated that Mr. Harris' DNA wasn't present on any of the Vaginal Swabs.  However, Dr. Kamnik indicted that he was unable to finish testing the swabs for lubricant because the Medical Examiners Office now only tests for biological substances and no longer tested for chemical substances.

172.    In Dr. Kamnik's report relating to the alleged sexual abuse and attempted rape allegation which he sent to **ADA HOLDERNESS,**  he expressed the importance of making sure **ADA HOLDERNESS** sent the Vaginal Swabs to an independent lab to finish the testing for lubricant so that there would be "conclusive probative evidence" as to whether or not Mr. Harris inserted his hand into the alleged victim's vagina.  Yet **ADA HOLDERNESS** still refused to finish the testing only so her and the other **ADA Defendants** could continue playing with Mr. Harris' life for 8 years when they knew he was innocent after only of few month of being arrested

173.    After the Partial Verdict Mistrial where the inexperienced Plaintiff represented himself and was acquitted of the most serious charges against him, he demanded that these test be performed by the Prosecution.   Yet, Defendants **ADA PARK, and ADA SERINO**

still refused to do their required "Administrative Duties", and were aggressively opposed to the Plaintiff having these test done himself. Obviously the defendants aggressively opposed the Plaintiff performing the tests himself because they knew he would discover the Prosecutors had already performed latent fingerprint tests on the wine glass.

174. Despite desperate opposition from Defendants **ADA PARK and ADA SERINO,** the Supreme Court trial judge who presided over this case from the beginning declared the Plaintiff had a basic right to have these tests performed pursuant to CPL 240.20 Discovery; upon demand of defendant.   Unfortunately however, and to add insult to injury Defendants were able to persuade the trial judge to order that the plaintiff pay for the fingerprint test and even the remaining tests that were part of the official Rape Kit investigation.

175. As soon as Go Evidence Laboratories received the wine glass for latent print testing, they immediately contacted the Plaintiff and asked him what kind of games are being played here, because the wine glass they received had already been processed and tested for fingerprints.

176. All Circuit Courts agree that the tests to determine whether a Prosecutor was acting in an advocatory role while excising discretion to withhold evidence or the tests thereof from a criminal defendant, is whether said evidence is exculpatory and the prosecutor was required to turn over the evidence.   *(See. Warney v. Monroe County 587 F.3d 113 (2d Cir. 2009)*

177. There was never a "Special Victims Detective" assigned from the NYPD to oversee the

it's own investigation, and therefore Defendant Prosecutors were able to assume complete control over the investigation.

178.   Throughout the course of this arrest, investigation, prosecution and continued "reinvestigation", Defendant Prosecutors  in this case were deliberately deceptive thus triggering a malicious prosecution claim.

179.   Defendants failed to relay pertinent information to the prosecution (despite having knowledge of the pertinent information).

180.   Defendants misled, coerced and/or failed to properly inform the prosecution.  leading the assigned district attorney to believe that plaintiff had allegedly assaulted two women.

181.   Defendants failed to investigate leads and failed to turn over Giglio and/or Brady information which clearly would have proven plaintiff's innocence.

182.   Defendants either failed to process, failed to timely process, or alternatively, processed and then concealed the results of the rape kit, which would have contributed to proving plaintiff's innocence. [2]

183.   Defendants failed to properly check the information that was provided to them from the alleged victim, despite having an opportunity to do so.  This failure to make a further inquiry, when a reasonable person would have, is evidence of lack of probable cause. Colon v. City of New York, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983), *see also* Boose v. City of Rochester, 71 A.D.2d 59, 421

---

[2] There were allegedly 350 rape kits unprocessed, submitted since November 2017 and as of 2020, Police in New York failed to process nearly 90% of rape kits performed on alleged victims of sexual assault of over the last six months and were still processing kits from three years ago

N.Y.S.2d 740, 748–749 (4th Dep't 1979).

184. By the actions described above, Defendants caused Plaintiff to be maliciously prosecuted without any probable cause, without reasonable suspicion, without any proper claims, without any right or authority to do so, illegally and with malice.

185. Defendants' actions with regards to the institution and maintenance of the criminal prosecution were committed wantonly and with a reckless disregard for whether a reasonable ground of suspicion existed, supported by the circumstances, which would lead a reasonably prudent person to believe that Plaintiff had committed a crime.

186. By the actions described above, Defendants initiated a prosecution against Plaintiff.

187. By the action described above, the deprivation of liberty was effected pursuant to legal process and in perversion of proper legal procedures.

188. Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; BULLARD; and P.O. and/or CAPTAIN and/or SERGEANT "DOES"** arrested and issued legal process in order to obtain collateral objectives outside the legitimate ends of the legal process and intimidating Plaintiff for their personal interest and further to prevent Plaintiff from disclosing the aforementioned evidence of their misconduct.

189. Defendants **P.O. PABON, P.O. HANKERSON and P.O. UNGCHAROEN; BULLARD; and P.O. and/or CAPTAIN and/or SERGEANT "DOES"** provided false information to the prosecutors and also created false information which likely would influence a jury's decision and forwarded that false information to the prosecutors.

190. Defendants **P.O. PABON, P.O. HANKERSON**, **P.O. UNGCHAROEN, and P.O. BULLARD**; and P.O. **and/or CAPTAIN and/or SERGEANT "DOES"** "failed to make a full and complete statement of facts to the District Attorneys, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith" which satisfies the initiation element of malicious prosecution.

191. Upon information and belief, Defendants **P.O. PABON, P.O. HANKERSON P.O. UNGCHAROEN; P.O. BULLARD, ADA HOLDERNESS and ADA, P.O. and/or CAPTAIN and/or SERGEANT "DOES";** procured a Grand Jury indictment by fraud, perjury and/or bad faith. Thus, there is a question of fact at this stage in the litigation as to the propriety of the indictment.

192. Defendant **ADA HOLDERNESS** and **ADA DOES** continued the prosecution knowing that the evidence was insufficient and by the actions described above, Defendants lacked probable cause to believe the proceeding could succeed.

193. Defendant **ADA HOLDERNESS** and **ADA PARK and SERINO** acted in an investigative capacity when they stopped the forensic testing of the rape kit and the vanginal swabs for the alleged Sexual Abuse and Attempted Rape. This testing would have shown that Mr. Harris never forcibly put his hand in her vagina, contrary to Ms. Mitchell's contention. **ADA HOLDERNESS** and **ADA PARK and SERINO** did this with malice because they knew the testing would result in an exoneration of the Plaintiff for both the allegations of Attempted Rape and Sexual Abuse.

194. Defendant **ADA HOLDERNESS** and **ADA PARK and SERINO** also refused, deferred, or delayed turning over the only forensic testing done on the rape kit, until

moments before trial.

195.   Defendants acted with intent to do harm to Plaintiff without excuse or justification.

196.   Defendants false accusations were done intentionally and maliciously to mislead the Criminal Court.

197.   The prosecution was ultimately terminated in favor of Plaintiff.

198.   Defendants, acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to and/or a reckless disregard for the natural and probable consequences of his acts, caused injury and damage due to this malicious prosecution in violation of Plaintiff's due process clause and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

199.   A timely Notice of Claim was filed with the City of New York.

200.   Even the requirement of attending court appearances in connection with prosecution either for the underlying sexual assault and escape felony charges or any subsequent fabricated infractions constitute deprivation of liberty under the 4th Amendment. *See* Murphy v. Lynn, 118 F.3d 938, 945 (2d Cir. 1997)("The question, therefore, is whether the requirement that he attend court appointments constituted a 'seizure' within the meaning of the Fourth Amendment. We conclude that they did.")

201.   The defendants created false information and forwarded that information to prosecutors.

202.   Mr. Harris overcomes the presumption of probable cause arising from his indictment with evidence establishing that police witnesses did not make complete and full statements of facts either to grand jury or to district attorney, that they misrepresented

or falsified evidence, and that they have withheld evidence or otherwise acted in bad faith.

203.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR AN FOURTH CAUSE OF ACTION
## DEPRIVATION OF CONSTITUTIONAL RIGHT TO A FAIR TRIAL

204.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

205.   The illegal and improper investigation created by Defendants established false information likely to influence a jury's decision and said information was forwarded to the prosecution.

206.   The Defendants engaged in an unlawful, unreasonable, and arbitrary investigation, which lead to Plaintiff's arrest.

207.   The defendants deviated from standard protocols.  Thus, Mr. Harris's Constitutional Right to a Fair Trial was violated and the harm occasioned by this violation is an action for damages under 42 USC § 1983.  Here, a reasonable jury could find, based on the evidence, that defendants, under the color of state law, violated the Plaintiff's clearly established constitutional rights by conspiring to fabricate the story, which was almost certain to influence a jury's verdict.

208.   Defendant **PO PABON** testified falsely in the Grand Jury and at Trial that "the witness in the park" positively described and identified Plaintiff as being the one that

assaulted her, when that was in fact not true.

209.   The Defendant Police Officers also lied in the official police paperwork regarding witness descriptions, witness identifications, and the observations surrounding the arrest for bail jumping.

210.   That the plaintiff did not know and could not have known that the investigation was illegal and/or improper until the favorable termination of the initial proceedings.

211.   The fabrication of evidence by the named police officers and unnamed police officers and forwarding of such evidence to prosecutors in this case was inherently harmful, regardless of whether there existed additional and untainted evidence.

212.   The plaintiff was subjected to deprivation of Constitutional Right to a Fair Trial in violation of his rights as guaranteed under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 USC § 1983.

213.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered a loss of quality and/or enjoyment of life, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS
**(INCLUDING UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT & DELIBERATE INDIFFERENCE TO CONDITIONS OF CONFINEMENT FABRICATION OF EVIDENCE & CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS)**

214.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

215. Defendants individually and collectively are liable pursuant to 42 U.S.C. § 1983 for abuses against Plaintiff that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

216. Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of Article 1, § 5 of the New York State Constitution.

217. Defendants individually and collectively are liable for abuses against Plaintiff that shock the conscience in violation of New York law, rules and regulations.

218. Defendants are liable for depriving Mr. Harris of liberty without due process of law in violation of U.S. Constitution, amend. XIV, § 1, cl. 3.

219. Defendants are liable for fabricating evidence, under the Sixth Amendment to the United States Constitution.

220. Defendants are liable for fabricating evidence, which is an independent harm redressable under § 1983 and brings this claim challenging his criminal pretrial detention as unsupported by probable cause, even after the start of legal process (i.e. after the Judge's probable cause determination).  Manuel v. City of Joliet, 137 S. Ct. 911, 914 (2017).  In this case, the Judge's probable cause determination was predicated on the police officer's false statements, and thus, Plaintiff's challenge is valid.

221. Defendants subjected Plaintiff to criminal charges on the basis of false evidence that was deliberately fabricated by the defendants.

222. Defendants did, with malice, compose and swear out a false criminal complaint against Plaintiff and institute the criminal case against Plaintiff and that there was

intent to do harm without justification. The defendants deliberately fabricated evidence that was used to criminally charge and prosecute the plaintiff.

223. Plaintiff was deprived of his property, namely his home, without probable cause.

224. Defendants systematically engaged in fabrication of evidence, false swearing, mishandling of evidence while in custody, withholding exculpatory evidence from prosecutors, failure to disclose evidence inconsistent with the plaintiff's guilt, false reporting of facts in the arresting documents, falsely reported facts in the warrants, maliciously concealing material evidence and maliciously prosecuting this case even after any and all probable cause had dissipated.

225. Evidence fabrication in this case served to both improperly charge and/or arrest him as well as unfairly try him and continue prosecution even past the partial not guilty verdict. It involves aspects of both due process violations.

226. In this case, the police officers turned over fabricated evidence to the prosecutor, and in addition to a <u>Brady</u> violation, can be redressed as a deprivation of liberty on the basis of false and fabricated evidence.

227. Officers swore out a false complaint, false warrant and withheld crucial information from the prosecutors and then the prosecutors in turn, once they learned or had reason to believe that the documents were not facially sufficient or that otherwise further inquiries needed to be made to continue the investigation, the prosecutors also violated Mr. Harris' due process rights.

228. Because no reasonably competent officer could disagree that the officer(s) could not properly rely on evidence, he knows to be false, qualified immunity cannot attach.

Additionally, there is no immunity attached to those who falsify affidavits and fabricate evidence. The inconsistencies in the arresting documents and the warrants are more than a "mere discrepancy".

229.    Defendants acted in concert to fabricate the charges. Defendants acted in their own personal interest, and not in the interest of the New York City Police Department or in the interest of the New York County District Attorney's Office in fabricating the charges against the Plaintiff. *See* Lewis v. Havernack, No. 12 Civ. 0031, 2013 WL 1294606, at *13 (N.D.N.Y. March 28, 2013).

230.    All the defendants, acting with each other individually and on behalf of and under the auspices and control of the City, and under color of law, conspired to injure plaintiff in his person and property and deprive plaintiff of his First, Fourth, Fifth and Fourteenth Amendment rights.

231.    The defendants jointly caused such deprivation of rights by acting in concert to disseminate false information concerning the plaintiff and by disseminating false information that lacked any reasonable basis or probable cause to support it that the plaintiff committed a crime, and/ or to charge him with a crime, and/ or to arrest him.

232.    This Court has long recognized that knowingly using false evidence to deprive a defendant of liberty is "inconsistent with the rudimentary demands of justice." Mooney v.Holohan, 294 U.S. 103, 112 (1935).

233.    Even in the event that it is determined that the Fourth Amendment's low bar for bringing charges was met in this case, that does not authorize decisions to prosecute or continue detaining Mr. Harris based on lies or fake evidence, which are independently

wrongful regardless of whether untainted evidence met the general probable-cause

standard.  In this case, Mr. Harris would not have been criminally charged,

prosecuted, or otherwise deprived of his liberty but for the fabricated evidence, and

that corruption violated his  due process rights.

234.   Plaintiff's rights pursuant to the Due Process Clause were violated when the use of

excessive force amounted to punishment while he was a pretrial detainee.   The

substantive right of due process includes the right to be free from excessive force.  Mr.

Harris was deprived of this right when he was brutally beaten, set up, and otherwise

subjected to acts of violence and punishment while incarcerated. The Defendants

**C.O. "DOES"** inflicted unnecessary and wanton pain and suffering upon Mr. Harris

and subjected Mr. Harris to conditions of detention that  amount to punishment.

235.   The Defendants **C.O. "DOES"** acted improperly to impose the conditions and

recklessly failed to act with reasonable care to mitigate the risk that the conditions

posed to Mr. Harris even though the Defendants-Correction Officers knew or should

have known that the conditions complained of posed an excessive risk to Mr. Harris'

health and/or safety.

236.   The defendants' deliberate manufacture of false evidence both in the courtroom and

within the prison were in direct contravention to the Due Process Clause.

237.   The defendants had no reasonable cause or rational decision-making when they

continued to prosecute Plaintiff after the evidence was processed and the results

exonerated  Plaintiff.

238.   Mr. Harris was a person detained prior to conviction, thus a pre-trial detainee innocent

by law, of the underlying charges for the entirety of his incarceration and throughout his prolonged prosecution.

239.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

240.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

241.    Defendants negligently caused injuries and otherwise damaged Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

242.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific physical, psychological and emotional injuries and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, TRAINING & INADEQUATE SUPERVISION UNDER NEW YORK STATE LAW AND § 1983

243.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

244. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to manage, control, and supervise the Defendants **POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS; AND ADA, P.O. /CAPTAIN/SERGEANT, C.O "DOES".**

245. Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) negligently hired, screened, retained, disciplined, supervised and trained **Defendants POLICE OFFICERS PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS; AND ADA, P.O. /CAPTAIN/SERGEANT and/or CO "DOES".**

246. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to hire qualified and sufficient personnel in connection with the operation, management control, teaching at and/or supervision of Defendants**.**

247. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to train their employees so as to enable them to properly maintain order and control.

248. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to promulgate proper and/or adequate rules and regulations governing the proper care, guidance and/or supervision to be provided and rendered by those agents, servants, officers and/or employees hired as New York City Police Officers, Correction Officers

and Assistant District Attorneys.

249. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to provide a safe and proper environment.

250. At all times herein mentioned, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) owed Plaintiff a duty to prevent from being prosecuted without probable cause.

251. At all times relevant hereto, Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and/or said Defendants' agents, servants, employees and/or licensees were, jointly, severally and concurrently, negligent, careless and reckless in individually and collectively breaching each and every duty owed to Plaintiff.

252. The aforesaid occurrence was caused wholly and solely by reason of the negligence of Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and/or said Defendants' agents, servants, employees and/or licensees, without any fault or negligence on the part of Plaintiff contributing thereto.

253. Defendant **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS,** and **ADA, P.O. /CAPTAIN/ SERGEANT and/or CO "DOES"** had *defacto* to policies, practices, customs and usage, which were a direct and proximate cause of the unconstitutional conduct alleged herein.

254.   The facts presented by Plaintiff present allegations in support of this cause of action in that it is abundantly clear that the individual defendants' conduct during this experience was in part, due to negligence in training, supervision and indeed retention; and that the City of New York (through the NYPD, DOC and NY County District Attorney's Office)'s hiring processes were utterly deficient.

255.   Had the employers used reasonable care in the hiring and retention of the employees that affected this matter, Mr. Harris may have been spared the foreseeable harm that he incurred at all phases of this incident.

256.   In this case, the employers placed their employees in positions to cause foreseeable harm to Mr. Harris.

257.   The municipality's failure to properly train, hire, retain and/or supervise its police officers, correction officers, Assistant District Attorneys and employed agents, servants and employees, which "evidences a deliberate indifference to the rights of its inhabitants." *See,* Henry-Lee v. City of New York, 746 F.Supp.2d 546, 566 (SDNY 2010).

258.   Because there was a failure to train in this case, which amounted to deliberate indifference to the rights of Mr. Harris throughout all phases of this experience, Mr. Harris rights were violated in the context of § 1983 and maintains a claim for liability in said context.

259.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was

otherwise damaged.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL HARM

260.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

261.   Defendants **THE CITY OF NEW YORK** and through the individual Defendants negligently caused emotional distress and damage to Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of emotional injury to Plaintiff and violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws, rules and regulations of the City of New York.

262.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

## AS AND FOR A NINTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL HARM via STATE LAW AND § 1983

263.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as thought fully stated herein.

264.   Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/ SERGEANT and/or C.O. "DOES"** knowingly, unreasonably, and maliciously sought

to disturb Plaintiff by their individual and collective outrageous conduct.

265. In this case, there has been extreme outrageous conduct by Defendants with the intent to cause (and/or a disregard of a substantial probability of causing severe emotional distress, a causal connection between this conduct and the emotional damage Mr. Harris has experienced and severe emotional distress, which has been documented by professionals.

266. A timely Notice of Claim was filed.

267. This conduct includes, without being limited to, unreasonably and forcefully arresting him, improperly detaining him; subjecting him to multiple intimidation tactics, swearing out a false complaint, fabricating evidence, withholding crucial information from the prosecution, failing to test or otherwise processing and concealing the DNA and rape kit evidence, maintaining the prosecution despite all of the instances when the probable cause dissipated, threatening him, mishandling his property, and many other additional ways in which they violated his statutory and common law rights as guaranteed by the laws in the U.S. Constitution, the Constitution of the State of New York, and under the Charter, laws, rules and regulations of the City of New York to be expounded upon in the course of discovery.

268. Defendants **THE CITY OF NEW YORK** (through the NYPD, DOC and NY County District Attorney's Office) and through Defendants **P.O. PABON; HANKERSON; UNGCHAROEN; BULLARD; ADA HOLDERNESS;** and **ADA, P.O. /CAPTAIN/ SERGEANT and/or C.O. "DOES"** have caused Plaintiff major depressive disorder, post-traumatic stress disorder, severe distress, humiliation, anxiety, fear, sleeplessness

and severe distress, among many other severe emotional and psychological damages.

269.   Courts have held that continuous and coercive harassment *can* establish an IIED cause of action.

270.   Upon information and belief, Defendants committed multiple acts against Plaintiff, which invaded his interests and inflicted injuries upon his throughout all stages of investigation, the continuous detention, the hearings, trials and prolonged waiting period prior to deciding not to re-try; which cumulatively amounted to intentional infliction of emotional harm and/ or distress for a near decade of Mr. Harris' life.

271.   The emotional harm and/or distress continues to the present day.

272.   The conduct transcended the bounds of human decency. The conduct amounted to more than the emotional harm that is encompassed within the other claims.

273.   While certain of plaintiffs' allegations would not, by themselves, necessarily rise to the level of extremity and outrageousness to support an IIED claim, the defendants' total alleged course of conduct does. "Collectively, these actions are sufficiently extreme and outrageous to state a claim for IIED under New York law." Mejia v City of New York, 119 F Supp 2d 232, 284-87 (EDNY 2000).

274.   **THE CITY OF NEW YORK** is responsible based on the theory of *respondeat superior.*

275.   As a result of the foregoing, Plaintiff was deprived of his liberty, suffered loss of quality and/or enjoyment of life, physical injury, economic injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all Defendants:

a.  Compensatory damages;

b.  Punitive damages;

c.  Declaratory relief;

d.  Injunctive relief;

e.  The convening and empaneling of a jury to consider the merits of the claims herein;

f.  Costs and interest and Attorneys' fees;

g.  Such other further relief as this court may deem appropriate and equitable.

DATED:      New York, New York
            July 03, 2023

Respectfully submitted,

Derrick R. Harris
Pro Se Plaintiff